FILED
January 27, 2017 2:51 PM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: pjw / _____ SCANNED BY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

[UNDER SEAL]

**1:17-cv-95**
Paul L. Maloney,
United States District Judge

Plaintiffs,

v.

[UNDER SEAL]

Defendants.

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

FILED UNDER SEAL
PURSUANT TO 31 U.S.C.
§ 3730 (b)(2)

ORIGINAL COMPLAINT
FOR VIOLATION OF
FEDERAL FALSE CLAIMS
ACT AND VARIOUS
STATE FALSE CLAIMS
ACTS

DO NOT PUT ON PACER

DO NOT PLACE IN PRESS
BOX

JURY TRIAL DEMANDED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| *ex rel.* Adam LaFerriere, | § | |
| STATE OF CALIFORNIA | § | |
| *ex rel.* Adam LaFerriere, | § | |
| STATE OF CONNECTICUT | § | |
| *ex rel.* Adam LaFerriere, | § | |
| STATE OF DELAWARE | § | |
| *ex rel.* Adam LaFerriere, | § | |
| STATE OF FLORIDA | § | CIVIL NO: |
| *ex rel.* Adam LaFerriere, | § | |
| STATE OF GEORGIA | § | HON. |
| *ex rel.* Adam LaFerriere, | § | |
| STATE OF ILLINOIS | § | |
| *ex rel.* Adam LaFerriere, | § | FILED UNDER SEAL |
| STATE OF INDIANA | § | PURSUANT TO 31 U.S.C. |
| *ex rel.* Adam LaFerriere, | § | § 3730 (b)(2) |
| STATE OF IOWA | § | |
| *ex rel.* Adam LaFerriere, | § | |
| STATE OF LOUISIANA | § | ORIGINAL COMPLAINT |
| *ex rel.* Adam LaFerriere, | § | FOR VIOLATION OF |
| STATE OF MARYLAND | § | FEDERAL FALSE CLAIMS |
| *ex rel.* Adam LaFerriere, | § | ACT AND VARIOUS |
| COMMONWEALTH OF | § | STATE FALSE CLAIMS |
| MASSACHUSETTS | § | ACTS |
| *ex rel.* Adam LaFerriere, | § | |
| STATE OF MICHIGAN | § | |
| *ex rel.* Adam LaFerriere, | § | DO NOT PUT ON PACER |
| STATE OF MINNESOTA | § | |
| *ex rel.* Adam LaFerriere, | § | DO NOT PLACE IN PRESS |
| STATE OF NEW JERSEY | § | BOX |
| *ex rel.* Adam LaFerriere, | § | |
| STATE OF NEW YORK | § | JURY TRIAL DEMANDED |
| *ex rel.* Adam LaFerriere, | § | |
| STATE OF NORTH CAROLINA | § | |
| *ex rel.* Adam LaFerriere, | § | |
| STATE OF RHODE ISLAND | § | |
| *ex rel.* Adam LaFerriere, | § | |

STATE OF TENNESSEE                        §
*ex rel.* Adam LaFerriere,                §
STATE OF TEXAS                            §
*ex rel.* Adam LaFerriere,                §
COMMONWEALTH OF VIRGINIA                   §
*ex rel.* Adam LaFerriere,                §
STATE OF WASHINGTON                       §
*ex rel.* Adam LaFerriere,                §
DOE STATES 1 – 21 *ex rel.*               §
Adam LaFerriere,                          §
                                          §
     Plaintiffs,  §
                                          §
v.                                        §
                                          §
ENCORE REHABILITATION SERVICES,           §
LLC,                                      §
ENCORE PREAKNESS, INC.,                   §
AUTUMN WOODS RESIDENTIAL                  §
HEALTH CARE FACILITY, LLC,                §
THE MCGUIRE GROUP, INC.,                  §
ELIZABETH WOLF,                           §
MEDILODGE GROUP, INC.,                    §
PRESTIGE HEALTHCARE I, LLC,               §
NORTHPOINTE SENIOR SERVICES,              §
LLC,                                      §
CAPITAL AREA OPCO, LLC                    §
(MEDILODGE OF CAPITAL AREA),              §
CASS CITY OPCO, LLC (MEDILODGE            §
OF CASS CITY),                            §
CLARE OPCO, LLC (MEDILODGE OF             §
CLARE),                                   §
FRANKENMUTH OPCO, LLC                     §
(MEDILODGE OF FRANKENMUTH),               §
GRAND BLANC OPCO, LLC                     §
(MEDILODGE OF GRAND BLANC),               §
ML OF GRAND BLANC, LLC                    §
(MEDILODGE OF GRAND BLANC,                §
LLC),                                     §
HOLLAND OPCO, LLC (MEDILODGE              §

OF HOLLAND),                                        §
KALAMAZOO OPCO, LLC                                 §
(MEDILODGE OF KALAMAZOO),                           §
LANSING OPCO, LLC (MEDILODGE OF                     §
LANSING),                                           §
MARSHALL OPCO, LLC (MEDILODGE                       §
OF MARSHALL),                                       §
MIDLAND OPCO, LLC (MEDILODGE                        §
OF MIDLAND),                                        §
MT. PLEASANT OPCO, LLC                              §
(MEDILODGE OF MT. PLEASANT),                        §
OKEMOS OPCO, LLC (MEDILODGE OF                      §
OKEMOS),                                            §
PORTAGE OPCO, LLC (MEDILODGE                        §
OF PORTAGE),                                        §
WESTWOOD OPCO, LLC (MEDILODGE                       §
OF WESTWOOD),                                       §
WYOMING OPCO, LLC (MEDILODGE                        §
OF WYOMING),                                        §
HILLMAN OPCO, LLC (MEDILODGE                        §
OF HILLMAN),                                        §
ML OF HILLMAN, LLC (MEDILODGE                       §
OF HILLMAN),                                        §
MEDILODGE OF HOWELL, INC. ,                         §
MILFORD OPCO, LLC (MEDILODGE OF                     §
MILFORD),                                           §
ML OF MILFORD, LLC (MEDILODGE                       §
OF MILFORD),                                        §
MONROE OPCO, LLC (MEDILODGE OF                      §
MONROE),                                            §
ML OF MONROE, LLC (MEDILODGE                        §
OF MONROE),                                         §
MEDILODGE OF MONTROSE, INC.,                        §
PLYMOUTH OPCO, LLC (MEDILODGE                       §
OF PLYMOUTH),                                       §
ML OF PLYMOUTH, INC.,                               §
PORT HURON OPCO, LLC                                §
(MEDILODGE OF PORT HURON),                          §
ML OF PORT HURON, LLC                               §
(MEDILODGE OF PORT HURON),                          §

RICHMOND OPCO, LLC (MEDILODGE §
OF RICHMOND), §
ML OF RICHMOND, INC., §
MEDILODGE OF ROCHESTER HILLS, §
INC., §
SOUTHFIELD OPCO, LLC §
(MEDILODGE OF SOUTHFIELD), §
ML OF SOUTHFIELD, INC., §
ST. CLAIR OPCO, LLC (MEDILODGE §
OF ST. CLAIR), §
ML OF ST. CLAIR, INC., §
STERLING OPCO, LLC (MEDILODGE §
OF STERLING), §
ML OF STERLING, LLC, §
STERLING HEIGHTS OPCO, LLC §
(MEDILODGE OF STERLING §
HEIGHTS), §
ML OF STERLING HEIGHTS, INC., §
TAYLOR OPCO, LLC (MEDILODGE OF §
TAYLOR), §
ML OF TAYLOR, INC., §
MEDILODGE OF YALE, INC., §
EAST LANSING OPCO, LLC §
(MEDILODGE OF CAMPUS AREA), §
NORTH LANSING OPCO, LLC §
(MEDILODGE OF EAST LANSING), §
FARMINGTON OPCO, LLC §
(MEDILODGE OF FARMINGTON), §
HOWELL OPCO, LLC (MEDILODGE OF §
LIVINGSTON), §
ARK OPCO GROUP, LLC, §
B&Y HEALTHCARE S CORP., §
CANARY OPCO GROUP, LLC, §
CENTURY OPCO GROUP, LLC, §
CODY HEALTHCARE S CORP., §
FIFTEENINONE OPCO GROUP, LLC, §
MIKO ENTERPRISES, INC. (METRON §
INTEGRATED HEALTH SYSTEMS), §
MIKO HOLDINGS, INC., §
BELDING CHRISTIAN NURSING §

HOME, INC. (METRON OF BELDING), §
GREENRIDGE NURSING CENTER, INC. §
(METRON OF BIG RAPIDS), §
CEDAR CARE CENTER, INC. (METRON §
OF CEDAR SPRINGS), §
CASCADE CARE CENTER, INC. §
(METRON OF FOREST HILLS), §
GREENVILLE CARE CENTER, INC. §
(METRON OF GREENVILLE), §
GLENWOOD CHRISTIAN NURSING §
HOME, INC. (METRON OF LAMONT), §
NEXCARE HEALTH SYSTEMS, LLC, §
NEXCARE HOLDINGS, LLC, §
BAY SHORES NURSING CENTER, LLC §
(BAY SHORES SENIOR CARE AND §
REHAB CENTER), §
DIMONDALE NURSING CARE §
CENTER, LLC, §
DURAND SENIOR CARE & REHAB §
CENTER, LLC, §
EVERGREEN MANOR SENIOR CARE §
CENTRE, LLC (EVERGREEN SENIOR §
CARE AND REHAB CENTER), §
FAIRLANE SENIOR CARE AND REHAB §
CENTER, LLC, §
FAITH HAVEN SENIOR CARE CENTRE, §
LLC, §
TARTAN HEALTH CARE §
CORPORATION (FISHER SENIOR CARE §
AND REHAB CENTER), §
CHAPLAINS, INC. (FOUR CHAPLAINS §
NURSING CARE CENTER), §
HOLT SENIOR CARE AND REHAB §
CENTER, LLC, §
CHELSEA HEALTH CENTRE, LLC §
(LAHSER HILLS CARE CENTRE), §
LAKEPOINTE SENIOR CARE AND §
REHAB CENTER, LLC, §
OAKPOINTE SENIOR CARE AND §
REHAB CENTER, LLC, §

SAGINAW SENIOR CARE AND REHAB §
CENTER, LLC §
SCHNEPP, INC. (SCHNEPP HEALTH §
CARE CENTER), §
SOUTH LYON SENIOR CARE AND §
REHAB CENTER, LLC, §
WEST OAKS SENIOR CARE AND §
REHAB CENTER, LLC, §
OLYMPIA GROUP, LLC, §
MOROUN NURSING CENTER OF §
DETROIT, LLC (AMBASSADOR §
NURSING AND REHABILITATION §
CENTRE), §
FATHER MURRAY NURSING AND §
REHABILITATION CENTRE, LLC, §
DETROIT NURSING CENTER, LLC §
(IMPERIAL NURSING AND §
REHABILITATION CENTRE), §
PARK NURSING CENTER OF TAYLOR, §
LLC (REGENCY NURSING AND §
REHABILITATION CENTRE), §
COLONIAL HEALTH CARE CENTER, §
LLC (ST. JOSEPH'S NURSING AND §
REHABILITATION CENTRE), §
WESTLAND NURSING AND §
REHABILITATION CENTRE, LLC, §
JONAH BRUCK, §
LEONARD WEISS, §
WELLBRIDGE GROUP, INC., §
WELLBRIDGE OF BRIGHTON, LLC, §
WELLBRIDGE OF FENTON, LLC, §
WELLBRIDGE OF NOVI, LLC, §
WELLBRIDGE OF PINCKNEY, LLC, §
WELLBRIDGE OF ROCHESTER HILLS, §
LLC, §
WELLBRIDGE OF ROMEO, LLC, §
APPLEWOOD NURSING CENTER, INC., §
SOUTH HILLS, LLC (BOULEVARD §
HEALTH CENTER), §
BOULEVARD MANOR, LLC, §

DOUGLAS INVESTMENTS &                    §
ASSOCIATES, LLC (GRACE OF                §
DOUGLAS),                                §
HEATHER HILLS NURSING, LLC               §
(HEATHER HILLS CARE CENTER),             §
CRG LYNWOOD, LLC (LYNWOOD                 §
MANOR HEALTHCARE CENTER),                §
RHEMA-BATTLE CREEK OPERATING,            §
LLC (MANOR OF BATTLE CREEK               §
SKILLED NURSING AND                      §
REHABILITATION CENTER),                  §
RIVERIDGE INVESTMENTS &                  §
ASSOCIATES, LLC (RIVERIDGE
REHABILITATION AND HEALTHCARE
CENTER),
ADVANTAGE MANAGEMENT GROUP,
INC. (SAMARITAN MANOR),

      Defendants.

## **RELATOR ADAM LAFERRIERE'S ORIGINAL COMPLAINT**

# TABLE OF CONTENTS

I.   **Introduction to Case** ...................................................................... 1

II.  **Jurisdiction and Venue** ................................................................ 6

III. **Original Source** ........................................................................... 6

IV.  **Introduction to Government Plaintiffs** ...................................... 7

V.   **Introduction to Defendants** ........................................................ 8

    A.   Encore Defendants............................................................... 8

    B.   Autumn Woods Defendants............................................... 10

    C.   MediLodge and Prestige Healthcare Defendants .............. 11

    D.   Metron Defendants ........................................................... 32

    E.   Nexcare Defendants........................................................... 35

    F.   Olympia Group Defendants............................................... 42

    G.   WellBridge Defendants. .................................................... 46

    H.   Other Facility Defendants................................................. 48

VI.  **Respondeat Superior and Vicarious Liability** ......................... 52

    A.   Encore Defendants............................................................. 52

    B.   Autumn Woods Defendants............................................... 52

    C.   MediLodge Defendants ..................................................... 53

    D.   Metron Defendants ........................................................... 54

    E.   Nexcare Defendants........................................................... 54

F.    Olympia Group Defendants ................................................. 55

G.    Wellbridge Defendants ....................................................... 55

H.    Other Facility Defendants .................................................. 56

VII.    **Introduction to Relator Adam LaFerriere** ............................. 57

VIII.    **Statutory Background** .................................................. 60

A.    Medicare ............................................................................ 60

1.    Medicare Part A ......................................................... 62

a.    Medicare Part A Coverage of SNF Rehabilitation
Therapy ..................................................................... 62

b.    Medicare Part A Reimbursement for SNF
Rehabilitation Therapy .................................................. 67

c.    Medicare Part A Claims for Payment ........................... 71

2.    Medicare Part B ......................................................... 75

3.    Medicare Cost Report Certifications ......................... 78

B.    Medicaid ............................................................................ 78

1.    Overview of the Medicaid Program .......................... 78

2.    Medicaid Reimbursement for Skilled Nursing Care ............... 79

3.    Medicaid Certifications ............................................. 80

4.    Medicaid Reimbursement Methodologies ............... 87

a.    States Utilizing a Case-Mix System ............................. 89

b.    States Without a Case-Mix Reimbursement

System ......................................................................... 96

    C.     TRICARE ............................................................ 101

**IX.**    **Defendants' Schemes to Defraud the Government**................ 103

    A.     The Encore Defendants Knowingly Pushed Therapists to Provide Medically Unreasonable and Unnecessary Services........... 103

          1.     Encore set unreasonably high "productivity" goals at the corporate level and threatened therapists with disciplinary action if they failed to meet them ...................... 103

          2.     The Encore Defendants and SNF Defendants presumptively placed patients into the highest RUG level to increase reimbursement .................................................... 104

          3.     Encore manipulated and "ramped" minutes during the look-back period to recertify patients at the highest RUG level and increase reimbursement .......................................... 105

          4.     The Encore Defendants and SNF Defendants forced patients to participate in therapy and refused to discharge them even when contrary to therapists' recommendations .... 106

          5.     The Defendants billed Medicare Part B for medically unnecessary services .............................................................. 107

    B.     Facilities Serviced by Encore Billed a Disproportionate Amount of Skilled Nursing Patients at the Ultra High Level ......................... 108

    C.     Defendants Submitted Claims for Medically Unreasonable and Unnecessary Services ..................................................... 109

          1.     An Encore TPM ignored a physician's therapy "hold" order and forced a patient, who was actively dying, to endure "therapy".................................................................... 109

          2.     Defendants subjected a patient to therapy despite weak

vital signs ............................................................... 111

3. Defendants billed Medicare for therapy the day a patient died ............................................................... 113

4. Defendants provided medically unnecessary and unreasonable services to a patient in comfort care ................ 115

5. Defendants billed Medicare for medically unnecessary and unreasonable services for a patient unable to participate in therapy .......................................... 116

6. Defendants billed Medicare for a patient's therapy, even though the patient showed no potential for improvement and was a candidate for hospice services .............................. 117

X. **Actionable Conduct by Defendants** .......................................... 118

A. False Claims Act .......................................................... 118

1. Applicable Law ...................................................... 118

2. Defendants' Violations of the False Claims Act .................... 120

a. Presentation of False Claims (31 U.S.C. § 3729(a)(1)(A)) ............................................ 120

b. Making or Using False Records or Statements to Cause Claims to be Paid (31 U.S.C. § 3729(a)(1)(B)) ............................................ 122

c. Conspiracy to Defraud the Government (31 U.S.C. 3729(a)(1)(C)) ........................................... 124

XI. **Causes of Action** ..................................................... 125

A. Count I – False Claims (31 U.S.C. § 3729(a)(1)(A)) ............... 125

B.      Count II – False Records or Statements (31 U.S.C. §

        3729(a)(1)(B)) ..................................................................... 127

C.      Count III – Conspiracy (31 U.S.C. § 3729(a)(1)(C)) ..................... 129

D.      Count IV – California False Claims Act ............................................ 132

E.      Count V – Connecticut False Claims Act ......................................... 136

F.      Count VI – Delaware False Claims and Reporting Act ................... 140

G.      Count VII – Florida False Claims Act .............................................. 145

H.      Count VIII – Georgia State False Medicaid Claims Act ................. 149

I.      Count IX – Illinois False Claims Act ............................................... 153

J.      Count X – Indiana Medicaid False Claims and Whistleblower
        Protection Act ..................................................................................... 157

K.      Count XI – Iowa False Claims Act ................................................... 162

L.      Count XII – Lousiana Medical Assistance Programs Integrity

        Law ....................................................................................................... 166

M.      Count XIII – Maryland False Health Claims Act ............................ 171

N.      Count XIV – Massachusetts False Claims Act ................................ 175

O.      Count XV – Michigan Medicaid False Claims Act ......................... 179

P.      Count XVI – Minnesota False Claims Act ....................................... 184

Q.      Count XVII – New Jersey False Claims Act .................................... 188

R.      Count XVIII – New York False Claims Act .................................... 192

S.      Count XIX – North Carolina False Claims Act ............................... 196

T.   Count XX – Rhode Island State False Claims Act ............................. 201

U.   Count XXI – Tennessee Medicaid False Claims Act ....................... 205

V.   Count XXII – Texas Medicaid Fraud Prevention Act ..................... 209

W.   Count XXIII – Virginia Fraud Against Taxpayers Act ................... 214

X.   Count XIV – Washington State Medicaid Fraud False Claims
     Act ............................................................................................... 218

Y.   Count XXV – Common Fund Relief ............................................... 223

XII.  **Demand for Jury Trial** ..................................................................... 224

XIII. **Documentary Evidence** ............................................................................ 224

1.     On behalf of the United States of America, the States of California, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, New Jersey, New York, North Carolina, Rhode Island, Tennessee, Texas, Washington, the Commonwealths of Massachusetts and Virginia, and Doe States 1 - 21 ("Government Plaintiffs"), and on his own behalf, Plaintiff/Relator Adam LaFerriere ("LaFerriere" or "Relator") brings this action pursuant to the federal False Claims Act (FCA), 31 U.S.C. § 3729-3732, and the false claims act statutes of the above-captioned States. Relator seeks to recover all damages, penalties, and other remedies established by the federal and state false claims acts on behalf of the Government Plaintiffs and himself. Relator submitted a voluntary Pre-filing Disclosure Statement to the United States and the above-captioned States on January 13, 2017, prior to filing this action. Relator would respectfully show the following:

## I.   INTRODUCTION TO CASE

1.     "I must know if the guest is NOT going to tolerate 75 min each day by therapy. We can always ramp up the time and that is much better than missing the 7 day look back period." Relator Adam LaFerriere, a speech-language pathologist working for Encore Rehabilitation ("Encore"), heard this directive from Jody Seal, an Encore Therapy Program Manager, and heard other directives like these from supervisors on a daily basis. During his time working at multiple nursing facilities

1

serviced by Encore, including Autumn Woods and MediLodge of Sterling Heights, LaFerriere saw Encore engage in conduct that defrauded state and federal health care programs.

2.      Encore's corporate hierarchy is structured to fraudulently maximize revenue in violation of state and federal law and at the expense of patient care. Encore's management exerts tremendous pressure on therapists to achieve financial outcomes, requiring physical, occupational, and speech therapists to bill 90% of the time they spend inside a facility each day and threatening employees with disciplinary action if they did not meet this goal.

3.      Encore's supervisors consist of Therapy Program Managers (TPMs) who communicate daily with nursing facility Minimum Data Set (MDS) coordinators to assure optimal "financial outcomes" for residents receiving therapy.[1] Encore's Regional Vice Presidents visit facilities frequently to assist with day-to-day clinical and fiscal operations.[2] Encore also assists facilities with "census support" and facility marketing efforts. Encore's TPMs and therapists work on site at facilities and assist with initial assessments of therapy patients, as well as plans of care for residents.

4.      When assessing patients' medical needs, Encore's physical and occupational therapists and speech-language pathologists were told to ask

---

[1] *On-site Program Manager*, ENCORE REHABILITATION SERVICES, http://encorerehabilitation.net/services/on-site-
[2] *The Encore Advantage*, ENCORE REHABILITATION SERVICES, http://encorerehabilitation.net/about-us/encore-advantage.

themselves whether patients would be able to "tolerate" multiple lengthy therapy sessions on a daily basis, not what services patients would benefit from and actually needed. Patients were presumptively placed in the highest therapy reimbursement level.

5.     Relator and other therapists were directed to provide treatment that was neither medically necessary nor reasonable, including speech therapy to patients who were actively dying. Encore management instructed therapists to manipulate records to increase payments from Medicare and Medicaid by providing excessive and medically unnecessary therapy toward the end of a patient's seven-day look-back period. Relator and others were also instructed to pad the minutes provided to patients, thus billing for services that were not provided.

6.     During his time working at multiple facilities LaFerriere saw employees forcing patients in comfort care[3] and in need of hospice services to endure therapy, sometimes just days or hours before they died, patients with advanced Alzheimer's and dementia coerced into therapy, manipulation of records to increase reimbursement, and group therapy billed as individual therapy.

---

[3] Comfort care is "care that helps or soothes a patient who is dying." *See* NATIONAL INSTITUTE OF AGING, END OF LIFE, HELPING WITH COMFORT CARE (2016), available at https://www.nia.nih.gov/health/publication/end-life-helping-comfort-and-care/providing-comfort-end-life. It is generally a precursor to a patient receiving hospice services, which requires a certification that the patient will likely expire within six months. 42 C.F.R. § 418.22.

7.    Encore and the nursing facilities also engaged in the illegal practice of retaining patients in facilities after they should have been discharged. A therapist's recommendation that a patient be discharged from therapy was met with harsh scrutiny, and some Encore TPMs ordered the continuation of therapy despite these recommendations in order to satisfy corporate demands and directives.

8.    The Encore Defendants did not act alone. The Skilled Nursing Facility Defendants ("SNF Defendants") worked together with Encore and focused on capturing as much money as possible, rather than providing appropriate and necessary care to patients. For example, Encore's therapists were instructed to enlist the help of facility staff when patients declined therapy in an effort to coerce the patient into participating in therapy.

9.    Encore's arrangement with the SNF Defendants incentivized billing for more therapy than what was medically necessary or provided; the amount of Encore's payments from the SNF Defendants was contingent on the amount of therapy minutes billed and/or the severity of the patients treated. Billing for more therapy than what was medically necessary or provided also benefitted the SNF Defendants by increasing Medicare Part A revenue.

10.    Encore also has financial incentive for inappropriate and unethical treatment of Part B patients. Relator, based on personal observation, believes that some of Encore's contracts were structured so that all reimbursement from

Medicare Part B went to Encore. Encore required therapists to maintain a certain percentage of Part B patients, and Encore TPMs reviewed files of patients who had Part B coverage and instructed therapists, including LaFerriere, to provide therapy to those patients. LaFerriere also witnessed supervisors instructing physical and occupational therapists to meet the "team goal" of billing 3 – 4 CPT codes to Medicare Part B for each visit, a blind directive given without regard to specific patient needs.

11.    The Encore Defendants provided the medically unnecessary therapy to the SNF Defendants' residents and received payments from the SNF Defendants. The SNF Defendants likewise benefitted from the provision of unnecessary treatment by receiving higher payments from Medicare and Medicaid than they would have received had patients only received medically necessary treatment.

12.    From at least 2010 to the present, Defendants knowingly submitted or caused to be submitted false claims to the Medicare, Medicaid, and TRICARE programs for medically unreasonable and unnecessary therapy services, knowingly submitted or caused to be submitted false claims to the Medicare, Medicaid, and TRICARE programs for services not provided, and used, or caused the use of, false records and statements to support those false claims. Defendants conspired in effecting their scheme.

## II.   JURISDICTION AND VENUE

13.   Jurisdiction and venue are proper in the Western District of Michigan pursuant to the False Claims Act (31 U.S.C. § 3732(a)), because Relator's claims seek remedies on behalf of the United States for multiple violations of 31 U.S.C. § 3729 in the United States by Defendants, some of which occurred in the Western District of Michigan. Defendants engage in business in the Western District of Michigan and are subject to general and specific personal jurisdiction pursuant to 31 U.S.C. § 3732(a) in that the claims for relief in this action are brought on behalf of the United States for multiple violations of 31 U.S.C. §3729. Pendent jurisdiction is also proper over Relator's state claims under 18 U.S.C. § 3732 and 28 U.S.C. § 1367.

## III.   ORIGINAL SOURCE

14.   There are no bars to recovery under 31 U.S.C. § 3730(e), and, or in the alternative, Relator is an original source as defined therein. Relator has direct and independent knowledge of the information on which the allegations are based. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions and has provided this information to the United States and the States of California, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, New

Jersey, New York, North Carolina, Rhode Island, Tennessee, Texas, Washington, and the Commonwealths of Massachusetts and Virginia prior to filing this Original Complaint by serving a voluntary Pre-filing Disclosure Statement detailing Relator LaFerriere's discovery and investigation of Defendants' fraudulent schemes on January 13, 2017.

15.     Relator is also submitting an Original Disclosure Statement contemporaneously with the filing of this Original Complaint, disclosing to the United States and the Attorney Generals of the States of California, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, New Jersey, New York, North Carolina, Rhode Island, Tennessee, Texas, Washington, and the Commonwealths of Massachusetts and Virginia all material evidence and information related to his Original Complaint.

## IV.   INTRODUCTION TO GOVERNMENT PLAINTIFFS

16.    The Government Plaintiffs in this lawsuit are the United States of America, the States of California, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, New Jersey, New York, North Carolina, Rhode Island, Tennessee, Washington, the Commonwealths of Massachusetts and Virginia, and Doe States 1-21.

17.    Plaintiff Doe States 1-21 include the states that subsequent to the initiation of this action enact *qui tam* statutes that include the right for private

citizens to initiate *qui tam* actions, or whose previously enacted statutes become effective after the filing of Relator's complaint.  The Doe States 1-21 include the States of Alabama, Alaska, Arizona, Arkansas, Idaho, Kansas, Kentucky, Maine, Mississippi, Missouri, Nebraska, North Dakota, Ohio, Oregon, Pennsylvania, South Carolina, South Dakota, Utah, West Virginia, Wisconsin, and Wyoming.

## V.   INTRODUCTION TO DEFENDANTS

### A.   Encore Defendants

#### 1.   Encore Rehabilitation Services, LLC

18.     Encore Rehabilitation Services, LLC ("Encore") is a Michigan limited liability company with its principal place of business located at 33533 West 12 Mile Road, Suite 290, Farmington, Michigan 48331. The registered agent for Encore Rehabilitation Services, LLC is The Corporation Company, 40600 Ann Arbor Rd. E., Ste. 201, Plymouth, MI  48170.

19.     Encore is one of the nation's largest contract therapy providers with over 8,000 skilled therapists providing rehabilitative therapy to patients in more than 600 facilities across 34 states.[4] Encore contracts with skilled nursing facilities to provide physical, occupational, and speech therapy services to skilled nursing facility residents. A few of the skilled nursing facility chains that Encore has contracted with during the relevant timeframe include Olympia Group, LLC,

---

[4] http://encorerehabilitation.net/about-us/locations.

located in Dearborn, Michigan, MediLodge, located in Washington, Michigan, the WellBridge Group, located in Howell, Michigan, and Metron Integrated Health Systems, located in Grand Rapids, Michigan.

20.     Encore's therapists treat patients in the following states: Alabama, California, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nebraska, New Hampshire, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Washington, West Virginia, Wisconsin, and the Commonwealths of Massachusetts and Virginia.

21.     Encore Rehabilitation Services, LLC acquired the following companies in April 2016: Evergreen Rehabilitation, LLC, Select Medical Rehabilitation Services, Inc., and Metro Therapy, Inc., the contract therapy business of Select Medical Holdings Corp.

22.     Encore's annual revenue is estimated at over $200 million dollars.

### 2.     Encore Preakness, Inc.

23.     Encore Rehabilitation Services, LLC acquired Select Medical Rehabilitation Services, Inc. ("SMRS") in April 2016. Following the acquisition, SMRS's legal business name changed to Encore Preakness, Inc., but it continues to do business as SMRS in some states. Encore Preakness, Inc. and Encore

9

Rehabilitation Services, Inc. share a principal place of business located at 33533 West 12 Mile Road, Suite 290, Farmington, Michigan 48331.

24.     Encore Preakness, Inc. is a Delaware for-profit corporation. The registered agent for Encore Preakness, Inc. is The Corporation Company, 40600 Ann Arbor Rd. E., Ste. 201, Plymouth, MI 48170.

25.     Encore Rehabilitation Services, LLC and Encore Preakness, Inc. will be collectively referred to herein as "Encore Defendants."

## B.     Autumn Woods Defendants

### 1.     Autumn Woods Residential Health Care Facility, LLC

26.     Autumn Woods Residential Health Care Facility, LLC is a Michigan limited liability company and certified Medicare and Medicaid provider. Relator worked on-site as a speech-language pathologist at this facility from March 2013 to September 2016. The facility is located at 29800 Hoover Rd., Warren, MI 48093. The registered agent for Autumn Woods Residential Health Care Facility, LLC is Elizabeth Wolf, 29800 Hoover Rd., Warren, MI 48093.

### 2.     The McGuire Group, Inc.

27.     The McGuire Group, Inc. is a New York for-profit corporation with operational and managerial control over Autumn Woods Residential Health Care Facility. The facility is located at 29800 Hoover Rd., Warren, MI 48093. The

McGuire Group, Inc. may be served at 560 Delaware Ave., Ste. 400, Buffalo, NY 14202.

### 3. Elizabeth Wolf

28.     Elizabeth Wolf is a resident of Michigan and has an ownership interest in Autumn Woods Residential Health Care Facility, a certified Medicare and Medicaid provider. Elizabeth Wolf is also the Administrator of the facility, which is located at 29800 Hoover Rd., Warren, MI 48093. Elizabeth Wolf may be served at Autumn Woods Residential Health Care Facility, 29800 Hoover Rd., Warren, MI 48093.

29.     Unless otherwise specified, Autumn Woods Residential Health Care Facility, LLC, The McGuire Group, Inc., and Elizabeth Wolf will be collectively referred to herein as "Autumn Woods Defendants."

## C. MediLodge and Prestige Healthcare Defendants

### 1. The MediLodge Group, Inc.

30.     The MediLodge Group, Inc. is a for-profit Michigan corporation that owns and manages multiple nursing facilities in Michigan. The MediLodge Group, Inc. contracted with Encore Rehabilitation to provide therapy services to residents in MediLodge facilities during the relevant timeframe. The registered agent for The MediLodge Group, Inc. is Frank Wronski, 10503 Citation Dr., Suite 100, Brighton, MI 48116.

31.    In October 2013, the MediLodge Group sold fifteen facilities to Prestige Healthcare,[5] a company based in Kentucky. The acquired facilities, which are discussed further in this section below, consist of the following: MediLodge of Howell, MediLodge of Hillman, MediLodge of Milford, MediLodge of Monroe, MediLodge of Montrose, MediLodge of Plymouth, MediLodge of Port Huron, MediLodge of Richmond, MediLodge of Rochester Hills, MediLodge of Southfield, MediLodge of St. Clair, MediLodge of Sterling, MediLodge of Sterling Heights, MediLodge of Taylor, and MediLodge of Yale. These facilities continue to operate under the MediLodge name, and the MediLodge Group still lists them as MediLodge facilities on their website.[6]

### 2.    Prestige Healthcare I, LLC

32.    Prestige Healthcare I, LLC is a Delaware limited liability company. The principal office on file with the Michigan Secretary of State is 1605 46th Street, 2nd Floor, Brooklyn, NY 11204. The registered agent on file with the Michigan Secretary of State is National Corporate Research, Ltd., 828 Lane Allen Road, Ste. 219, Lexington, KY 40504.

---

[5] *See* Ross Benes, *CON Roundup: MediLodge selling 15 nursing homes to Kentucky Group*, CRAIN'S DETROIT BUSINESS (Oct. 13, 2013, 8:00 AM), http://www.crainsdetroit.com/article/20131013/NEWS/310139933/con-roundup-medilodge-selling-15-nursing-homes-to-kentucky-group; *see also* Alyssa Gerace, *Prestige Healthcare Buys SNF Portfolio with $126 Million REIT Loan*, SENIOR HOUSING NEWS (Nov. 3, 2013), http://seniorhousingnews.com/2013/11/03/prestige-healthcare-buys-snf-portfolio-with-126-million-reit-loan/.

[6] *See* list of MediLodge locations at http://www.medilodge.com/locations.html.

### 3. Northpoint Senior Services, LLC (Prestige Healthcare)

33.    Northpoint Senior Services, LLC is a Georgia limited liability company that operates in Kentucky under the assumed name Prestige Healthcare. The address on file with the Kentucky Secretary of State is 7400 New LaGrange Rd., Louisville, KY 40222.

### 4.    Capital Area Opco, LLC (MediLodge of Capital Area)

34.    Capital Area Opco, LLC is a Delaware limited liability company that operates in Michigan under the assumed name MediLodge of Capital Area. MediLodge of Capital Area is a certified Medicare and Medicaid provider with 120 beds. The facility is located at 2100 E. Provincial House Dr., Lansing, MI 48910. The registered agent on file with the Michigan Secretary of State is National Corporate Research, Ltd., 229 Brookwood Dr., Ste. 14, South Lyon, MI 48178.

### 5.    Cass City Opco, LLC (MediLodge of Cass City)

35.    Cass City Opco, LLC is a Delaware limited liability company that operates in Michigan under the assumed name MediLodge of Cass City. MediLodge of Cass City is a certified Medicare and Medicaid provider with 108 beds. The facility is located at 4782 Hospital Drive, Cass City, MI 48726. The registered agent on file with the Michigan Secretary of State is National Corporate Research, Ltd., 229 Brookwood Dr., Ste. 14, South Lyon, MI 48178.

**6.     Clare Opco, LLC (MediLodge of Clare)**

36.    Clare Opco, LLC is a Delaware limited liability company that operates in Michigan under the assumed name MediLodge of Clare. MediLodge of Clare is a certified Medicare and Medicaid provider with 129 beds. The facility is located at 600 S. E 4th Street, Clare, MI 48617. The registered agent on file with the Michigan Secretary of State is National Corporate Research, Ltd., 229 Brookwood Dr., Ste. 14, South Lyon, MI 48178.

**7.     Frankenmuth Opco, LLC (MediLodge of Frankenmuth)**

37.    Frankenmuth Opco, LLC is a Delaware limited liability company that operates in Michigan under the assumed name MediLodge of Frankenmuth. MediLodge of Frankenmuth is a certified Medicare and Medicaid provider with 126 beds. The facility is located at 500 W. Genesee Street, Frankenmuth, MI 48734. The registered agent on file with the Michigan Secretary of State is National Corporate Research, Ltd., 229 Brookwood Dr., Ste. 14, South Lyon, MI 48178.

**8.     Grand Blanc Opco, LLC (MediLodge of Grand Blanc)**

38.    Grand Blanc Opco, LLC is a Delaware limited liability company that operates in Michigan under the assumed name MediLodge of Grand Blanc. MediLodge of Grand Blanc is a certified Medicare and Medicaid provider with the

14

largest Medicaid-Certified Ventilator Program in the state of Michigan.[7] The facility is located at 11941 Belsay Road, Grand Blanc, MI 48439. The registered agent on file with the Michigan Secretary of State is National Corporate Research, Ltd., 229 Brookwood Dr., Ste. 14, South Lyon, MI 48178.

### 9. ML of Grand Blanc, LLC (MediLodge of Grand Blanc, LLC)

39. ML of Grand Blanc, LLC is a Michigan limited liability company that operates in Michigan under the assumed name MediLodge of Grand Blanc, LLC. The registered agent on file with the Michigan Secretary of State is Frank M. Wronski, 64500 Van Dyke Rd., Washington, MI 48095.

### 10. Holland Opco, LLC (MediLodge of Holland)

40. Holland Opco, LLC is a Delaware limited liability company that operates in Michigan under the assumed name MediLodge of Holland. MediLodge of Holland is a certified Medicare and Medicaid provider with 77 beds. The facility is located at 1221 E. 16th Street, Holland, MI 49423. The registered agent on file with the Michigan Secretary of State is National Corporate Research, Ltd., 229 Brookwood Dr., Ste. 14, South Lyon, MI 48178.

### 11. Kalamazoo Opco, LLC (MediLodge of Kalamazoo)

41. Kalamazoo Opco, LLC is a Delaware limited liability company that operates in Michigan under the assumed name MediLodge of Kalamazoo.

---

[7] *See* website for MediLodge of Grand Blanc at http://www.medilodgeofgrandblanc.com/.

15

MediLodge of Kalamazoo is a certified Medicare and Medicaid provider with 114 beds. The facility is located at 1701 S. Eleventh Street, Kalamazoo, MI 49009. The registered agent on file with the Michigan Secretary of State is National Corporate Research, Ltd., 229 Brookwood Dr., Ste. 14, South Lyon, MI 48178.

### 12. Lansing Opco, LLC (MediLodge of Lansing)

42. Lansing Opco, LLC is a Delaware limited liability company that operates in Michigan under the assumed name MediLodge of Lansing. MediLodge of Lansing is a certified Medicare and Medicaid provider with 117 beds. The facility is located at 731 Starkweather Drive, Lansing, MI 48917. The registered agent on file with the Michigan Secretary of State is National Corporate Research, Ltd., 229 Brookwood Dr., Ste. 14, South Lyon, MI 48178.

### 13. Marshall Opco, LLC (MediLodge of Marshall)

43. Marshall Opco, LLC is a Delaware limited liability company that operates in Michigan under the assumed name MediLodge of Marshall. MediLodge of Marshall is a certified Medicare and Medicaid provider with 98 beds. The facility is located at 879 E. Michigan Avenue, Marshall, MI 49068. The registered agent on file with the Michigan Secretary of State is National Corporate Research, Ltd., 229 Brookwood Dr., Ste. 14, South Lyon, MI 48178.

**14.    Midland Opco, LLC (MediLodge of Midland)**

44.    Midland Opco, LLC is a Delaware limited liability company that operates in Michigan under the assumed name MediLodge of Midland. MediLodge of Midland is a certified Medicare and Medicaid provider with 120 beds. The facility is located at 4900 Hedgewood Drive, Midland, MI  48640. The registered agent on file with the Michigan Secretary of State is National Corporate Research, Ltd., 229 Brookwood Dr., Ste. 14, South Lyon, MI 48178.

**15.    Mt. Pleasant Opco, LLC (MediLodge of Mt. Pleasant)**

45.    Pleasant Opco, LLC is a Delaware limited liability company that operates in Michigan under the assumed name MediLodge of Mt. Pleasant. MediLodge of Mt. Pleasant is a certified Medicare and Medicaid provider with 108 beds. The facility is located at 1524 Portabella Trail, Mt. Pleasant, MI  48858. The registered agent on file with the Michigan Secretary of State is National Corporate Research, Ltd., 229 Brookwood Dr., Ste. 14, South Lyon, MI 48178.

**16.    Okemos Opco, LLC (MediLodge of Okemos)**

46.    Okemos Opco, LLC is a Delaware limited liability company that operates in Michigan under the assumed name MediLodge of Okemos. MediLodge of Okemos is a certified Medicare and Medicaid provider with 80 beds. The facility is located at 5211 Marsh Road, Okemos, MI 48864. The registered agent

on file with the Michigan Secretary of State is National Corporate Research, Ltd., 229 Brookwood Dr., Ste. 14, South Lyon, MI 48178.

### 17.   Portage Opco, LLC (MediLodge of Portage)

47.   Portage Opco, LLC is a Delaware limited liability company that operates in Michigan under the assumed name MediLodge of Portage. MediLodge of Portage is a certified Medicare and Medicaid provider with 120 beds. The facility is located at 7855 Currier Drive, Portage, MI 49002. The registered agent on file with the Michigan Secretary of State is National Corporate Research, Ltd., 229 Brookwood Dr., Ste. 14, South Lyon, MI 48178.

### 18.   Westwood Opco, LLC (MediLodge of Westwood)

48.   Westwood Opco, LLC is a Delaware limited liability company that operates in Michigan under the assumed name MediLodge of Westwood. MediLodge of Westwood is a certified Medicare and Medicaid provider with 109 beds. The facility is located at 2575 N. Drake Road, Kalamazoo, MI 49006. The registered agent on file with the Michigan Secretary of State is National Corporate Research, Ltd., 229 Brookwood Dr., Ste. 14, South Lyon, MI 48178.

### 19.   Wyoming Opco, LLC (MediLodge of Wyoming)

49.   Wyoming Opco, LLC is a Delaware limited liability company that operates in Michigan under the assumed name MediLodge of Wyoming. MediLodge of Wyoming is a certified Medicare and Medicaid provider with 80

beds. The facility is located at 2786 56th Street SW, Wyoming, MI 49418. The registered agent on file with the Michigan Secretary of State is National Corporate Research, Ltd., 229 Brookwood Dr., Ste. 14, South Lyon, MI 48178.

**20.    Hillman Opco, LLC (MediLodge of Hillman)**

50.    Hillman Opco, LLC is a Delaware limited liability company that operates in Michigan under the assumed name MediLodge of Hillman. MediLodge of Hillman is a certified Medicare and Medicaid provider. The facility is located at 631 Caring Street, Hillman, MI 49746. The registered agent on file with the Michigan Secretary of State is National Corporate Research, Ltd., 229 Brookwood Dr., Ste. 14, South Lyon, MI 48178.

**21.    ML of Hillman, LLC (MediLodge of Hillman)**

51.    ML of Hillman, LLC is a Michigan limited liability company that operates in Michigan under the assumed name MediLodge of Hillman. MediLodge of Hillman is a certified Medicare and Medicaid provider. The facility is located at 631 Caring Street, Hillman, MI 49746. The registered agent on file with the Michigan Secretary of State for ML of Hillman, LLC is Todd M. Sangster, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

**22.    MediLodge of Howell, Inc. (MediLodge of Howell)**

52.    MediLodge of Howell, Inc. is incorporated in Michigan and operates under the assumed name MediLodge of Howell. MediLodge of Howell is a

19

certified Medicare and Medicaid provider. The facility is located at 1333 W. Grand River Ave., Howell, MI 48843. The registered agent on file with the Michigan Secretary of State is Craig Flashner, 64500 Van Dyke, Washington, MI 48095.

### 23.   Milford Opco, LLC (MediLodge of Milford)

53.    Milford Opco, LLC is a Delaware limited liability company that operates in Michigan under the assumed name MediLodge of Milford. MediLodge of Milford is a certified Medicare and Medicaid provider. The facility is located at 555 Highland Avenue, Milford, MI 48381. The registered agent on file with the Michigan Secretary of State is National Corporate Research, Ltd., 229 Brookwood Dr., Ste. 14, South Lyon, MI 48178.

### 24.   ML of Milford, LLC (MediLodge of Milford)

54.    ML of Milford, LLC is a Michigan limited liability company that operates in Michigan under the assumed name MediLodge of Milford. MediLodge of Milford is a certified Medicare and Medicaid provider. The facility is located at 555 Highland Avenue, Milford, MI 48381. The registered agent on file with the Michigan Secretary of State for ML of Milford, LLC is Todd M. Sangster, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

### 25.   Monroe Opco, LLC (MediLodge of Monroe)

55.    Monroe Opco, LLC is a Delaware limited liability company that operates in Michigan under the assumed name MediLodge of Monroe. MediLodge

of Monroe is a certified Medicare and Medicaid provider. The facility is located at 481 Village Green Lane, Monroe, MI 48162. The registered agent on file with the Michigan Secretary of State is National Corporate Research, Ltd., 229 Brookwood Dr., Ste. 14, South Lyon, MI 48178.

**26.    ML of Monroe, LLC (MediLodge of Monroe)**

56.    ML of Monroe, LLC is a Michigan limited liability company that operates in Michigan under the assumed name MediLodge of Monroe. MediLodge of Monroe is a certified Medicare and Medicaid provider. The facility is located at 481 Village Green Lane, Monroe, MI 48162. The registered agent on file with the Michigan Secretary of State for ML of Monroe, LLC is Todd M. Sangster, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

**27.    MediLodge of Montrose, Inc. (MediLodge of Montrose)**

57.    MediLodge of Montrose, Inc. is incorporated in Michigan and operates under the assumed name MediLodge of Montrose. MediLodge of Montrose is a certified Medicare and Medicaid provider. The facility is located at 9317 W. Vienna Road, Montrose, MI 48457. The registered agent on file with the Michigan Secretary of State is Craig Flashner, 64500 Van Dyke, Washington, MI 48095.

**28.    Plymouth Opco, LLC (MediLodge of Plymouth)**

58.    Plymouth Opco, LLC is a Delaware limited liability company that operates in Michigan under the assumed name MediLodge of Plymouth. MediLodge of Plymouth is a certified Medicare and Medicaid provider. The facility is located at 395 W. Ann Arbor Trail, Plymouth, MI 48170. The registered agent on file with the Michigan Secretary of State is National Corporate Research, Ltd., 229 Brookwood Dr., Ste. 14, South Lyon, MI 48178.

**29.    ML of Plymouth, Inc. (MediLodge of Plymouth and MediLodge of Plymouth, Inc.)**

59.    ML of Plymouth, Inc. is incorporated in Michigan and operates under the assumed name MediLodge of Plymouth. MediLodge of Plymouth is a certified Medicare and Medicaid provider. The facility is located at 395 W. Ann Arbor Trail, Plymouth, MI 48170. The registered agent on file with the Michigan Secretary of State is Frank M. Wronski, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

**30.    Port Huron Opco, LLC (MediLodge of Port Huron)**

60.    Port Huron Opco, LLC is a Delaware limited liability company that operates in Michigan under the assumed name MediLodge of Port Huron. MediLodge of Port Huron is a certified Medicare and Medicaid provider. The facility is located at 5635 Lakeshore Road, Fort Gratiot, MI 48059. The registered

agent on file with the Michigan Secretary of State is National Corporate Research, Ltd., 229 Brookwood Dr., Ste. 14, South Lyon, MI 48178.

**31.    ML of Port Huron, LLC (MediLodge of Port Huron)**

61.    ML of Port Huron, LLC is a Michigan limited liability company that operates in Michigan under the assumed name MediLodge of Port Huron. MediLodge of Port Huron is a certified Medicare and Medicaid provider. The facility is located at 5635 Lakeshore Road, Fort Gratiot, MI 48059. The registered agent on file with the Michigan Secretary of State for ML of Port Huron, LLC is Todd M. Sangster, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

**32.    Richmond Opco, LLC (MediLodge of Richmond)**

62.    Richmond Opco, LLC is a Delaware limited liability company that operates in Michigan under the assumed name MediLodge of Richmond. MediLodge of Richmond is a certified Medicare and Medicaid provider. The facility is located at 34901 Division Road, Richmond, MI 48062. The registered agent on file with the Michigan Secretary of State is National Corporate Research, Ltd., 229 Brookwood Dr., Ste. 14, South Lyon, MI 48178.

**33.    ML of Richmond, Inc. (MediLodge of Richmond and MediLodge of Richmond, Inc.)**

63.    ML of Richmond, Inc. is incorporated in Michigan and operates under the assumed name MediLodge of Richmond. MediLodge of Richmond is a certified Medicare and Medicaid provider. The facility is located at 34901 Division

Road, Richmond, MI 48062. The registered agent on file with the Michigan Secretary of State is Frank M. Wronski, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

**34.    MediLodge of Rochester Hills, Inc. (MediLodge of Rochester Hills)**

64.    MediLodge of Rochester Hills, Inc. is incorporated in Michigan and operates under the assumed name MediLodge of Rochester Hills. MediLodge of Rochester Hills is a certified Medicare and Medicaid provider. The facility is located at 1480 Walton Boulevard, Rochester Hills, MI 48309. The registered agent on file with the Michigan Secretary of State is Craig Flashner, 64500 Van Dyke Ave., Washington Twp, MI 48095.

**35.    Southfield Opco, LLC (MediLodge of Southfield)**

65.    Southfield Opco, LLC is a Delaware limited liability company that operates in Michigan under the assumed name MediLodge of Southfield. MediLodge of Southfield is a certified Medicare and Medicaid provider. The facility is located at 26715 Greenfield Road, Southfield, MI 48076. The registered agent on file with the Michigan Secretary of State is National Corporate Research, Ltd., 229 Brookwood Dr., Ste. 14, South Lyon, MI 48178.

### 36.   ML of Southfield, Inc. (MediLodge of Southfield)

66.   ML of Southfield, Inc. is incorporated in Michigan and operates under the assumed name MediLodge of Southfield. MediLodge of Southfield is a certified Medicare and Medicaid provider. The facility is located at 26715 Greenfield Road, Southfield, MI 48076. The registered agent on file with the Michigan Secretary of State is Frank M. Wronski, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

### 37.   St. Clair Opco, LLC (MediLodge of St. Clair)

67.   St. Clair Opco, LLC is a Delaware limited liability company that operates in Michigan under the assumed name MediLodge of St. Clair. MediLodge of St. Clair is a certified Medicare and Medicaid provider. The facility is located at 4220 S. Hospital Drive, St. Clair, MI  48079. The registered agent on file with the Michigan Secretary of State is National Corporate Research, Ltd., 229 Brookwood Dr., Ste. 14, South Lyon, MI 48178.

### 38.   ML of St. Clair, Inc. (MediLodge of St. Clair)

68.   ML of St. Clair, Inc. is incorporated in Michigan and operates under the assumed name MediLodge of St. Clair. MediLodge of St. Clair is a certified Medicare and Medicaid provider. The facility is located at 4220 S. Hospital Drive, St. Clair, MI  48079. The registered agent on file with the Michigan Secretary of State is Frank M. Wronski, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

### 39. Sterling Opco, LLC (MediLodge of Sterling)

69. Sterling Opco, LLC is a Delaware limited liability company that operates in Michigan under the assumed name MediLodge of Sterling. MediLodge of Sterling is a certified Medicare and Medicaid provider. The facility is located at 500 School Road, Sterling, MI 48659. The registered agent on file with the Michigan Secretary of State is National Corporate Research, Ltd., 229 Brookwood Dr., Ste. 14, South Lyon, MI 48178.

### 40. ML of Sterling, LLC (MediLodge of Sterling)

70. ML of Sterling, LLC is a Michigan limited liability company that operates in Michigan under the assumed name MediLodge of Sterling. MediLodge of Sterling is a certified Medicare and Medicaid provider. The facility is located at 500 School Road, Sterling, MI 48659. The registered agent on file with the Michigan Secretary of State for ML of Sterling, LLC is Todd M. Sangster, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

### 41. Sterling Heights Opco, LLC (MediLodge of Sterling Heights)

71. Sterling Heights Opco, LLC is a Delaware limited liability company that operates in Michigan under the assumed name MediLodge of Sterling Heights. MediLodge of Sterling Heights is a certified Medicare and Medicaid provider. Relator worked on-site as a speech-language pathologist at this facility from March 2011 to September 2012. The facility is located at 14151 E. 15 Mile Road, Sterling

Heights, MI 48312. The registered agent on file with the Michigan Secretary of State is National Corporate Research, Ltd., 229 Brookwood Dr., Ste. 14, South Lyon, MI 48178.

**42.  ML of Sterling Heights, Inc. (MediLodge of Sterling Heights)**

72.    ML of Sterling Heights, Inc. is incorporated in Michigan and operates under the assumed name MediLodge of Sterling Heights. MediLodge of Sterling Heights is a certified Medicare and Medicaid provider. Relator worked on-site as a speech-language pathologist at this facility from March 2011 to September 2012. The facility is located at 14151 E. 15 Mile Road, Sterling Heights, MI 48312. The registered agent on file with the Michigan Secretary of State is Frank M. Wronski, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

**43.  Taylor Opco, LLC (MediLodge of Taylor)**

73.    Taylor Opco, LLC is a Delaware limited liability company that operates in Michigan under the assumed name MediLodge of Taylor. MediLodge of Taylor is a certified Medicare and Medicaid provider. The facility is located at 23600 Northline Road, Taylor, MI 48180. The registered agent on file with the Michigan Secretary of State is National Corporate Research, Ltd., 229 Brookwood Dr., Ste. 14, South Lyon, MI 48178.

**44.     ML of Taylor, Inc. (MediLodge of Taylor)**

74.     ML of Taylor, Inc. is incorporated in Michigan and operates under the assumed name MediLodge of Taylor. MediLodge of Taylor is a certified Medicare and Medicaid provider. The facility is located at 23600 Northline Road, Taylor, MI  48180. The registered agent on file with the Michigan Secretary of State is Frank M. Wronski, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

**45.     MediLodge of Yale, Inc. (MediLodge of Yale)**

75.     MediLodge of Yale, Inc. is incorporated in Michigan and operates under the assumed name MediLodge of Yale. MediLodge of Yale is a certified Medicare and Medicaid provider. The facility is located at 90 Jean Street, Yale, MI  48097. The registered agent on file with the Michigan Secretary of State is Craig Flashner, 90 Jean Street, Yale, MI  48097.

**46.     East Lansing Opco, LLC (MediLodge of Campus Area)**

76.     East Lansing Opco, LLC is a Delaware limited liability company that operates in Michigan under the assumed name MediLodge of Campus Area. MediLodge of Campus Area is a certified Medicare and Medicaid provider. The facility is located at 2815 Northwind Dr., East Lansing, MI 48823. The registered agent on file with the Michigan Secretary of State is National Corporate Research, Ltd., 229 Brookwood Dr., Ste. 14, South Lyon, MI 48178.

**47.    North Lansing Opco, LLC (MediLodge of East Lansing)**

77.    North Lansing Opco, LLC is a Delaware limited liability company that operates in Michigan under the assumed name MediLodge of East Lansing. MediLodge of East Lansing is a certified Medicare and Medicaid provider. The facility is located at 1843 N. Hagadorn, East Lansing, MI 48823. The registered agent on file with the Michigan Secretary of State is National Corporate Research, Ltd., 229 Brookwood Dr., Ste. 14, South Lyon, MI 48178.

**48.    Farmington Opco, LLC (MediLodge of Farmington)**

78.    Farmington Opco, LLC is a Delaware limited liability company that operates in Michigan under the assumed name MediLodge of Farmington. MediLodge of Farmington is a certified Medicare and Medicaid provider. The facility is located at 34225 Grand River Ave., Farmington, MI 48335. The registered agent on file with the Michigan Secretary of State is National Corporate Research, Ltd., 229 Brookwood Dr., Ste. 14, South Lyon, MI 48178.

**49.    Howell Opco, LLC (MediLodge of Livingston)**

79.    Howell Opco, LLC is a Delaware limited liability company that operates in Michigan under the assumed name MediLodge of Livingston. MediLodge of Livingston is a certified Medicare and Medicaid provider. The facility is located at 3003 W Grand River Ave., Howell, MI 48843. The registered

agent on file with the Michigan Secretary of State is National Corporate Research, Ltd., 229 Brookwood Dr., Ste. 14, South Lyon, MI 48178.

**50.    Ark Opco Group, LLC**

80.    Ark Opco Group, LLC is a Delaware limited liability company with a 100% direct ownership interest in the following facilities: MediLodge of Capital Area, MediLodge of Cass City, MediLodge of Clare, MediLodge of Frankenmuth, MediLodge of Holland, MediLodge of Kalamazoo, MediLodge of Lansing, MediLodge of Marshall, MediLodge of Midland, MediLodge of Mt. Pleasant, MediLodge of Okemos, MediLodge of Portage, MediLodge of Westwood, and MediLodge of Wyoming. The registered agent for Ark Opco Group, LLC is National Corporate Research. Ltd., 850 New Burton Rd., Ste. 201, Dover, DE 19904.

**51.    B&Y Healthcare S Corp.**

81.    B&Y Healthcare S Corp. is a Delaware corporation with a 48% direct ownership interest in MediLodge of Grand Blanc. The registered agent for B&Y Healthcare S Corp. is National Corporate Research. Ltd., 850 New Burton Rd., Ste. 201, Dover, DE 19904.

**52.    Canary Opco Group, LLC**

82.    Canary Opco Group, LLC is a Delaware limited liability company with a 100% direct ownership interest in MediLodge of Campus Area and

MediLodge of East Lansing. The registered agent on file with the Michigan Secretary of State is National Corporate Research, Ltd., 229 Brookwood Dr., Ste. 14, South Lyon, MI 48178.

### 53. Century Opco Group, LLC

83. Century Opco Group, LLC is a Delaware limited liability company with a 100% direct ownership interest in MediLodge of Farmington. Century Opco Group, LLC also has a direct ownership interest in MediLodge of Livingston. The registered agent for Century Opco Group, LLC is National Corporate Research. Ltd., 850 New Burton Rd., Ste. 201, Dover, DE 19904.

### 54. Cody Healthcare S Corp.

84. Cody Healthcare S Corp. is a Delaware corporation with a 48% direct ownership interest in MediLodge of Grand Blanc. The registered agent for Cody Healthcare S Corp. is National Corporate Research. Ltd., 850 New Burton Rd., Ste. 201, Dover, DE 19904.

### 55. FifteenInOne Opco Group, LLC

85. FifteenInOne Opco Group, LLC is a Delaware limited liability company with a 100% direct ownership interest in the following facilities: MediLodge of Hillman, MediLodge of Howell, MediLodge of Milford, MediLodge of Monroe, MediLodge of Montrose, MediLodge of Plymouth, MediLodge of Port Huron, MediLodge of Richmond, MediLodge of Rochester

Hills, MediLodge of Southfield, MediLodge of St. Clair, MediLodge of Sterling, MediLodge of Sterling Heights, MediLodge of Taylor, MediLodge of Yale. The registered agent on file with the Michigan Secretary of State is National Corporate Research, Ltd., 229 Brookwood Dr., Ste. 14, South Lyon, MI 48178.

86.    Unless otherwise specified, all of the facilities and corporate entities listed within this subsection will be collectively referred to herein as "MediLodge" or "MediLodge Defendants."

**D.    Metron Defendants**

**1.    Miko Enterprises, Inc. (Metron Integrated Health Systems)**

87.    Miko Enterprises, Inc. is a Michigan corporation that operates in Michigan under the assumed name Metron Integrated Health Systems. Metron Integrated Health Systems contracted with Encore Rehabilitation to provide therapy services to residents in Metron facilities during the relevant timeframe. The corporate address for Metron Integrated Health Systems is 4630 Plainfield Ave. NE, Suite 100, Grand Rapids, MI 49525. Miko Enterpises, Inc. has 100% operational and managerial control over the following facilities: Metron of Belding, Metron of Big Rapids, Metron of Cedar Springs, Metron of Forest Hills, Metron of Greenville, and Metron of Lamont. The registered agent for Miko Enterprises, Inc. is Mark Piersma, 4630 Plainfield Ave. NE, Suite 100, Grand Rapids, MI 49525.

**2.      Miko Holdings, Inc.**

88.     Miko Holdings, Inc. is a Michigan corporation with a 100% ownership interest in the following facilities: Metron of Belding, Metron of Big Rapids, Metron of Cedar Springs, Metron of Forest Hills, Metron of Greenville, and Metron of Lamont. The registered agent for Miko Holdings, Inc. is Mark Piersma, 4630 Plainfield Ave. NE, Suite 100, Grand Rapids, MI 49525.

**3.      Belding Christian Nursing Home, Inc. (Metron of Belding)**

89.     Belding Christian Nursing Home, Inc. is a Michigan corporation that operates in Michigan as Metron of Belding. Metron of Belding is a certified Medicare and Medicaid provider. The facility is located at 414 E. State St., Belding, MI 48809. The registered agent for Belding Christian Nursing Home, Inc. is Mark Piersma, 4630 Plainfield Ave. NE, Suite 100, Grand Rapids, MI 49525.

**4.      Greenridge Nursing Center, Inc. (Metron of Big Rapids)**

90.     Greenridge Nursing Center, Inc. is a Michigan corporation that operates in Michigan as Metron of Big Rapids. Metron of Big Rapids is a certified Medicare and Medicaid provider. The facility is located at 725 W. Fuller, Big Rapids, MI 49307. The registered agent for Greenridge Nursing Center, Inc. is Mark Piersma, 4630 Plainfield Ave. NE, Suite 100, Grand Rapids, MI 49525.

**5.** **Cedar Care Center, Inc. (Metron of Cedar Springs)**

91.     Cedar Care Center, Inc. is a Michigan corporation that operates in Michigan as Metron of Cedar Springs. Metron of Cedar Springs is a certified Medicare and Medicaid provider. The facility is located at 400 Jeffrey St., Cedar Springs, MI 49319. The registered agent for Cedar Care Center, Inc. is Mark Piersma, 4630 Plainfield Ave. NE, Suite 100, Grand Rapids, MI 49525.

**6.** **Cascade Care Center, Inc. (Metron of Forest Hills)**

92.     Cascade Care Center, Inc. is a Michigan corporation that operates in Michigan as Metron of Forest Hills. Metron of Forest Hills is a certified Medicare and Medicaid provider. The facility is located at 1095 Medical Park Dr. SE, Grand Rapids, MI 49546. The registered agent for Cascade Care Center, Inc. is Mark Piersma, 4630 Plainfield Ave. NE, Suite 100, Grand Rapids, MI 49525.

**7.** **Greenville Care Center, Inc. (Metron of Greenville)**

93.     Greenville Care Center, Inc. is a Michigan corporation that operates in Michigan as Metron of Greenville. Metron of Greenville is a certified Medicare and Medicaid provider. The facility is located at 828 E. Washington St., Greenville, MI 48838. The registered agent for Greenville Care Center, Inc. is Mark Piersma, 4630 Plainfield Ave. NE, Suite 100, Grand Rapids, MI 49525.

8.      **Glenwood Christian Nursing Home, Inc. (Metron of Lamont)**

94.      Glenwood Christian Nursing Home, Inc. is a Michigan corporation that operates in Michigan as Metron of Lamont. Metron of Lamont is a certified Medicare and Medicaid provider. The facility is located at 13030 Commercial St., Lamont, MI 49430. The registered agent for Glenwood Christian Nursing Home, Inc. is Mark Piersma, 4630 Plainfield Ave. NE, Suite 100, Grand Rapids, MI 49525.

95.      Unless otherwise specified, all of the facilities and corporate entities listed within this subsection will be collectively referred to herein as "Metron" or "Metron Defendants."

E.      **NexCare Defendants**

1.      **NexCare Health Systems, LLC**

96.      NexCare Health Systems, LLC is a Michigan limited liability company that exercises operational and managerial control over the following NexCare facilities: Bay Shores Senior Care and Rehab Center, Dimondale Nursing Care Center, Durand Senior Care & Rehab Center, Evergreen Senior Care and Rehab Center, Fairlane Senior Care and Rehab Center, Faith Haven Senior Care Centre, Fisher Senior Care and Rehab Center, Four Chaplains Nursing Care Center, Holt Senior Care and Rehab Center, Lahser Hills Care Centre, LakePointe Senior Care and Rehab Center, OakPointe Senior Care and Rehab Center, Saginaw

Senior Care and Rehab Center, Schnepp Health Care Center, South Lyon Senior Care and Rehab Center, and West Oaks Senior Care and Rehab Center. NexCare Health Systems, LLC contracted with Encore Rehabilitation to provide therapy services to residents in facilities during the relevant timeframe. The registered agent for NexCare Health Systems, LLC is James Branscum, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

### 2.    NexCare Holdings, LLC

97.    NexCare Holdings, LLC is a Michigan limited liability company with a 100% ownership interest in the following NexCare facilities: Bay Shores Senior Care and Rehab Center, Dimondale Nursing Care Center, Durand Senior Care & Rehab Center, Evergreen Senior Care and Rehab Center, Fairlane Senior Care and Rehab Center, Faith Haven Senior Care Centre, Holt Senior Care and Rehab Center, LakePointe Senior Care and Rehab Center, OakPointe Senior Care and Rehab Center, Saginaw Senior Care and Rehab Center, South Lyon Senior Care and Rehab Center, and West Oaks Senior Care and Rehab Center. The registered agent for NexCare Holdings, LLC is James Branscum, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

### 3.    Bay Shores Nursing Center, LLC (Bay Shores Senior Care and Rehab Center)

98.    Bay Shores Nursing Center, LLC is a Michigan limited liability company and certified Medicare and Medicaid provider. The facility is located at

36

3254 East Midland Rd., Bay City, MI 48706. The registered agent for Bay Shores Nursing Center, LLC is James Branscum, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

### 4.  Dimondale Nursing Care Center, LLC

99.    Dimondale Nursing Care Center, LLC is a Michigan limited liability company and certified Medicare and Medicaid provider. The facility is located at 4000 North Michigan Road, Dimondale, MI 48821. The registered agent for Dimondale Nursing Care Center, LLC is James Branscum, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

### 5.  Durand Senior Care & Rehab Center, LLC

100.   Durand Senior Care & Rehab Center, LLC is a Michigan limited liability company and certified Medicare and Medicaid provider. The facility is located at 8750 E Monroe Road, Durand, MI 48429. The registered agent for Durand Senior Care & Rehab Center, LLC is James Branscum, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

### 6.  Evergreen Manor Senior Care Centre, LLC (Evergreen Senior Care and Rehab Center)

101.   Evergreen Manor Senior Care Centre, LLC is a Michigan limited liability company that operates in Michigan as Evergreen Senior Care and Rehab Center. Evergreen Senior Care and Rehab Center is a certified Medicare and Medicaid provider. The facility is located at 111 Evergreen Road, Battle Creek, MI

49015. The registered agent for Evergreen Manor Senior Care Centre, LLC is James Branscum, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

**7. Fairlane Senior Care and Rehab Center, LLC**

102. Fairlane Senior Care and Rehab Center, LLC is a Michigan limited liability company and certified Medicare and Medicaid provider. The facility is located at 15750 Joy Road, Detroit, MI 48228. The registered agent for Fairlane Senior Care and Rehab Center, LLC is James Branscum, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

**8. Faith Haven Senior Care Centre, LLC**

103. Faith Haven Senior Care Centre, LLC is a Michigan limited liability company and certified Medicare and Medicaid provider. The facility is located at 6531 West Michigan Avenue, Jackson, MI 49201. The registered agent for Faith Haven Senior Care Centre, LLC is James Branscum, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

**9. Tartan Health Care Corporation (Fisher Senior Care and Rehab Center)**

104. Tartan Health Care Corporation is a Michigan for-profit corporation that operates in Michigan under the assumed name Fisher Senior Care and Rehab Center. Fisher Senior Care and Rehab Center is a certified Medicare and Medicaid provider. The facility is located at 521 Ohmer Road, Mayville, MI 48744. The

registered agent for Tartan Health Care Corporation is James Branscum, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

**10.    Chaplains, Inc. (Four Chaplains Nursing Care Center)**

105.    Chaplains, Inc. is a Michigan for-profit corporation that operates in Michigan under the assumed name Four Chaplains Nursing Care Center. Four Chaplains Nursing Care Center is a certified Medicare and Medicaid provider. The facility is located at 28349 Joy Road, Westland, MI 48185. The registered agent for Chaplains, Inc. is James Branscum, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

**11.    Holt Senior Care and Rehab Center, LLC**

106.    Holt Senior Care and Rehab Center, LLC is a Michigan limited liability company and certified Medicare and Medicaid provider. The facility is located at 5091 Willoughby Road, Holt, MI 48842. The registered agent for Holt Senior Care and Rehab Center, LLC is James Branscum, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

**12.    Chelsea Health Centre, LLC (Lahser Hills Care Centre)**

107.    Chelsea Health Centre, LLC is a Michigan limited liability company that operates in Michigan under the assumed name Lahser Hills Care Centre. Lahser Hills Care Centre is a certified Medicare and Medicaid provider. The facility is located at 25300 Lahser Road, Southfield, MI 48034. The registered

agent for Chelsea Health Centre, LLC is James Branscum, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

### 13.    LakePointe Senior Care and Rehab Center, LLC

108.    LakePointe Senior Care and Rehab Center, LLC is a Michigan limited liability company and certified Medicare and Medicaid provider. The facility is located at 37700 Harper Road, Clinton Twp., MI 48036. The registered agent for LakePointe Senior Care and Rehab Center, LLC is James Branscum, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

### 14.    OakPointe Senior Care and Rehab Center, LLC

109.    OakPointe Senior Care and Rehab Center, LLC is a Michigan limited liability company and certified Medicare and Medicaid provider. The facility is located at 18901 Meyers Road, Detroit, MI 48235. The registered agent for OakPointe Senior Care and Rehab Center, LLC is James Branscum, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

### 15.    Saginaw Senior Care and Rehab Center, LLC

110.    Saginaw Senior Care and Rehab Center, LLC is a Michigan limited liability company and certified Medicare and Medicaid provider. The facility is located at 4322 Mackinaw Road, Saginaw, MI 48603. The registered agent for Saginaw Senior Care and Rehab Center, LLC is James Branscum, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

### 16.     Schnepp, Inc. (Schnepp Health Care Center)

111.     Schnepp, Inc. is a Michigan for-profit corporation that operates in Michigan under the assumed name Schnepp Health Care Center. Schnepp Health Care Center is a certified Medicare and Medicaid provider. The facility is located at 427 E. Washington Avenue, St. Louis, MI 48880. The registered agent for Schnepp, Inc. is James Branscum, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

### 17.     South Lyon Senior Care and Rehab Center, LLC

112.     South Lyon Senior Care and Rehab Center, LLC is a Michigan limited liability company and certified Medicare and Medicaid provider. The facility is located at 700 Reynold Sweet Parkway, South Lyon, MI 48178. The registered agent for South Lyon Senior Care and Rehab Center, LLC is James Branscum, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

### 18.     West Oaks Senior Care and Rehab Center, LLC

113.     West Oaks Senior Care and Rehab Center, LLC is a Michigan limited liability company and certified Medicare and Medicaid provider. The facility is located at 22355 West Eight Mile Road, Detroit, MI 48219. The registered agent for West Oaks Senior Care and Rehab Center, LLC is James Branscum, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

114.   Unless otherwise specified, all of the facilities and corporate entities listed within this subsection will be collectively referred to herein as "NexCare" or "NexCare Defendants."

## F.   Olympia Group Defendants

### 1.   Olympia Group LLC

115.   Olympia Group LLC is an Illinois limited liability company that exercises 100% operational and managerial control over the following Olympia Group facilities: Ambassador Nursing and Rehabilitation Centre, Father Murray Nursing and Rehabilitation Centre, Imperial Nursing and Rehabilitation Centre, Regency Nursing and Rehabilitation Centre, St. Joseph's Nursing and Rehabilitation Centre, and Westland Nursing and Rehabilitation Centre. These facilities are located in Michigan and are certified Medicare and Medicaid providers. Olympia Group, LLC contracted with Encore Rehabilitation to provide therapy services to residents in facilities during the relevant timeframe. The registered agent for Olympia Group LLC is Leonard Weiss, 7366 N. Lincolnwood Ave., Ste. 304, Lincolnwood, IL 60712.

### 2.   Moroun Nursing Center of Detroit, LLC (Ambassador Nursing and Rehabilitation Centre)

116.   Moroun Nursing Center of Detroit, LLC is a Michigan limited liability company that operates in Michigan as Ambassador Nursing and Rehabilitation Centre. Ambassador Nursing and Rehabilitation Centre is a certified

Medicare and Medicaid provider. The facility is located at 8045 East Jefferson, Detroit, MI 48214. The registered agent for Moroun Nursing Center of Detroit, LLC is the Corporation Company, 40600 Ann Arbor Rd. E., Ste. 201, Plymouth, MI 48170.

### 3.  Father Murray Nursing and Rehabilitation Centre, LLC

117.    Father Murray Nursing and Rehabilitation Centre, LLC is a Michigan limited liability company and certified Medicare and Medicaid provider. The facility is located at 8444 Engleman, Center Line, MI 48015. The registered agent for Father Murray Nursing and Rehabilitation Centre, LLC is the Corporation Company, 40600 Ann Arbor Rd. E., Ste. 201, Plymouth, MI 48170.

### 4.  Detroit Nursing Center, LLC (Imperial Nursing and Rehabilitation Centre)

118.    Detroit Nursing Center, LLC is a Michigan limited liability company that operates in Michigan as Imperial Nursing and Rehabilitation Centre. The facility is located at 26505 Powers Ave., Dearborn Heights, MI 48125. Imperial Nursing and Rehabilitation Centre is a certified Medicare and Medicaid provider. The registered agent for Detroit Nursing Center, LLC is the Corporation Company, 40600 Ann Arbor Rd. E., Ste. 201, Plymouth, MI 48170.

**5.** **Park Nursing Center of Taylor, LLC (Regency Nursing and Rehabilitation Centre)**

119.   Park Nursing Center of Taylor, LLC is a Michigan limited liability company that operates in Michigan as Regency Nursing and Rehabilitation Centre. The facility is located at 12575 South Telegraph Rd., Taylor, MI 48180. Regency Nursing and Rehabilitation Centre is a certified Medicare and Medicaid provider. The registered agent for Park Nursing Center of Taylor, LLC is the Corporation Company, 40600 Ann Arbor Rd. E., Ste. 201, Plymouth, MI 48170.

**6.** **Colonial Health Care Center, LLC (St. Joseph's Nursing and Rehabilitation Centre)**

120.   Colonial Health Care Center, LLC is a Michigan limited liability company that operates in Michigan as St. Joseph's Nursing and Rehabilitation Centre. The facility is located at 9400 Conant, Hamtramck, MI 48212. St. Joseph's Nursing and Rehabilitation Centre is a certified Medicare and Medicaid provider. The registered agent for Colonial Health Care Center, LLC is the Corporation Company, 40600 Ann Arbor Rd. E., Ste. 201, Plymouth, MI 48170.

**7.** **Westland Nursing and Rehabilitation Centre, LLC**

121.   Westland Nursing and Rehabilitation Centre, LLC is a Michigan limited liability company and certified Medicare and Medicaid provider. The facility is located at 36137 West Warren, Westland, MI 48185. The registered

agent for Westland Nursing and Rehabilitation Centre, LLC is the Corporation Company, 40600 Ann Arbor Rd. E., Ste. 201, Plymouth, MI 48170.

## 8.   Jonah Bruck

122.   Jonah Bruck is the Chief Executive Officer at Olympia Group, LLC and has a direct ownership interest in the following facilities: Ambassador Nursing and Rehabilitation Centre, Father Murray Nursing and Rehabilitation Centre, Imperial Nursing and Rehabilitation Centre, Regency Nursing and Rehabilitation Centre, St. Joseph's Nursing and Rehabilitation Centre, and Westland Nursing and Rehabilitation Centre. These facilities are located in Michigan and are certified Medicare and Medicaid providers. Jonah Bruck may be served at Olympia Group, LLC, 6 Park Ln Blvd, Dearborn, MI 48126.

## 9.   Leonard Weiss

123.   Leonard Weiss is the registered agent for Olympia Group, LLC and has a direct ownership interest in the following facilities: Ambassador Nursing and Rehabilitation Centre, Father Murray Nursing and Rehabilitation Centre, Imperial Nursing and Rehabilitation Centre, Regency Nursing and Rehabilitation Centre, St. Joseph's Nursing and Rehabilitation Centre, and Westland Nursing and Rehabilitation Centre. These facilities are located in Michigan and are certified Medicare and Medicaid providers. Leonard Weiss may be served at 7366 N. Lincolnwood Ave., Ste. 304, Lincolnwood, IL 60712.

124.   Unless otherwise specified, all of the facilities, corporate entities, and individuals listed within this subsection will be collectively referred to herein as "Olympia Group" or "Olympia Group Defendants."

## G.   WellBridge Defendants

### 1.   WellBridge Group, Inc.

125.   WellBridge Group, Inc. is a Michigan corporation that owns and operates the following facilities: WellBridge of Brighton, WellBridge of Fenton, WellBridge of Novi, WellBridge of Pinckney, WellBridge of Rochester Hills, and WellBridge of Romeo. These facilities are located in Michigan and are certified Medicare and Medicaid providers. WellBridge Group, Inc. contracted with Encore Rehabilitation to provide therapy services to residents in facilities during the relevant timeframe. The registered agent for WellBridge Group, Inc. is Leo Eisenberg, 30230 Orchard Lake Rd., Ste. 160, Farmington Hills, MI 48334.

### 2.   WellBridge of Brighton, LLC

126.   WellBridge of Brighton, LLC is a Michigan limited liability company and certified Medicare and Medicaid provider. The facility is located at 2200 Dorr Road, Howell, MI 48843. The registered agent for WellBridge of Brighton, LLC is Todd Sangster, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

**3.      WellBridge of Fenton, LLC**

127.    WellBridge of Fenton, LLC is a Michigan limited liability company and certified Medicare and Medicaid provider. The facility is located at 901 Pine Creek Dr., Fenton, MI 48430. The registered agent for WellBridge of Fenton, LLC is Todd Sangster, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

**4.      WellBridge of Novi, LLC**

128.    WellBridge of Novi, LLC is a Michigan limited liability company and certified Medicare and Medicaid provider. The facility is located at 48300 11 Mile Rd., Novi, MI 48374. The registered agent for WellBridge of Novi, LLC is Todd Sangster, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

**5.      WellBridge of Pinckney, LLC**

129.    WellBridge of Pinckney, LLC is a Michigan limited liability company and certified Medicare and Medicaid provider. The facility is located at 664 South Howell St., Pinckney, MI 48169. The registered agent for WellBridge of Pinckney, LLC is Todd Sangster, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

**6.      WellBridge of Rochester Hills, LLC**

130.    WellBridge of Rochester Hills, LLC is a Michigan limited liability company and certified Medicare and Medicaid provider. The facility is located at 252 Meadowfield Dr., Rochester Hills, MI 48307. The registered agent for

WellBridge of Rochester Hills, LLC is Todd Sangster, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

**7.      WellBridge of Romeo, LLC**

131.    WellBridge of Romeo, LLC is a Michigan limited liability company and certified Medicare and Medicaid provider. The facility is located at 375 South Main St., Romeo, MI 48065. The registered agent for WellBridge of Romeo, LLC is Todd Sangster, 10503 Citation Dr., Ste. 100, Brighton, MI 48116.

132.    Unless otherwise specified, all of the facilities and corporate entities listed within this subsection will be collectively referred to herein as "WellBridge" or "WellBridge Defendants."

**H.      Other Facility Defendants**

**1.      Applewood Nursing Center, Inc.**

133.    Applewood Nursing Center, Inc. is a Michigan for-profit corporation and a certified Medicare and Medicaid provider. The facility is located at 18500 Van Horn Rd., Woodhaven, MI 48183. The registered agent for Applewood Nursing Center, Inc. is Kimberly M. Tackett, 910 S. Washington Ave., Royal Oak, MI 48067.

**2.      South Hills, LLC (Boulevard Health Center)**

134.    South Hills, LLC is a Michigan limited liability company that operates in Michigan as Boulevard Health Center. The facility is located at 3500

West South Blvd., Rochester Hills, MI 48309. Boulevard Health Center is a certified Medicare and Medicaid provider. The registered agent for South Hills, LLC is Alan Funk, 5480 Corporate Dr., Ste. 230, Troy, MI 48098.

### 3.    Boulevard Manor, LLC

135.    Boulevard Manor, LLC is a Michigan limited liability company and certified Medicare and Medicaid provider. The facility is located at 464 E. Grand Blvd., Detroit, MI 48207. The registered agent for Boulevard Manor, LLC is Fahim Uddin, 30700 Telegraph Rd., Ste. 2504, Bingham Farms, MI 48025.

### 4.    Douglas Investments & Associates, LLC (Grace of Douglas)

136.    Douglas Investments & Associates, LLC is a Michigan limited liability company that operates in Michigan as Grace of Douglas. The facility is located at 243 Wiley Road, Douglas, MI 49406. Grace of Douglas is a certified Medicare and Medicaid provider. The registered agent for Douglas Investments & Associates, LLC is National Registered Agents, Inc., 40600 Ann Arbor Rd. E., Ste. 201, Plymouth, MI 48170.

### 5.    Heather Hills Nursing, LLC (Heather Hills Care Center)

137.    Heather Hills Nursing, LLC is a Michigan limited liability company that operates in Michigan as Heather Hills Care Center. The facility is located at 1157 Medical Park Dr. S.E., Grand Rapids, MI 49546. Heather Hills Care Center is a certified Medicare and Medicaid provider. The registered agent for Heather Hills

Nursing, LLC is The Corporation Company, 40600 Ann Arbor Rd. E., Ste. 201, Plymouth, MI 48170.

**6.     CRG Lynwood, LLC (Lynwood Manor Healthcare Center)**

138.    CRG Lynwood, LLC is a Delaware limited liability company that operates in Michigan as Lynwood Manor Healthcare Center. The facility is located at 730 Kimole Ln., Adrian, MI 49221. Lynwood Manor Healthcare Center is a certified Medicare and Medicaid provider. The registered agent for CRG Lynwood, LLC is Vcorp Services, LLC., 42180 Ford Rd., Ste. 101, Canton, MI 48187.

**7.     Rhema-Battle Creek Operating, LLC (Manor of Battle Creek Skilled Nursing and Rehabilitation Center)**

139.    Rhema-Battle Creek Operating, LLC is a Michigan limited liability company that operates in Michigan as Manor of Battle Creek Skilled Nursing and Rehabilitation Center. The facility is located at 675 Wagner Dr., Battle Creek, MI 49017. Manor of Battle Creek Skilled Nursing and Rehabilitation Center is a certified Medicare and Medicaid provider. The registered agent for Rhema-Battle Creek Operating, LLC is Reginald Hartsfield, 17515 W. Nine Mile Rd., Ste. 925, Southfield, MI 48075.

**8.    Riveridge Investments & Associates, LLC (Riveridge Rehabilitation and Healthcare Center)**

140.    Riveridge Investments & Associates, LLC is a Michigan limited liability company that operates in Michigan as Riveridge Rehabilitation and Healthcare Center. The facility is located at 1333 Wells St., Niles, MI 49120. Riveridge Rehabilitation and Healthcare Center is a certified Medicare and Medicaid provider. The registered agent for Riveridge Investments & Associates, LLC is National Registered Agents, Inc., 40600 Ann Arbor Rd. E., Ste. 201, Plymouth, MI 48170.

**9.    Advantage Management Group, Inc. (Samaritan Manor)**

141.    Advantage Management Group, Inc. is a Michigan for-profit corporation that operates in Michigan as Samaritan Manor. Samaritan Manor is a certified Medicare and Medicaid provider. The facility is located at 5555 Conner Avenue, Detroit, MI 48213. The registered agent for Advantage Management Group, Inc. is Reginald Hartsfield, 17515 W. Nine Mile Rd., Ste. 925, Southfield, MI 48075.

142.    Unless otherwise specified, the Autumn Woods Defendants, MediLodge Defendants, Metron Defendants, Olympia Group Defendants, WellBridge Defendants, and the other facility defendants listed within this subsection will be collectively referred to herein as "SNF Defendants."

## VI.   RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

### A.   Encore Defendants

143.   Any and all acts alleged herein to have been committed by the Encore Defendants were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the named defendants and within the course and scope of their employment, or by corporate predecessors to whom successive liability applies.

144.   The Encore Defendants are related entities sharing common employees, offices, and business names such that they are jointly and severally liable under legal theories of respondeat superior. Encore Preakness, Inc. and Encore Rehabilitation Services, Inc. share a principal place of business located at 33533 West 12 Mile Road, Suite 290, Farmington, Michigan 48331. Further, the past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for purposes of this suit, they should be considered as a single entity at law and equity.

### B.   Autumn Woods Defendants

145.   Any and all acts alleged herein to have been committed by the Autumn Woods Defendants were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the Autumn Woods

Defendants and within the course and scope of their employment, or by corporate predecessors to whom successive liability applies.

146.   The Autumn Woods Defendants are related entities sharing common employees, offices, and business names such that they are jointly and severally liable under legal theories of respondeat superior. Further, the past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for purposes of this suit, some or all of them can and should be considered as a single entity at law and equity.

**C.   MediLodge Defendants**

147.   Any and all acts alleged herein to have been committed by the MediLodge Defendants were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the MediLodge Defendants and within the course and scope of their employment, or by corporate predecessors to whom successive liability applies.

148.   The MediLodge Defendants are related entities sharing common employees, offices, and business names such that they are jointly and severally liable under legal theories of respondeat superior. Further, the past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for purposes of this suit, some or all of them can and should be considered as a single entity at law and equity.

## D.    Metron Defendants

149.   Any and all acts alleged herein to have been committed by the Metron Defendants were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the Metron Defendants and within the course and scope of their employment, or by corporate predecessors to whom successive liability applies.

150.   The Metron Defendants are related entities sharing common employees, offices, and business names such that they are jointly and severally liable under legal theories of respondeat superior. Further, the past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for purposes of this suit, some or all of them can and should be considered as a single entity at law and equity.

## E.    NexCare Defendants

151.   Any and all acts alleged herein to have been committed by the NexCare Defendants were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the NexCare Defendants and within the course and scope of their employment, or by corporate predecessors to whom successive liability applies.

152.   The NexCare Defendants are related entities sharing common employees, offices, and business names such that they are jointly and severally

liable under legal theories of respondeat superior. Further, the past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for purposes of this suit, some or all of them can and should be considered as a single entity at law and equity.

**F.      Olympia Group Defendants**

153.   Any and all acts alleged herein to have been committed by the Olympia Group Defendants were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the Olympia Group Defendants and within the course and scope of their employment, or by corporate predecessors to whom successive liability applies.

154.   The Olympia Group Defendants are related entities sharing common employees, offices, and business names such that they are jointly and severally liable under legal theories of respondeat superior. Further, the past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for purposes of this suit, some or all of them can and should be considered as a single entity at law and equity.

**G.      WellBridge Defendants**

155.   Any and all acts alleged herein to have been committed by the WellBridge Defendants were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the WellBridge

Defendants and within the course and scope of their employment, or by corporate predecessors to whom successive liability applies.

156.    The WellBridge Defendants are related entities sharing common employees, offices, and business names such that they are jointly and severally liable under legal theories of respondeat superior. Further, the past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for purposes of this suit, some or all of them can and should be considered as a single entity at law and equity.

## H.    Other Facility Defendants

157.    Any and all acts alleged herein to have been committed by the following Facility Defendants were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the respective facilities and within the course and scope of their employment, or by corporate predecessors to whom successive liability applies: Applewood Nursing Center, Inc., South Hills, LLC (Boulevard Health Center), Boulevard Manor, LLC, Douglas Investments & Associates, LLC (Grace of Douglas), Heather Hills Nursing, LLC (Heather Hills Care Center), CRG Lynwood, LLC (Lynwood Manor Healthcare Center), Rhema-Battle Creek Operating, LLC (Manor of Battle Creek Skilled Nursing and Rehabilitation Center), Riveridge Investments & Associates,

LLC (Riveridge Rehabilitation and Healthcare Center), and Advantage Management Group, Inc. (Samaritan Manor).

## VII.   INTRODUCTION TO RELATOR ADAM LAFERRIERE

158.   Relator Adam LaFerriere graduated from Eastern Michigan University in 2009 and became licensed in Michigan as a speech-language pathologist in 2010.

159.   In January 2010, LaFerriere began working for Encore Rehabilitation and worked in several facilities in Michigan with which Encore had contracts. Specifically, LaFerriere worked at the Martha T. Berry County Care facility from January 2010 to December 2010, Medilodge of Sterling Heights from March 2011 to September 2012, and Autumn Woods Care Facility from March 2013 to September 2016 on a contingent and full-time basis.

160.   While working for Encore, LaFerriere saw therapists providing services to ineligible patients, such as patients with advanced Alzheimer's and dementia, as well as patients in comfort care with no expectation of recovery. LaFerriere was even instructed by a supervisor, TPM Raj Tiwari, to provide speech therapy to a patient whose physician had signed a therapy "hold" order due to the patient's rapidly declining condition. When LaFerriere refused and directed his supervisor's attention to the "hold" order in the patient's file, Tiwari immediately went to the patient's room and provided 15 minutes of physical therapy. Tiwari

ordered that additional physical therapy and occupational therapy be provided to the dying patient that afternoon. The patient died the next day.

161.    LaFerriere also saw patients targeted for ultra-high levels of treatment prior to evaluations to determine actual patient needs, as well as the utilization of ultra-high levels of therapy, in order to attain maximum levels of reimbursement. Moreover, patients' treatment schedules were manipulated without regard to patients' needs in order to move patients into the highest RUG level for purposes of the next evaluation and re-certification for Medicare Part A coverage. Encore therapists "ramped up" therapy minutes toward the end of the seven-day "look-back" periods and also padded and fabricated minutes at the instruction of supervisors.

162.    While working on-site at MediLodge of Sterling Heights, LaFerriere participated in care plan meetings. The Director of Nursing (DON), Bunny Porter, gave the directive that patients were not to be discharged on certain days of the week. Barb Parsons, a social worker who assisted with discharge planning at MediLodge of Sterling Heights, likewise exerted pressure to retain patients at the facility.

163.    While at Autumn Woods Care Center, LaFerriere saw the facility's primary discharge planner tell the families of patients who had been recommended for discharge to keep their family members at the facility while still covered by

Part A. The facility's Administrator and DON also encouraged the provision of therapy to patients without regard to specific needs.

164. Encore management was well aware that their actions were fraudulent, as demonstrated by one Encore Regional Vice President telling an occupational therapist with whom LaFerriere worked, Shahid Khan, "If we checked the cameras we could fire any of you for fraud." No one was in fact fired for fraud.

165. Also while working at Autumn Woods, LaFerriere was instructed by his supervisor to recommend speech therapy services to patients who did not meet the requirements for those services. LaFerriere and other therapists were required to maintain a certain percentage of Part B patients. The TPM reviewed files of patients who had Part B coverage and instructed therapists, including LaFerriere, to provide therapy to those patients. LaFerriere also witnessed supervisors instructing physical and occupational therapists to meet the "team goal" of billing 3 – 4 CPT codes to Medicare Part B for each visit, a blind directive given without regard to specific patient needs. Relator believes based on personal observation that some of Encore's contracts were structured so that all Medicare Part B reimbursement went to Encore, which incentivized picking up as many Part B patients as possible.

166.   The threats, systemic fraud, and lack of regard for the welfare of patients disturbed LaFerriere, and he resigned from his position with Encore Rehabilitation in September 2016.

## VIII. STATUTORY BACKGROUND

### A.   Medicare

167.   Medicare is a federally-funded health insurance program that provides medical coverage for individuals who are over sixty-five years of age, disabled, or afflicted with end-stage renal disease. 42 U.S.C. § 1395 *et seq.* It is administered by the Center for Medicare and Medicaid Services ("CMS"), a division of the Department of Health and Human Services ("HHS"). HHS, through CMS, promulgates regulations governing the nature and scope of services that are covered by Medicare and the requirements and conditions of payments that Medicare providers must meet. *See generally* 42 U.S.C, Chapter IV. CMS also provides program instructions through various policy manuals that further expound the statutory and regulatory provisions governing Medicare.

168.   The Medicare program is divided into four parts that cover different services, two of which are at issue in the instant case. Medicare Part A covers inpatient hospital services, home health services, hospice care, and skilled nursing and rehabilitation care. 42 U.S.C. § 1395d. Medicare Part B generally covers medical expenses not covered under Part A, including physical and occupational

therapy and speech-language pathology services following exhaustion of a patient's Medicare Part A benefit period. 42 U.S.C. § 1395k.

169.   Any health care provider seeking to enroll in the Medicare program is required to sign a provider agreement with Medicare. *See* 42 C.F.R. § 489.10. Specifically, SNFs must sign Form CMS-855A, which contains the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is **conditioned upon the claim and the underlying transaction complying with such laws**, regulations and program instructions (including but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

*See* Medicare Enrollment Application, Institutional Providers, CMS-855A (emphasis added). The provider agreement makes it clear that payment is conditioned upon the compliance with all applicable laws, regulations, and program instructions.

170.   Medicare regulations provide that CMS may suspend payments to providers based upon a finding of a credible allegation of fraud, unless there exists good cause not to suspend payments, if for example a suspension would jeopardize an investigation or cause danger to life and health. *See* 42 C.F.R. §§ 405.370,

405.731. CMS may also recoup or offset payments as a result of any fraud resulting in overpayments by Medicare. *See generally* 42 C.F.R. Subpart C.

**1.    Medicare Part A**

**a.    Medicare Part A Coverage of SNF Rehabilitation Therapy**

171.    Skilled nursing facilities are facilities that offer inpatient rehabilitation treatment and are distinct from both traditional nursing homes and outpatient rehabilitation centers. Where traditional nursing homes are intended to provide only custodial care, such as assistance with bathing or changing clothes, and outpatient rehabilitation centers provide specialized treatment such as physical or occupational therapy for patients only during the day, skilled nursing facilities provide specialized treatment, such as physical, occupational, or speech therapy, for patients in an inpatient setting. *See* Your Medicare Coverage, Skilled Nursing Facility Care, available at https://www.medicare.gov/coverage/skilled-nursing-facility-care.html.

172.    "Generally, skilled care [at a skilled nursing facility] is covered by Medicare only for a short time after a hospitalization," and is intended to help address a specific issue or issues. *See* Exhibit 1 at 5 (Centers for Medicare & Medicaid Services, Medicare Coverage of Skilled Nursing Facilities). Patients "don't usually stay in a [skilled nursing facility] until they're completely recovered because Medicare only covers certain [skilled nursing facility] care services that

are needed daily on a short-term basis (up to 100 days)." *Id.* at 8. This is in contrast to traditional nursing homes, where patients often receive long-term custodial care.

173.  Medicare Part A covers up to 100 days of skilled nursing and rehabilitation care per benefit period (or spell of illness). 42 U.S.C. § 1395d(a)(2); 42 C.F.R. §§ 409.61(b). A patient qualifies for a benefit period and is covered by Medicare only if (1) the patient has been previously hospitalized for at least 3 consecutive days; (2) is in need for posthospital SNF care; and (3) receives the needed care within 30 days of the hospital stay.  42 C.F.R. § 409.30(a), (b).

174.  In order for rehabilitation therapy provided in a SNF to be covered by Medicare Part A, the following conditions must be met: (1) the patient must require skilled nursing care or skilled rehabilitation services, or both; (2) the patient must require these skilled services on a daily basis; (3) the daily skilled services must be services that can only be provided in a skilled nursing facility on an inpatient basis; and (4) the services are provided to address a condition for which the patient received treatment during a qualifying hospital stay, or for a condition that arose while the patient was receiving care in a SNF for a condition treated during the hospital stay. *See* 42 U.S.C. § 1395f(a)(2)(B); 42 C.F.R. § 409.31(b); *see also* Medicare Benefit Policy Manual, Chapter 8, § 30.

175.  As a condition of payment, Medicare requires a physician or certain other practitioners to certify that the patient meets these requirements at the time of

admission to the SNF and to re-certify the patient's continued need for skilled rehabilitation therapy services at regular intervals thereafter. *See* 42 U.S.C. § 1395(a)(2)(B); 42 C.F.R § 424.20; *see also* Medicare General Information, Eligibility, and Entitlement Manual, Ch. 4, §§ 40.2, 40.3.

176.   For skilled nursing services or skilled rehabilitation services "[t]o be considered a skilled service, the service must be so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel." 42 C.F.R. § 409.32(a). Skilled nursing and skilled rehabilitation services must be (1) furnished pursuant to physician orders; (2) require the skills of qualified technical or professional health personnel such as registered nurses, licensed practical (vocational) nurses, physical therapists, occupational therapists, and speech-language pathologists or audiologists; and (3) must be furnished directly by or under the general supervision of these skilled nursing or skilled rehabilitation personnel to assure the safety of the patient and to achieve the medically desired result. *See* 42 C.F.R. § 409.31(a); *see also* Medicare Benefit Policy Manual, Chapter 8, § 30.2.1.

177.   Importantly, Medicare will only cover services that are medically necessary, i.e., that are "**reasonable and necessary** for the diagnosis and treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y (a)(1)(A) (emphasis added).

64

178.   In the context of skilled rehabilitation therapy, this means that services provided by SNFs (1) must be consistent with the nature and severity of a patient's individual illness, injury, or particular medical needs; (2) must be consistent with accepted standards of medical practice; and (3) must be reasonable in terms of duration and quantity. *See* Medicare Benefit Policy Manual, Ch. 8, § 30; *see also* Medicare Program Integrity Manual, Ch. 13, § 13.5.1.

179.   Physical therapy services are not reasonable and necessary and would not be covered if the expected results are insignificant in relation to the extent and duration of physical therapy services that would be required to achieve those results. *Id.*

180.   Determinations of whether skilled services are reasonable and necessary are made from the perspective of the patient's condition when the services were ordered and what was, at that time, reasonably expected to be appropriate treatment for the illness or injury. Medicare Benefit Policy Manual, Chapter 8, § 30.2.2.1. However, if it becomes apparent at some point that the goal set for the patient is no longer a reasonable one, then the treatment goal itself should be promptly and appropriately modified to reflect this, and the patient should be reassessed to determine whether the treatment goal as revised continues to require the provision of skilled services. *Id.*

181.   In particular, skilled therapy services must be provided with the expectation that the condition of a patient will *materially improve* in a reasonable period of time. Medicare Benefit Policy Manual, Chapter 8, § 30.4.1.1 (emphasis added).

182.   Skilled therapy services generally do not include personal care services, repetitive exercises to improve gait or maintain strength and endurance, as well as assistive walking services. Medicare Benefit Policy Manual, Chapter 8, § 30.4.1.2. It also does not include custodial care. *Id.*, Chapter 8, § § 50.

183.   In order to determine whether skilled rehabilitation therapy services are reasonable and determine whether the services are eligible for reimbursement, Medicare requires proper and complete documentation of services rendered to beneficiaries. In particular, the Medicare statute provides that:

> The Secretary shall periodically determine the amount which should be paid under this part to each provider of services with respect to the services furnished by it, and the provider of services shall be paid, at such time or times as the Secretary believes appropriate (but not less often than monthly) and prior to audit or settlement by the Government Accountability Office, from the Federal Hospital Insurance Trust Fund, the amounts so determined, with necessary adjustments on account of previously made overpayments or underpayments; except that no such payments shall be made to any provider unless it has furnished such information as the Secretary may request in order to determine the amounts due such provider under this part for the period with respect to which the amounts are being paid or any prior period.

42 U.S.C. § 1395g(a).

**b.      Medicare Part A Reimbursement for SNF Rehabilitation Therapy**

184.    Under its prospective payment system ("PPS"), Medicare pays a nursing facility a pre-determined daily rate for each day of skilled nursing and rehabilitation services it provides to a patient. *See* 42 C.F.R. § 413.330. The daily PPS rate that Medicare pays a nursing facility depends on the Resource Utilization Group ("RUG") to which a patient is assigned. 42 C.F.R. § 413.337. Each distinct RUG is intended to reflect the anticipated costs associated with providing nursing and rehabilitation services to beneficiaries with similar characteristics or resource needs. 63 Fed. Reg. 26,252, 26,261 (May 12, 1998).

185.    The RUG classification system has seven major patient type categories: Rehabilitation, Extensive Services, Special Care, Clinically Complex, Impaired Cognition, Behavioral Problems, and Reduced Physical Functions. 63 Fed. Reg. at 26,257.

186.    There are five RUG levels within the Rehabilitation category: Rehabilitation Ultra High ("RU"); Rehabilitation Very High ("RV"); Rehabilitation High ("RH"); Rehabilitation Medium ("RM"); and Rehabilitation Low ("RL"). 63 Fed. Reg. at 26,258. The rehabilitation RUG level to which a patient is assigned depends upon both the number of skilled therapy minutes and the number of therapy disciplines that a patient receives. *Id.* The RUG system

"uses minimum levels of minutes per week as qualifiers for classification into the rehabilitation therapy groups. These are minimums and are not to be counted as upper limits for service provision." 64 Fed. Reg. 41,644, 41,662 (July 30, 1999).

187.    The following chart reflects the requirements for the five rehabilitation RUG levels:

| Rehabilitation RUG Level | Requirements to Attain RUG Level |
|---|---|
| RU = Ultra High | 1. Minimum 720 minutes per week total therapy<br>2. At least two therapy disciplines<br>3. One discipline must be provided at least 5 days per week |
| RV = Very High | 1. Between 500 to 719 minutes per week total therapy<br>2. One therapy discipline must be provided at least 5 days per week |
| RH = High | 1. Between 325 to 499 minutes per week total therapy<br>2. One therapy discipline must be provided at least 5 days per week |
| RM = Medium | 1. Between 150 to 324 minutes per week total therapy<br>2. Therapy must be provided at least 5 days per week<br>3. Can be any mix of therapy disciplines |
| RL = Low | 1. Minimum 45 minutes per week total therapy<br>2. Therapy must be provided at least 3 days per week<br>3. Can be any mix of therapy disciplines |

63 Fed. Reg. at 26,262.

188.    Medicare pays the highest rate for those patients that fall in the RU level. This level is "intended to apply only to the most complex cases requiring rehabilitative therapy well above the average amount of service time." 63 Fed. Reg. at 26,258.

189.    Effective 2006, CMS added the Rehabilitation Plus Extensive Services category to account for patients who qualified for the Rehabilitation category and Extensive Services category. 70 Fed. Reg. 29,070, 29,076 (May 19,

2005). To qualify for Extensive Services, a patient must need intravenous treatment, tracheostomy care, a ventilator/respirator, or suctioning. 63 Fed. Reg. at 26,263.

190.  Medicare reimbursement also varies within each RUG level depending on the patient's ability to perform certain activities of daily living ("ADLs"), such as eating, toileting, bed mobility, and transfers (*e.g.*, from a bed to a chair). 63 Fed. Reg. at 26,263.

191.  ADL scores of A, B, C, L, or X are assigned to each patient. A patient who can perform ADLs without assistance would receive an "A," while a patient who requires assistance with all ADLs, but does not require extensive services, would receive a "C." A patient who requires only one of the extensive services may receive an ADL score of "L," while a patient who requires several extensive services would generally receive an ADL score of "X."

192.  The summary chart below shows the impact that a RUG level and ADL score have on the Medicare daily reimbursement rate for FY 2016.[8]

---

[8] Medicare adjusts base PPS rates annually and based on locality. *See* 42 U.S.C. § 1395yy(e)(4)(E)(ii)(IV).

| RUG Rates: Federal Rates for Fiscal Year 2016 | | | | |
|---|---|---|---|---|
| | Rehabilitation with Extensive Services | | Rehabilitation without Extensive Services | |
| **RUG Level** | **X** | **L** | **C** | **B** | **A** |
| **RU** | $785.50 | $768.39 | $595.51 | $595.51 | $497.94 |
| **RV** | $699.15 | $627.26 | $510.87 | $442.40 | $440.69 |
| **RH** | $633.44 | $564.98 | $445.16 | $400.65 | $352.72 |
| **RM** | $581.07 | $533.14 | $391.07 | $367.11 | $302.06 |
| **RL** | $510.30 | n/a | n/a | $380.22 | $244.99 |

80 Fed. Reg. 46,390, 46,398 (Aug. 4, 2015).

193.   Prior to 2012, a therapist could provide group therapy to four or fewer patients and the amount of time a therapist spent providing therapy to the group counted fully towards each patient's weekly total, provided that these minutes did not amount to 25% or more of the patient's weekly therapy in that discipline. 64 Fed. Reg. at 41,662. In 2012, CMS changed this policy, noting that it "create[d] an inappropriate payment incentive to perform group therapy in place of individual therapy[.]" 76 Fed. Reg. 48,486 48,511 (Aug. 8, 2011). Since 2012, group therapy minutes have been allocated among patients, meaning that a skilled nursing facility can no longer *multiply* the total minutes provided in group therapy by the number of patients; instead, the total minutes provided in group therapy is *divided* by the number of patients. 76 Fed. Reg. at 48,512–48,517.

### c.      Medicare Part A Claims for Payment

194.    Medicare requires SNFs to periodically assess each patient's clinical condition and functional capacity. 42 C.F.R. § 483.20. Specifically, SNFs are required to assess a patient on the 5th, 14th, 30th, 60th, and 90th days of the patient's stay in the facility. 42 C.F.R. § 413.343(b). SNFs are required to transmit the results of these assessments to CMS using a standardized tool known as the Minimum Data Set ("MDS"). 42 C.F.R. § 483.20(f).

195.    Each assessment must be performed based on an Assessment Reference Date (ARD) within the specified window. 76 Fed. Reg. 26,364, 26,388–26,389 (May 6, 2011). The Assessment Reference Date (ARD) refers to the last day of the observation period that the assessment covers. *See* RAI Manual, Chapter 2, § 2.5, at Page 2-9 (definition of Assessment Reference Date). The observation period is the time period over which a resident's condition is captured by the MDS, which is generally 7 days. *See* RAI Manual, Chapter 2, § 2.5, at Page 2-14 (definition of Observation (Look Back) Period). This seven-day period is referred to as the "look-back period." *Id.*

196.    SNFs are required to report the number of minutes of skilled rehabilitation therapy the facility provided to a patient during the look-back period as well as the types of therapy provided in the "Special Treatments, Procedures, and Treatments. . . . Therapies" portion of a patient's MDS. RAI Manual, Chapter

1, § O, at Pages O-14 to O-31. In particular, a SNF must report the number of days and minutes of therapy the SNF provided to a patient in each of the following therapy disciplines: physical therapy, occupational therapy, and speech-language pathology. *Id.* The minutes reported directly impacts the RUG level assigned to each patient and therefore the amount of reimbursement that the SNF will receive for that patient.

197.    The RUG group determines the prospective payment that a SNF will be paid for a defined period of time. *See* 63 Fed. Reg. at 26,267.[9] For example, if a patient is assessed on day 14 of his stay, and the MDS reflects that the patient received 720 minutes of therapy during days 7 through 14 of the stay, then a facility will be paid the Ultra High RUG level for days 15 through 30 of the patient's stay.

198.    The following table demonstrates the link between the MDS assessment schedule and Medicare prospective payment to SNFs:

| Medicare PPS | | |
|---|---|---|
| **MDS Assessment Schedule Type** | **Assessment Reference Date (ARD)** | **Applicable Medicare Payment Days** |
| 5 day | Days 1 – 5 | 1 through 14 |
| 14 day | Days 13 – 14 | 15 through 30 |
| 30 day | Days 27 – 29 | 31 through 60 |
| 60 day | Days 57 – 59 | 61 through 90 |
| 90 day | Days 87 – 89 | 90 through 100 |

---

[9] Payment for days 1 through 14 is based on the number of therapy minutes provided through the five-day assessment, as well as an estimate of the number of minutes to be provided through day 14. *See* 63 Fed. Reg. at 26,265–67; 64 Fed. Reg. at 41,662.

RAI Manual, Ch. 2, § 2.8, at page 2-43.

199.   To receive payment under Medicare, a facility must complete an MDS for each patient. *See* 63 Fed. Reg. at 26,265. Each individual who completes a portion of the MDS must certify the accuracy of that portion of the assessment and a registered nurse must ultimately certify that the assessment has been completed. 42 C.F.R. § 483.20(i). Providers completing the MDS must sign and certify that the information in the MDS "accurately reflects resident assessment information for this resident" and that the "information was collected in accordance with applicable Medicare and Medicaid requirements." Minimum Data Set (MDS) – Version 3.0, Resident Assessment and Care Screening, Section Z.   Providers further certify that: "I understand that this information is used . . . as basis for payment from federal funds" and "that payment of such federal funds and continued participation in the government-funded health care programs is conditioned on the accuracy and truthfulness of this information." *Id.*

200.   The RUG groups are also incorporated into the Health Insurance Prospective Payment System (HIPPS) Code. HIPPS codes are billing codes facilities use when submitting Medicare Part A SNF payment claims. *See* RAI Manual, Chapter 5, § 5.4. The HIPPS code consists of 5 positions: a 3-character RUG code and a 2-digit assessment indicator corresponding to the assessment

type. *Id.* The HIPPS code, consisting of the RUG code and AI code, is generated from a patient's MDS. *Id.*

201.   Institutional providers, such as SNFs, must bill Medicare electronically using the CMS-1450 (also known as UB-04) claim form. *See* Medicare Claims Processing Manual, Ch. 6, § 10.1. When billing Medicare, SNFs must include the HIPPS code in Field 44 of the CMS-1450 claim form. Medicare Claims Processing Manual, Ch. 25, § 75.5. The HIPPS code contained in a claim must match the HIPPS code found in the patient's MDS assessment. Medicare Claims Processing Manual, Chapter 6, § 30.1. Medicare payments are made according to the RUG code a nursing facility submits in the claim. *See* 63 Fed. Reg. at 26,267; Medicare Claims Processing Manual, Ch. 25, § 75.5.

202.   Facilities submit claims to Medicare payment processors known as Medicare Administrative Contractors ("MACs"). MACs process and pay Medicare Part A claims submitted by SNFs for skilled nursing and rehabilitation therapy services.

203.   Each time a facility submits a claim, CMS-1450 requires providers to certify that the information in the claim is "true, accurate, and complete" and "[t]hat the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts." Form CMS-1450. It also states that "MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL

INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S)." *Id.* (emphasis in original).

### 2.    Medicare Part B

204.    Medicare Part B pays for outpatient physical therapy services, occupational therapy services, and speech language pathology services furnished to an inpatient of a hospital, critical access hospital, or SNF who requires them but who has exhausted or is otherwise ineligible for benefit days under Medicare Part A. 42 C.F.R. §§ 410.60(b), 410.59(b), 410.62(b); Medicare Claims Processing Manual, Ch. 7, § 10; *see also generally* Medicare Benefit Manual, Ch. 15, § 220.

205.    Items or services provided to a Part B beneficiary must be reasonable  and medically necessary. *See* 42 U.S.C. § 1395y(a).

206.    Part B payments are based on a fee schedule for the specific items or services provided, termed the Medicare Physician's Fee Schedule. 42 U.S.C. § 1395yy(e)(9); Medicare Claims Processing Manual, Ch. 23, § 30. They are not, contrary to Part A payments, based on a daily rate. "[W]here a fee schedule exists for the type of service, the fee amount will be paid. Where a fee does not exist on the Medicare Physician Fee Schedule (MPFS) the particular service is priced based

on cost." Medicare Claims Processing Manual, Ch. 7, § 10.5; Medicare Claims Processing Manual, Ch. 23, § 30.D.

207.   Part B skilled nursing facility claims are submitted on CMS-1450 forms using Healthcare Common Procedure Coding System (HCPCS) codes to bill the number of units of outpatient rehabilitation services provided to a patient. *See* 42 C.F.R. § 424.32; Medicare Claims Processing Manual, Ch. 5, § 20.2; Medicare Claims Processing Manual, Ch. 7, § 20; Medicare Claims Processing Manual, Ch. 23, §§ 20.3, 30. HCPCS codes are based on CPT codes. Medicare Claims Processing Manual, Ch. 23, § 20.

208.   There are two types of HCPCS codes that can be submitted: timed and untimed. Untimed codes are used to bill for procedures that are not defined by a specific timeframe, but that are based on the number of times a procedure is performed in a day. Medicare Claims Processing Manual, Ch. 5, § 20.2.B. Time-based codes are used to bill for time spent providing therapy services and procedures to patients based on 15-minute increments, where each increment is one (1) billing unit. *Id.* A provider can only bill for units of time that are spent in direct (one-on-one) contact with a patient. *Id.*

209.   Since 1998, Medicare has had in place billing requirements regarding these time-based 15-minute increments units. *Id.* At the heart of these requirements is the 8-minute rule, which dictates that in order to bill for the first and each

additional time-based unit, the therapist must spend at least eight (8) minutes (or more than 8 minutes after each 15-minute interval) providing direct service to a patient. The time intervals for 1 through 8 units are as follows:

| Time-Based Billing Codes | |
|---|---|
| Therapy Minutes Provided | Units of Time that Can Be Billed |
| 8 through 22 | 1 |
| 23 through 37 | 2 |
| 38 through 52 | 3 |
| 53 through 67 | 4 |
| 68 through 82 | 5 |
| 83 through 97 | 6 |
| 98 through 112 | 7 |
| 113 through 137 | 8 |

*Id.*

210.    "All Part B claims for services furnished to [skilled nursing facility] residents (whether filed by the [skilled nursing facility] or by another entity) must include the [skilled nursing facility's] Medicare provider number and appropriate HCPCS coding." 42 C.F.R. § 424.32(a)(5). Providers must certify the accuracy and completeness of the information contained on the CMS-1450. Form CMS-1450.

211.    Under Medicare Part B, CMS makes retrospective payments through a MAC to Medicare providers for patient services. The MAC will review and approve claims submitted for reimbursement by Medicare providers and makes payments on those claims which appear to be eligible for reimbursement under the Medicare Program.

### 3.      Medicare Cost Report Certifications

212.    Providers are also required to submit cost reports on an annual basis, and must certify that the cost reports are correct and that the provider or entity has complied with the relevant laws and regulations. 42 C.F.R. §§ 413.20(b), 413.24(d), (f). That report requires the provider or chief financial offer sign the following certification:

> I hereby certify that I have read the above certification statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet Statement of Revenue and Expenses prepared by _____ (Provider Name(s) and Number(s)) for the cost reporting period beginning ___ and ending ___ and that to the best of my knowledge and belief, this report and statement are true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

42 C.F.R. § 413.24(f)(4)(iv).

## B.      Medicaid

### 1.      Overview of the Medicaid Program

213.    Medicaid was established by Title XIX of the Social Security Act of 1965. 42 U.S.C. § 1396 *et seq.* It is a joint federal-state program that provides healthcare benefits to certain demographic groups, particularly the poor and disabled.

214.   Within broad national guidelines established by federal statutes, regulations and policies, each state (i) establishes its own eligibility standards; (ii) determines the type, amount, duration, and scope of services; (iii) sets the rate of payment for services; and (4) administers its own program.  42 C.F.R. § 430.0. Most states reimburse nursing homes with a prospective payment system similar to Medicare.

### 2.   Medicaid Reimbursement for Skilled Nursing Care

215.   Medicaid coverage includes skilled nursing care, long-term care, and nursing home care, for eligible individuals.  To be eligible for Medicaid assistance with the costs of nursing home care, individuals must have limited assets and must contribute all of their available income toward the cost of that care.

216.   Unlike Medicare, Medicaid covers custodial care provided to patients in long-term care or nursing home facilities.  Staff providing custodial care in these facilities will assist patients with daily activities such as dressing and eating.

217.   Some individuals, who are known as "dual eligibles," qualify for Medicare coverage but also have such limited resources that they qualify for Medicaid benefits as well.

218.   Medicare Part A covers up to 100 days of skilled nursing and rehabilitation care per benefit period. 42 C.F.R. § 409.63(b). For the first 20 days,

Medicare Part A pays 100% of all covered services of a dual eligible's stay in a skilled nursing facility. 42 C.F.R. § 409.63(b).

219.   From the 21st to the 100th day of a patient's stay in a skilled nursing facility, Medicare Part A pays for all covered services, except that a patient becomes responsible for a paying a daily "coinsurance" amount. This coinsurance amount is paid by Medicaid if the patient is a dual eligible. During this time period, patients who are dual eligibles begin to have their care covered by both Medicare and Medicaid. The specific coinsurance amount for the 21st day to the 100th day increases each year and is published annually in the Federal Register. The coinsurance amount for FY 2016 is $161.00 per day. *See* 80 Fed. Reg. 70,808 (Nov. 16, 2015).

220.   Once the 100th day of service is reached, the patient has exhausted his or her Medicare benefits for skilled nursing care for that particular benefit period. From the 101st day onward, Medicaid pays 100% of the costs of a dual eligible's stay at the skilled nursing facility.

### 3.   Medicaid Certifications

221.   Providers make express and/or implied certifications in their state Medicaid provider enrollment forms that they will comply with all federal and state laws applicable to Medicaid.  The following are representative samples of the types of certifications required by provider enrollment forms and agreements:

222.  **California:** When a provider enters into the "Medi-Cal Provider Agreement" with the State of California's Health and Human Services Agency, the provider agrees under the Provider Attestation section that "compliance with the provisions of this agreement is a condition precedent to payment to the provider." Medi-Cal Provider Agreement, Item 41. Provider Attestation, at 8, http://files.medi-cal.ca.gov/pubsdoco/provappsenroll/o2enrollment_ DHCS6208.pdf and incorporated herein).  The agreement's provisions include the provider's agreement to comply with the California Department of Health Care Services' rules, regulations and provisions found in Chapters 7 and 8 of the Welfare and Institutions Code as well as all federal laws and regulations governing and regulating Medicaid providers.  *Id.*, Item 2, at 1.  Furthermore, the provider agrees not to engage in or commit fraud under applicable federal or state laws and abuse that would result in unnecessary costs to health care programs financed in whole or in part by the Federal Government or any state or local agency in California or any other state, or practices that are inconsistent with sound medical practices that result in reimbursement from health care programs financed in whole or in part by the Federal Government or any state or local agency in California or any other state.  *Id.*, Item 15, at 3.  Finally, the provider agrees to comply with the Welfare and Institutions Code billing and claims requirements, its implementing regulations and the provider manual.  *Id., Item 24, at 4*.

223.   **Connecticut:** The State of Connecticut requires providers to enter into a "Health Care Financing Provider Enrollment Agreement" with the Department of Social Services ("DSS"). By signing the contract, the provider agrees to "abide by and comply with all federal and state statutes, regulations, and policies pertaining to Provider's participation in the Connecticut Medical Assistance Program." Health Care Financing Provider Enrollment Agreement, General Provider Requirements: Item 2, at 1, www.ct.gov/.../exhibit_1_dss_medicaid_provider_enrollment_agreement and incorporated by reference herein. The provider also agrees to abide by the DSS Medical Assistance Program Provider Manual(s). *Id.*, General Provider Requirements: Item 11, Page 3. Furthermore, a provider agrees to only submit claims for goods and services that are documented as being "medically necessary." *Id.*, Billing/Payment Rates: Item 15, at 4.

224.   **Georgia:** In Georgia, a provider must sign an enrollment agreement with the Department of Community Health, Division of Medical Assistance, wherein a provider agrees to comply with all Department requirements, including applicable manuals and federal and state statutes and regulations. Department of Community Health Division of Medical Assistance Statement of Participation, Item 2, § A, at 1, https://www.mmis.georgia.gov/portal/Portals/0/Static/Content/Public/ALL/FORM

S/Stmt_of_Participation%2013-02-2012%20212352.pdf, and incorporated by reference herein. A provider also agrees to "submit claims for Covered Services" and "certify each claims for truth, accuracy, and completeness." *Id.* Item 2, § B.4.A, at 1.

225.  **Illinois:** Under the Illinois "Agreement for Participation in the Illinois Medical Assistance Program," a provider agrees "on a continuing basis, to comply with all applicable Federal, State and Department laws, regulations, rules, requirements, policies, and procedures . . . and Program provider handbooks, policies and requirements." State of Illinois Department of Healthcare and Family Services Agreement for Participation Illinois Medical Assistance Program, Item 1, Page 1, http://www.hfs.illinois.gov/assets/hfs1413.pdf, and incorporated by reference herein. The provider agrees to be "fully liable for the truth, accuracy and completeness of all claims submitted . . . for payment," acknowledges that all services provided will be in compliance with the law, and that compliance with the law is "a condition of payment for all claims submitted." *Id.*, Item 5, Page 1. The provider further agrees that "[a]ny submittal of false or fraudulent claim or claims or any concealment of a material fact may be prosecuted under applicable Federal and State laws." *Id.*

226.  **Maryland:** The State of Maryland requires providers to sign the State Department of Health and Mental Hygiene's "Provider Agreement for

Participation in Maryland Medical Assistance Program." By signing the contract, the provider agrees to comply with "all applicable federal and state laws, statutes, rules and regulations, as well as administrative policies, procedures, transmittals, and guidelines issued by the Department . . . including but not limited to . . . submitting accurate, complete and timely claims." Provider Agreement for Participation in Maryland Medical Assistance Program, Item A, at 1, https://mmcp.dhmh.maryland.gov/docs/Provider_ Agreement_Signed.pdf, and incorporated by reference herein. A provider also agrees to submit claims that are "medically necessary" and "acknowledges the submission of false or fraudulent claims could result in criminal prosecution and civil and administrative sanctions." *Id.*, Item J, at 3.

227.   **Commonwealth of Massachusetts:** The Massachusetts Executive Office of Health and Human Services, the Commonwealth's Medicaid agency, requires providers to sign a contract to participate as a MassHealth provider. 130 Mass. Code Regs. 450.223(C). In signing the agreement, the provider agrees to comply with all laws, rules, and regulations governing MassHealth. *Id.* Furthermore, the provider agrees that with every claim submission, the provider certifies, whether or not the certification is on the claims, that the "information submitted in, with, or in support of the claim is true, accurate, and complete." *Id.*

228.   **Michigan:** Michigan requires providers to enter into an enrollment agreement with the Michigan Department of Health and Human Services.  Mich. Comp. L. § 400.111b(4); *see also* Michigan Medicaid Provider Manual, General Information for Providers, Section 2 (April 1, 2016) (incorporated by reference herein). Providers are required to submit claims in accordance with the law, "must certify by signature that a claim is true, accurate, and contains no false or erroneous information," and certify that "health care services provided were within the limitation of Medicaid (or compliance with a contract)." Michigan Medicaid Provider Manual, General Information for Providers, Sections 12, 12.8.

229.   **North Carolina:** North Carolina requires providers to electronically sign a "Provider Administrative Participation Agreement" with the North Carolina Department of Health and Human Services. A provider agrees to "submit claims . . . in accordance with rules and billing instructions," that "payment for covered services . . . is limited to those services that are medically necessary," that "payment . . . of claims will be from federal and state funds," and that "all claims are subject to the North Carolina False Claims Act, . . . the federal False Claims Act, and when applicable the Medical Assistance Provider False Claims Act."  A provider may submit claims to the state Medicaid program either through electronic or paper claims submission process.  In consideration for the right to submit electronic claims, the provider agrees to "abide by all Federal and State

statutes, rules, regulations and policies…of the Medicaid program . . . ."  NC
DHSS  Provider  Administrative  Participation  Agreement,  Items  a,  i,  k
(https://www.nctracks.nc.gov/content/public/providers/provider-enrollment/terms-
and-conditions/admin-participation-rev.html).

230.  **Tennessee:** In Tennessee, a provider signs an agreement with  the
Department of Finance and Administration in order to participate in the Tennessee
Medicaid health care program, TennCare.  By signing the agreement, the applicant
agrees to, among other things, "comply with all contractual terms and Medicaid
policies  as  outlined  in  Federal  and  State  rules  and  regulations  and  Medicaid
provider manuals and bulletins."   State of Tennessee The Department of Finance
and  Administration  Provider  Participation  Agreement  Medicaid/TennCare  Title
XIX Program, Item 7, at 1, http://www.tn.gov/tenncare/forms/mccchoices.pdf, and
incorporated by reference herein.

231.  **Texas:** To receive reimbursement from the Texas Medical Assistance
Program, a provider must sign an HHSC Medicaid Provider Agreement. Therein, a
provider agrees to "comply with all the requirements of the Provider Manual, as
well as all state and Federal laws governing or regulating Medicaid" and agrees it
is "subject to all state and federal law and regulations relating to fraud, abuse, and
waste  in  health  care  and  the  Medicaid  program."  HHSC  Medicaid  Provider
Agreement, Items 1.1, 1.2.3. Furthermore, a provider agrees to "submit claims for

payment in accordance with billing guidelines and procedures" and "certifies that information submitted regarding claims or encounter data will be true, accurate, and complete." *Id.*, Item 1.3.1. Finally, a provider certifies and agrees to "abide by all Medicaid regulations, program instructions, and Title XIX of the Social Security Act" and "understands that payment of a claim by Medicaid is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions. *Id.*, Item 12.1(i).

### 4.    Medicaid Reimbursement Methodologies

232.   As discussed *supra*, Medicaid covers the daily coinsurance payment for dual-eligibles after the twentieth day of their stay at a skilled nursing facility and pays for all covered services once dual-eligibles exhaust their Medicare benefits for that particular benefit period. 42 C.F.R. § 409.85.

233.   Medicaid reimbursement varies by state. Pursuant to 42 U.S.C. § 1396a(a)(3), a state is required to set forth its payment methodology in its Medicaid State Plan. Many states further codify their reimbursement methodologies in statutes, regulations, and Medicaid manuals.

234.   Many states set reimbursement rates based on cost. In a cost-based system, rates are established prospectively, based on facilities' past reported costs. New rates are set each year using actual costs from the prior year, or are inflated from a selected previous year's costs.

235.   There are two different approaches to the prospective cost-based methodology: acuity-based systems, which take into account the severity of patient needs, and systems that do not account for acuity. For the acuity-based approach, the daily reimbursement rate paid by Medicaid is calculated by adjusting the direct care cost component for the patient's acuity. The other approach does not consider the acuity of the resident in setting reimbursement rates. Nevertheless, with either approach, the overall per diem rate that a facility is paid is also impacted by supplemental payments for additional services, and peer groupings whereby similarly situated facilities are arrayed based on like-costs, number of beds, geography, and/or occupancy rate standards.

236.   States that classify patients based on acuity are referred to as "Case-Mix States." "Case-mix reimbursement" refers to a payment system that reimburses each facility according to the amount of resources consumed while treating its case-mix of Medicaid residents according to their level of care. Under a case-mix system and similar to Medicare Part A, Medicaid pays a higher daily rate for patients requiring more services.

237.   In states that employ a case-mix system, the per diem payment for Medicaid residents is determined by the average Case Mix Index ("CMI") for the facility.  There are several approaches to case-mix methodology for payments to skilled nursing facilities. Many states have adopted the RUG system used in the

Medicare program, as discussed *supra*. In states using the RUG system, the RUG level is derived from data entered into the MDS assessment, which assesses patient needs. Alternatively, states may choose to adopt their own classification system based on the patient's level of care.

### a.    States Utilizing a Case-Mix System

#### Delaware

238.    Delaware's per diem rate for nursing facility services consists of five rate components: primary patient care (nursing), secondary patient care, support services, administrative, and capital costs. Delaware Medicaid State Plan, Attachment       4.19-D,       at       2–3       (available       at http://dhss.delaware.gov/dhss/dmma/files//sp_attachment_4_11_a_to_7_2_a.pdf).

239.    The primary patient care component of the per diem rate is directly related to each patient's classification. In order to establish a patient's classification for reimbursement, patients are scored according to the specific amount of staff assistance needed in the following Activity of Daily Living (ADL) dependency areas: Eating, Mobility, Transfer, and Toileting. *Id.* at 6–7.

240.    Each patient class is subject to up to three additional "add-ons" for rehabilitative and psycho-social nursing services that are beyond the scope of basic nursing care. Delaware Medicaid State Plan, Attachment 4.19-D, at 6. For instance, patients receiving an active rehabilitative/preventive program are reimbursed an

additional 20 percent of the primary care rate component. *Id.* at 4, 5, 6. Patients exhibiting disruptive, psycho-social behaviors receive an additional 10 percent of the primary care rate component. *Id.* at 5, 6. Thus, the primary care component will depend on a patient's class and qualification for added rehabilitative/preventive and/or psychosocial reimbursement.

### Georgia

241.   In Georgia, all nursing home residents are classified using the RUG-II 34-group model, which uses a patient's MDS to determine the RUG classification. Georgia Medicaid State Plan, Attachment 4.19-D, Supplement 3, at 5 (available at http://dch.georgia.gov/sites/dch.georgia.gov/files/related_files/document/State_Plan_Attachment_4.pdf).

### Illinois

242.   Prior to 2015, Illinois employed a state-specific, case-mix, prospective reimbursement system based on a patient's MDS. *See* Illinois Healthcare and Family Services, Nursing Home Rate Calculation Handbook, January 2009, at 2, 3, 6. Illinois currently employs the RUG-IV 48-group model. ILL. ADMIN. CODE tit. 89, § 147.310.

### Indiana

243.   Indiana Medicaid uses the RUG-III resident classification system consisting of 34 classifications to classify nursing home residents into a case-mix

index. 405 IND. ADMIN. CODE 1-14.6-7(g); *see also* Indiana Medicaid State Plan, Attachment 4.19-D, at 19–21 (available at http://www.indianamedicaid.com/ihcp/StatePlan/Attachments_and_Supplements/Section_4/4.19d_16-25.pdf).

**Iowa**

244.   Iowa's Medicaid agency classifies all nursing home residents using the RUG-III 34-group model. IOWA ADMIN. CODE r. 441-81.6(19) (249A).

**Louisiana**

245.   The Louisiana Department of Health and Hospitals administers the state's Medicaid program and classifies all nursing home residents using the RUG-III 34-group model. LA. ADMIN CODE tit. 50, pt. II, § 20007.

**Maryland**

246.   Maryland Medicaid classifies nursing facility residents using the RUG-IV 48-group model.  MD. CODE REGS. 10.09.10.01(70). Prior to 2015, using a prospective, cost-based methodology to calculate the reimbursement rate, Maryland employed a state-specific, case-mix classification system based on case-mix weights corresponding to the Activities of Daily Living (ADLs). Residents were assessed using an ADL classification based on the dependency of the resident in five activities of daily living: (1) Bathing; (2) Dressing; (3) Mobility; (4) Continence; and (5) Feeding. MD. CODE REGS. 10.09.10.11(J). Each resident was

then assigned to one of nine ADL classifications based on the number of dependencies among the five ADLs. MD. CODE REGS. 10.09.10.11(G)(8), The main four ADL classification and reimbursement levels were: Light; Moderate; Heavy; Heavy Special. MD. CODE REGS. 10.09.10.11(K), (L).

**Commonwealth of Massachusetts**

247.   The Massachusetts Executive Office of Health and Human Services administers the state's Medicaid program, MassHealth, and through its Division of Healthcare Finance and Policy sets Medicaid reimbursement rates for nursing facilities. A daily reimbursement rate is calculated utilizing a prospective case-mix system that adjusts reimbursement based on resident acuity. MassHealth does not utilize CMS's Resource Utilization Group case-mix system to measure resident acuity, however, and instead uses its own classification system entitled, "Management Minute System (MMS)". *See* Nicole Nube, Massachusetts' Medicaid Nursing Home Payment System (January 28, 2009), available at https://www.cga.ct.gov/2009/rpt/2009-R-0041.htm.

248.   To receive MassHealth reimbursement, a nursing facility must complete a Management Minutes Questionnaire (MMQ) to determine the amount of care that a patient requires. 130 MASS. CODE REGS. 456.420. Based on the information provided in the MMQ, a patient is assigned to one of ten Management

Minutes Categories (MMC), which corresponds to a one of six payment levels. *Id.*

MassHealth pays higher daily rates for patients in need of more services.

### Minnesota

249.   Since 2012, Minnesota's Medicaid agency has classified all nursing home residents using the RUG IV 48-group model. MINN. STAT. ANN. § 144.0724, Subd. 3a. Prior to 2012, Minnesota employed the RUG III 34-group model for its Medicaid nursing facility residents.

### New Jersey

250.   To calculate Medicaid reimbursement rates, New Jersey classifies all nursing home residents using the RUG-III 34-group model. N.J. ADMIN. CODE §§ 8:85-3.4; 8:85-1.2.

### New York

251.   New York Medicaid classifies nursing home residents using the RUG-III 53-group model, with NYS Specific RUG Weights for Medicaid reimbursement. DAL: DRS 11-02: NY MDS 3.0 Requirements, Including Sections S and Z (available at https://www.health.ny.gov/professionals/nursing_home_administrator/docs/dal_11 -02_ny_mds_3.0_requir_incl_sec_s&z.pdf); CMS's RAI Version 3.0 Manual, NY APPENDIX A:   MDS 3.0 NY-Specific Requirements, at 9 (available at

https://www.health.ny.gov/professionals/nursing_home_administrator/docs/11-02_appendix_a_ny-specific_requiremetns.pdf).

**North Carolina**

252.    To calculate Medicaid reimbursement rates, North Carolina classifies all nursing home residents using the RUG-III, 34-group model. *See* Clinical Coverage Policy 2B-1, Nursing Facilities, Attachment G, at 47 (available at https://ncdma.s3.amazonaws.com/s3fs-public/documents/files/2B1.pdf).

**Rhode Island**

253.    Effective February 1, 2010, Rhode Island began using the RUG-III 34-group model. R.I. CODE R. 39-1-96:1. By June 1, 2013, Rhode Island began classifying all nursing facility residents using the RUG-IV 48-group model. *See* Rhode Island Medicaid Resource Utilization Grouper (RUG) Frequently Asked Questions, at 1 (available at http://www.eohhs.ri.gov/Portals/0/Uploads/Documents/RUG_FAQ.pdf).

**Tennessee**

254.    As of 2016, Tennessee employs a case-mix methodology using the RUG IV, 48-group model. TENN. CODE. ANN. § 71-5-1002(h)(3). Prior to the decision to transition to RUG, TennCare, Tennessee's Medicaid program, used a state-specific acuity-based reimbursement methodology to determine payment rates to skilled nursing facilities.

255.    To classify a nursing facility patient based on their acuity level, Tennessee used a numeric score derived from their Activities of Daily Living (ADLs). TENN. COMP. R. & REGS. 1200-13-01-.10. The ADLs assessed the patient's (1) need for assistance with transfer, mobility, eating and toileting; and (2) independence or deficiency in communication, orientation, dementia-related behavior, and self-administration of medications. TENN. COMP. R. & REGS. 1200-13-01-.10(6)(a). The maximum possible acuity score for Activities of Daily Living (ADL) was twenty-one (21). TENN. COMP. R. & REGS. 1200-13-01-.10(6)(d).   In addition to the ADL score, the patient was assigned a score based on the level of skilled nursing and rehabilitation services needed, of which the maximum possible acuity score was five (5).   *Id.* Thereafter, the patient's total ADL score was added to the patient's skilled services acuity score in order to determine the resident's total acuity score. *Id.*   The maximum total acuity score was twenty-six (26). *Id.*

**Texas**

256.    Texas Administrative Code, Chapter 355, governs the reimbursement methodology for nursing facilities. Texas uses the RUG-III 34-group model to classify patients. 1 TEX. ADMIN. CODE § 355.307(b)(2). Prior to transitioning to RUG in 2008, Texas classified their patients based on the Texas Index for Level of Effort (TILE) acuity-based classification system. 1 TEX. ADMIN. CODE § 355.307(f).

**Commonwealth of Virginia**

257. To determine Medicaid reimbursement rates for nursing facility residents, the Commonwealth of Virginia employs the RUG-III 34-group model. 12 VA. ADMIN. CODE 30-90-305.

**Washington**

258. Prior to July 1, 2016, Washington Medicaid employed a case-mix methodology utilizing the RUG-III 44-group model. WASH. REV. CODE ANN. § 74.46.485. Washington Medicaid now employs the RUG-IV 57-group model to establish its case-mix index. WASH. REV. CODE ANN. § 74.46.501.

### b. States Without a Case-Mix Reimbursement System

259. In states that do not classify patients in terms of acuity level for purposes of reimbursement, there is still room for providers to defraud the state's reimbursement system, for instance, by misrepresenting direct care costs. Most states utilize an occupancy rate to partially determine the payment rate. Facilities that meet the occupancy standard are paid at a higher rate than facilities that do not meet the occupancy standard, creating incentives to misrepresent or manipulate occupancy rates.

260. Additionally, most states provide supplemental reimbursement to patients with special needs, such as patients with ventilator needs, or behavioral

issues. In states that use RUGs, these needs are similarly indicated using the patient's RUG classification and documented through a separate system. States that do not use RUGs also allow add-ons and supplemental payments. Thus, it may be possible that supplemental payments are received based on misrepresentation of a patient's direct care needs.

261.     The following states do not employ a case-mix reimbursement system.

**California**

262.     The Department of Health Care Services (DHCS) administers California's Medicaid program, Medi-Cal. Each nursing facility is reimbursed based on the following criteria: (1) resident acuity; (2) organization type; (3) total number of beds in the facility; and (4) geographic location of the facility. California State Plan, Attachment 4.19-D, at 3–5.

263.     Resident acuity, i.e. level of care, is reimbursed on the provision of the following services: level A services; level B services; subacute – ventilator and non-ventilator dependent; pediatric subacute – ventilator and non-ventilator dependent services. *Id.* at 3. Level A services are provided to residents requiring medically necessary services of relative low-intensity; Level B, subacute, and pediatric subacute services are provided to residents requiring medically necessary services of varying degrees of higher intensity. *Id.* at 3–4.

264.   Freestanding level-B nursing facilities ("FS/NF-B") and subacute care units of FS/NF-Bs provide services to level-B residents, subacute ventilator-dependent residents, and subacute non-ventilator-dependent residents. California State Plan, Attachment 4.19-D, Supplement 4, at 1, 1.1, http://www.dhcs.ca.gov/formsandpubs/laws/Documents/Supplement%204%20to%20Attachment%204.19-D.pdf. FS/NF-B facilities are reimbursed a prospective, per diem amount for services rendered to an eligible resident for one stay. *Id.* at 5. The per diem amount is calculated prospectively using a cost-based, facility-specific reimbursement rate methodology.  *Id.* at 6. The per diem rate is comprised of the following major cost categories: labor costs, indirect care non-labor costs, administrative costs, professional liability insurance costs, capital costs, and direct pass-through costs. *Id.*

265.   Information necessary to calculate the per diem amount and facility costs is obtained from a FS/NF-B's costs reports. *Id.* FS/NF-Bs are reimbursed the lower of their actual costs per diem or the ceiling per diem amount. *Id.* at 6–7.

**Connecticut**

266.   Under the Connecticut Medicaid program, payment rates for nursing homes are set on a prospective, cost-based basis. CONN. GEN. STAT. ANN. § 17b-340; CONN. AGENCIES REGS. § 17-311-52. The per diem reimbursement rate is based upon five categories of allowable costs: (1) direct costs, which includes

salaries; (2) indirect costs; (3) fair rent; (4) capital-related costs; and (5) administrative and general costs. CONN. GEN. STAT. ANN. § 17b-340(f)(1).

267.    A facility is placed in one of two peer groupings established by geographic location for each facility's level of care. CONN. GEN. STAT. ANN. § 17b-340(f)(2) (West). One peer group is comprised of all facilities located in Fairfield County, while the other peer group is comprised of facilities located in all other counties. *Id.* Each facility's allowable direct, indirect, and administrative and general costs are limited to a statutory ceiling based on geographic location. CONN. GEN. STAT. ANN. § 17b-340(f)(3).

268.    The direct care component is not adjusted for the resident's acuity level. Although Section 17-311-52 of the Regulations of Connecticut State Agencies provides that "[p]er diem reimbursement rates shall be calculated for each level of care, e.g., chronic and convalescent hospital, rest home with nursing supervision and home for the aged," this reference is not indicative of a reimbursement methodology employing a case-mix system. CONN. AGENCIES REGS. § 17-311-52.

**Michigan**

269.    The Michigan Medicaid program utilizes a prospective, cost-based system to establish the reimbursement rates paid to long-term care facilities. Michigan Medicaid Provider Manual, Nursing Facility, Cost Reporting &

Reimbursement Appendix, Section 1.1, at a1 (available at http://www.mdch.state.mi.us/dch-medicaid/manuals/medicaidprovidermanual.pdf). Prospective payment rates are calculated using a facility's cost report ending in the previous calendar year. *Id.*, Section 10, at a88.

270. Michigan does not presently use a case-mix reimbursement system. Instead, facilities are classified into one of six classes, and there is a separate reimbursement method for each class. *Id.*

271. Skilled nursing facilities are classified as either Class I, Class III, or Class V facilities. See *Id.*, Section 3, at a8. The per diem reimbursement rate for Class I and Class III nursing facilities are based upon three components: a plant cost component, a variable cost component, and add-ons. *Id.*, Section 10, at a88. Variable costs consist of the total allowable base and support costs in a facility's routine nursing service units. *Id.*, Section 9.2, at a60. Variable costs are allocated depending on the activity for which the cost was incurred. *Id.* Plant costs include depreciation, interest expense, and real estate and personal property taxes. *Id.*, Section 9.3, at a61. Add-ons are items that provide reimbursement to a provider for costs that are not previously included in the provider's variable cost component *Id.*, Section 10.11, at a106. The reimbursement rate for Class V facilities are set prospectively by Medicaid as an individual nursing unit rate per resident day. *Id.*, Section 10.6, at 103. The prospective rate covers all ventilator care requirements of

the residents, including but not limited to all routine, ancillary, physician, and other services. *Id.*

## C.    TRICARE

272.    TRICARE (formerly CHAMPUS) is a federally-funded medical benefit program providing healthcare benefits to active duty service members, retired service members, and their dependents. 10 U.S.C. §§ 1071–1110.

273.    TRICARE covers the same skilled nursing services as Medicare and reimburses providers in the same manner. 10 U.S.C. § 10790(2) (institutional providers). TRICARE only covers "medically necessary services and supplies required in the diagnosis and treatment of illness or injury." 32 C.F.R. 199.4(a)(l)(i).

274.    TRICARE follows Medicare's PPS and RUG systems, and beneficiaries are assessed using the same MDS assessment tool used by Medicare. TRICARE Reimbursement Manual 6010.10M, Ch. 8, §§ 4.2.6, 4.2.7 (April 1, 2015). TRICARE does not limit the number of days a patient may get skilled nursing facility care. 32 C.F.R. § 199.4(b)(3)(xiv).

275.    Some TRICARE beneficiaries who are enrolled in Medicare are still eligible for TRICARE. In this circumstance, TRICARE is the secondary payer to Medicare, and TRICARE is responsible to the skilled nursing facility for any amounts not covered by Medicare.

276.   TRICARE considers "[b]illings or CHAMPUS claims which involve flagrant and persistent overutilization of services without proper regard for results, the patient's ailments, condition, medical needs, or the physician's orders" to be fraud. 32 C.F.R. § 199.9(c)(5).

277.   Such practices are also deemed abusive because they cause financial loss to the United States. 32 C.F.R. § 199.9(b). "To avoid abuse situations," TRICARE providers are obligated to provide services and supplies that are "[f]urnished at the appropriate level and only when and to the extent medically necessary[.]" *Id.* "[A]buse situations under CHAMPUS are a sufficient basis for denying all or part of CHAMPUS cost-sharing of individual claims." *Id.* "Abuse" specifically includes "[a] pattern of claims for services which are not medically necessary or, if medically necessary, not to the extent rendered." *Id.* at § 199.9(b)(3).

278.   Because Medicare is the primary payer for patients enrolled in both Medicare and TRICARE, TRICARE follows Medicare's determination regarding medical necessity. If services are determined not to be medically necessary under Medicare, they are not covered under TRICARE. TRICARE Reimbursement Manual 6010.10M, Ch. 8, § 4.2.14.4 (Note), 4.2.17 (Note) (April 1, 2015).

## IX.   DEFENDANTS' SCHEMES TO DEFRAUD THE GOVERNMENT

**A.   The Defendants knowingly billed Medicare for medically unreasonable and unnecessary services.**

> **1.   Encore set unreasonably high "productivity" goals at the corporate level and threatened therapists with disciplinary action if they failed to meet them.**

279.   Encore's management pressured therapists and therapy assistants to provide unnecessary therapy by requiring staff to adhere to unreasonably high "productivity" goals. Management made it clear that the productivity expectations were set at the corporate level. For example, Jody Seal, a TPM at WellBridge of Brighton[10], berated therapists and therapy assistants for failing to attain respective levels of 90% and 95% productivity and then demanded written action plans for increasing productivity. Exhibit 2 (January 13, 2015 e-mail from Jody Seal). Seal noted that therapists "will be held accountable" for reaching these goals, "because I am." *Id.* On February 25, 2015, Seal again demanded action plans for increasing productivity, because she "received another email due to the fact that so far this week we are at 84.7%." Exhibit 3 (February 25, 2015 e-mail from Jody Seal).

280.   Another manager, Alan Beck, told therapists and therapy assistants that if they could not meet the productivity expectations, they "must punch out for the day" and that "[f]ailure to meet the efficiency expectation may result in

---

[10] Ms. Seal is currently working at WellBridge of Pinckney. *See* Noe Hernandez, *$15 Million Rehab Facility Opening in Pinckney*, Detroit Free Press (Oct. 17, 2016, 8:27 PM), http://www.freep.com/story/news/local/michigan/2016/10/13/15-million-rehab-facility-opening-pinckney/92018648/.

disciplinary action per Kathy Seeber." Exhibit 4 (November 4, 2015 e-mail from Alan Beck). Seeber is a Regional Vice President at Encore Rehabilitation Services.

281.   Encore management followed through on the threats. For example, one occupational therapist, Erica Finn, was written up in late August 2016 for attaining between 85% - 89% productivity. Prior to being written up, Finn had been asked to bill for an evaluation she had not done, and she refused.

### 2. The Encore Defendants and SNF Defendants presumptively placed patients into the highest RUG level to increase reimbursement.

282.   Physical and occupational therapists and speech-language pathologists were directed to assume that all patients needed the highest level of therapy services, and therefore the highest level of daily Medicare reimbursement, when assessing patients' needs. For example, Seal told therapists that at the time of the patient's evaluation, she "must know if the guest is NOT going to tolerate 75 min each day by therapy." Exhibit 5 (June 18, 2015 e-mail from Jody Seal) (emphasis in original). Seal made it clear that therapists were to recommend at least 75 minutes of therapy per day, only taking into account whether patients could "tolerate" such therapy, making no mention of considering whether patients needed the therapy.

283.   The Defendants falsely certified that patients needed therapy services when such services were not medically necessary, and there was no reasonable

expectation that patients would improve. For example, Encore's therapists were instructed to provide services to patients who were in comfort care or hospice, patients with significant cognitive impairments, such as Alzheimer's or dementia, and patients who had previously been assessed as having no rehabilitative potential for the purpose of increasing Medicare reimbursement.

### 3. Encore manipulated and "ramped" minutes during the look-back period to recertify patients at the highest RUG level and increase reimbursement.

284.    There were open discussions about manipulating therapy minutes in such a way as to support recertifying a patient at a higher RUG level. For example, if a patient was unable to tolerate therapy, Seal said they could "always ramp up the time," which is "much better than missing the 7 day look back period." Exhibit 5 (June 18, 2015 e-mail from Jody Seal). Management frequently emphasized the need to increase therapy minutes during a look-back period. If a patient approaching the end of the seven-day look-back period was not at the RUG Ultra level, Encore's TPMs instructed therapists to provide enough therapy toward the end of the period to move the patient to a higher RUG.

285.    Encore also provided group therapy to patients but billed Medicare for individual therapy sessions for the purpose of increasing therapy minutes.

### 4. The Encore Defendants and SNF Defendants forced patients to participate in therapy and refused to discharge them even when contrary to therapists' recommendations.

286.    Encore's management instructed therapists to coerce patients to participate in therapy. For example, Seal told therapists that if a patient declined to participate, they "must recruit the nurse to assist." Exhibit 5 (June 18, 2015 e-mail from Jody Seal). Seal further stated, "I understand that some new guests are not the high level we are used to and may not tolerate the gym- and the way you are used to treating – but your job is to find an alternative way to treat now." *Id.* Encore simply prohibited patients from exercising their right to decline unwanted and unneeded therapy services.

287.    Encore management required therapists to give two-weeks' notice before discharging a Medicare Part A patient from therapy services. TPM Raj Tiwari made it clear that any recommendations to discharge a patient from therapy would be carefully scrutinized and that therapists' clinical judgment would be questioned. Exhibit 6 (October 20, 2015 e-mail from Raj Tiwari stating, "From time to time we may discuss with you as a clinician that did [sic] we try every skill, techniques, and modalities before giving the 2 weeks' notice?"). Tiwari even told therapists that he would continue to provide physical therapy to patients whose therapists recommended that they be discharged, telling them, "I will take the responsibility to continue and treat that patient onwards under me." *Id.*

**5.  The Defendants billed Medicare Part B for medically unnecessary services.**

288.    Therapists also had to meet high expectations when treating patients covered by Medicare Part B. The Encore Defendants required therapists to maintain a certain percentage of Medicare Part B patients, and TPMs would hand-pick patients for therapy services based on available coverage. For example, Relator's supervisor frequently reviewed patients' files to determine which patients had Medicare Part B coverage. If a patient had not yet exhausted his or her Part B benefits, Relator's supervisor instructed him to provide services to that patient. Relator had to tell his supervisor on at least one occasion that he would not provide speech therapy to a patient who did not need it.

289.    TPM Kevin Kuznia told therapists that they needed to bill an average of 3 – 4 CPT codes to Medicare Part B for each physical and occupational therapy session in order to meet the "team goal." Exhibit 7 (E-mail from Kevin Kuznia). Furthermore, although management did not want to discharge Part A patients, it had no problem discharging patients covered by Medicare Part B as soon as they came close to approaching their benefits cap, knowing that if they provided therapy beyond the cap, the patient's records would be subject to manual medical review. Exhibit 8 (E-mail from Tiwari asking if patient needs to be discharged before going over cap).

**B.     Facilities Serviced by Encore Billed a Disproportionate Amount of Skilled Nursing Patients at the Ultra High Level.**

290.    Defendants' initiatives to bill Medicare at the most profitable RUG levels paid off, as demonstrated by CMS data. For example, in 2013, the Autumn Woods Health Care facility in which Relator worked billed Medicare for 14,158 days of care at the RU level. In sharp contrast, Autumn Woods only billed Medicare for 5,294 days of care for all other levels *combined*. Expressed as a percentage, Autumn Woods billed **72.8%** of its days of care at the RU level in 2013.

291.    CMS data reflects a similar trend at other facilities serviced by Encore. The demonstrative chart[11] below contains representative examples of billing at the RU level versus other levels for several facilities in 2013:

| Facility | Days Billed at RU Level | Days Billed at all Other Levels | Percentage of Days Billed at RU Level |
|---|---|---|---|
| Metron of Big Rapids Big Rapids, MI | 2,448 | 0 | **100%** |
| Metron of Cedar Springs Cedar Springs, MI | 2,104 | 0 | **100%** |
| Metron of Forest Hills Grand Rapids, MI | 565 | 0 | **100%** |
| Metron of Lamont Lamont, MI | 596 | 0 | **100%** |
| WellBridge of Brighton Howell, MI | 3,126 | 0 | **100%** |
| Ambassador Nursing and Rehabilitation Center | 7,705 | 375 | **95.4%** |

---

[11] A chart with additional representative examples and CMS data is attached as Exhibit 9.

| | | | |
|---|---|---|---|
| Detroit, MI | | | |
| MediLodge of Milford<br>Milford, MI | 10,402 | 1,477 | **87.6%** |
| Regency Healthcare Centre<br>Taylor, MI | 8,203 | 1,251 | **86.8%** |
| Father Murray Nursing and<br>Rehabilitation<br>Center Line, MI | 7,856 | 1,823 | **81.2%** |
| MediLodge of Montrose<br>Montrose, MI | 8,625 | 3,165 | **73.2%** |
| MediLodge of Sterling<br>Heights<br>Sterling Heights, MI | 9,107 | 3,352 | **73.1%** |
| Metron of Belding<br>Belding, MI | 1,062 | 548 | **65.9%** |
| Lahser Hills Care Center<br>Southfield, MI | 4,225 | 2,411 | **63.7%** |

**C.      Defendants Submitted Claims for Medically Unnecessary Services.**

> **1.      An Encore TPM ignored a physician's therapy "hold" order and forced a patient, who was actively dying, to endure "therapy."**

292.    Patient One was admitted to Autumn Woods Care Center on April 29, 2016 with rapidly declining health. She was assessed on May 2, 2016 and was projected to receive 250 minutes of speech therapy, 105 minutes of occupational therapy, and 195 minutes of physical therapy for the following week, which put her RUG level at RV (Very High). Exhibit 10 (Therapy projections for Patient One).

293.    From May 2, 2016 through May 5, 2016, and while being evaluated for and admitted to comfort care, which is often a precursor for hospice services, Patient One was given 165 minutes of physical therapy, 90 minutes of occupational

therapy, and 210 minutes of speech therapy. Exhibit 10 (Therapy projections[12] for Patient One with bolded entries showing minutes recorded as provided). Such therapy was medically unreasonable and unnecessary, given Patient One's referral to comfort care and rapidly worsening condition.

294.    Shortly after Relator began a speech therapy session with Patient One on May 6, 2016, he discovered that her physician had signed a therapy "hold" order stating that she should not receive therapy services. When Relator informed the TPM, Raj Tiwari, that Patient One's physician had signed a therapy "hold" order, Tiwari immediately went to the patient's room and provided 15 minutes of physical therapy. Tiwari ordered that additional physical therapy and occupational therapy be provided to the dying patient that afternoon. Medicare was billed on May 6, 2016 for 15 minutes of speech therapy, 15 minutes of occupational therapy, and 30 minutes of physical therapy, which consisted of the therapist rubbing lotion on the actively dying patient's legs. Exhibit 10 (Therapy projections for Patient One with bolded entries showing minutes recorded as provided). Had no therapy services been provided on May 6, 2015, Medicare reimbursement for Patient One's care would have been at the RL (RUG Low) level as opposed to the RV (RUG Very High) level. *Id.* Sadly, Patient One passed away on May 7, 2016. Exhibit 11 (Progress notes for Patient One).

---

[12] **Bolded** minutes on therapy projections were actually billed.

**2.     Defendants subjected a patient to therapy despite weak vital signs.**

295.    Patient Two was also subjected to medically unnecessary and unreasonable therapy services while actively dying, as demonstrated by her medical records. An August 13, 2016 treatment encounter note from physical therapy assistant (PTA) Angela Daoud notes that she had to "split" therapy into two separate sessions due to the patient's declining condition. Exhibit 12 (August 13, 2016 treatment encounter note from PTA Angela Daoud regarding Patient Two). Daoud subjected Patient Two to unnecessary physical therapy in the morning, and when she returned to subject her to a second session in the afternoon, Patient Two was "not responding and unable to move…" *Id.* Autumn Woods nursing staff checked Patient Two's vitals and told Daoud that she could provide physical therapy. *Id.* Dauod provided 60 minutes of physical "therapy" that day and signed a treatment report certification stating, "I accept responsibility for the content I documented in this patient's record and attest, to the best of my knowledge, that it accurately reflects the current performance, condition and **medically necessary**, skilled services provided per this patient's current treatment plan." *Id.* (emphasis added). Medicare was also billed for 60 minutes of medically unreasonable and unnecessary occupational therapy provided the same day. Exhibit 13 (Therapy projections for Patient Two with bolded entries showing minutes recorded as provided).

296.    Dauod's therapy treatment report for August 16, 2016 states that Patient Two was "lethargic" and "having difficulty following one step commands." Exhibit 14 (August 16 - 17, 2016 treatment encounter notes from PTA Angela Daoud regarding Patient Two). Dauod certified that she provided 60 minutes of physical therapy that day. *Id.*; *see also* Exhibit 13. The occupational therapist, Jennifer Canchola, also certified that she provided 60 minutes of therapy to Patient Two that day. Exhibit 15 (August 16, 2016 treatment encounter note from COTAL Jennifer Canchola regarding Patient Two); *see also* Exhibit 13.

297.    Patient Two's progress notes indicate that on August 17, 2016 at 11:30 AM, she was found in her wheelchair unresponsive to verbal and physical stimuli. Exhibit 16 (Progress notes for Patient Two). Two staff members lifted her from the wheelchair and placed her in bed, and staff notified her physician and family members regarding the decline in her condition. *Id.*

298.    Dauod recorded 45 minutes of physical therapy at 2:31 PM on August 17, 2016, noting that she could not complete the therapy session due to Patient Two's difficulty with breathing. Exhibit 14 (August 16 - 17, 2016 treatment encounter notes from PTA Angela Daoud regarding Patient Two); *see also* Exhibit 16. Occupational therapist Jennifer Canchola recorded 60 minutes of therapy at 3:18 PM, and her notes state that she was unable to arouse Patient Two and that she and the physical therapist transported her to nursing. Exhibit 15 (August 17,

2016 treatment encounter note from COTAL Jennifer Canchola regarding Patient Two); *see also* Exhibit 13. Patient Two died on August 18, 2016, less than 24 hours later. *See* Exhibit 16 (Progress notes for Patient Two). Medicare was billed at the RU (RUG Ultra) level for the medically unnecessary and unreasonable, if not unconscionable, therapy services forced onto Patient Two. Exhibit 13.

### 3. Defendants billed Medicare for therapy the day a patient died.

299.    Therapists also provided medically unnecessary and unreasonable services to Patient Three, as demonstrated by a side-by-side comparison of Patient Three's progress notes and recorded therapy minutes, as well as treatment encounter reports. According to the progress notes for June 8, 2016, Patient Three tried to leave the facility, "fighting swinging his arms kicking and trying to hit staff members as well as other residents," and staff had to forcibly inject the patient with Haldol to sedate him. Exhibit 17 (Progress notes for Patient Three). The occupational therapist recorded 75 minutes of therapy that day. Exhibit 18 (Therapy projections for Patient Three with bolded entries showing minutes recorded as provided).

300.    Patient Three had another episode of aggressive behavior on June 9, 2016, and the progress notes for that day indicate that he was trying to hit staff members. Exhibit 17 (Progress notes for Patient Three). 75 minutes of physical therapy and 75 minutes of occupational therapy were recorded for that day. Exhibit

18 (Therapy projections for Patient Three with bolded entries showing minutes recorded as provided).

301.    On June 10, 2016, Patient Three refused all medication, exhibited aggressive behaviors, attempted to hit staff, and was again sedated with Haldol. Exhibit 17 (Progress notes for Patient Three). The physical therapist recorded 70 minutes of therapy, and the occupational therapist recorded 70 minutes of therapy that day. Exhibit 18 (Therapy projections for Patient Three with bolded entries showing minutes recorded as provided).

302.    On the morning of June 13, 2016, the physical therapist, Liza Ann Dela Paz, initiated a therapy session with Patient Three even though the patient demonstrated "increased agitation and constantly requested to go back to his room." Exhibit 19 (June 13, 2016 treatment encounter note from PT Liza Ann M. Dela Paz regarding Patient Three). The occupational therapist, Samantha Vermillion, also initiated a therapy session that morning, but stopped after the resident became agitated and refused to participate. Exhibit 20 (June 13, 2016 treatment encounter note from COTAL Samantha Vermillion regarding Patient Three). Vermillion tried to get Patient Three to participate in therapy that afternoon, but the patient had difficulty breathing and a low pulse. *Id.* The physical therapist attempted to initiate another therapy session at 2:00 PM, but the patient declined to participate and had weak vital signs. Exhibit 19 (June 13, 2016

treatment encounter note from PT Liza Ann M. Dela Paz regarding Patient Three). The physical therapist went to Patient Three's room again at 4:30 PM and noted that the patient "passively participated" in his session. *Id.*

303.    Patient Three died just a few hours later. Exhibit 17 (June 13, 2016 progress note for Patient Three). The physical therapist recorded 15 minutes of therapy and the occupational therapist recorded 50 minutes of therapy that day. Exhibit 18 (Therapy projections for Patient Three with bolded entries showing minutes recorded as provided). The 65 minutes of therapy recorded the day the patient died put Patient Three at the RV (RUG Very High) level of Medicare reimbursement. *Id.*

**4.       Defendants provided medically unnecessary and unreasonable services to a patient in comfort care.**

304.    Patient Four was referred for comfort care on August 19, 2016. Exhibit 21 (Progress notes for Patient Four, which includes an August 19, 2016 progress note stating, "Hospice consult written today.") Patient Four entered the facility bedbound and as a strong candidate for hospice care, which requires a certification that the patient is likely to expire within six months. Patient Four was put on comfort care on August 23, 2016. *Id.*

305.    In spite of Patient Four's status as a comfort care patient, Encore's therapists pummeled the patient with enough therapy for Autumn Woods to bill Medicare at the RU (RUG Ultra) level. From August 19, 2016 to August 26, 2016,

Encore therapists recorded 495 physical therapy minutes, 385 occupational therapy minutes, and 189 minutes of speech therapy, for a total of 1,069 minutes of therapy in one week. Exhibit 22 (Therapy projections for Patient Four with bolded entries showing minutes recorded as provided). Furthermore, Patient Four's progress notes for that week indicate that she had a catheter, a Stage II open wound on her coccyx (tailbone), and life-threatening sepsis. Exhibit 21. Given her physical condition and the fact that she was in comfort care, the therapy provided was neither medically necessary nor reasonable.

### 5. Defendants billed Medicare for medically unnecessary and unreasonable services for a patient unable to participate in therapy.

306.    Patient Five suffered from bipolar disorder and was prone to periods of confusion and unsafe behavior. Exhibit 23 (Progress notes for Patient Five). He frequently refused therapy services, but was coerced to participate by therapists and nursing staff, who told him he would be kicked out of the building if he did not participate. Patient Five's October 20, 2015 progress notes indicate that he repeatedly yelled out, attempted to throw himself on the floor, and had to be "helped down to the floor on the blanket for safety." Exhibit 23 (Progress notes for Patient Five). A combined total of 145 physical and occupational therapy minutes were recorded that day. Exhibit 24 (Therapy projections for Patient Five with bolded entries showing minutes recorded as provided).

307.    Similarly, on October 23, 2015, Patient Five was placed on the floor after repeatedly trying to climb out of his chair. Exhibit 23 (Progress notes for Patient Five). Patient Five began rolling around, and staff had to remove all nearby items for safety. *Id.* In spite of Patient Five's state, the physical therapist recorded 45 minutes of therapy, and the occupational therapist recorded 60 minutes of therapy that day. Exhibit 24 (Therapy projections for Patient Five with bolded entries showing minutes recorded as provided). Given Patient Five's condition and his frequent refusal of services, the therapy provided was neither medically necessary nor reasonable.

**6.    Defendants billed Medicare for a patient's therapy, even though the patient showed no potential for improvement and was a candidate for hospice services.**

308.    Patient Six suffered a stroke in 2015 and was admitted to Autumn Woods multiple times. Prior to admission to Autumn Woods in August 2016, Patient Six stayed at a different facility, where he was assessed for physical therapy. An August 24, 2016 consultation report from physical therapist Jan Pietrasik states that Patient Six "is not a candidate for rehab" and that physical therapy was discontinued "due to 0 rehab potential." Exhibit 25 (August 24, 2016 consultation report from physical therapist Jan Pietrasik regarding Patient Six). The consultation report further notes that Patient Six was bedbound and in need of 24-hour long-term care or hospice services. *Id.* Despite this assessment, a total of 145

minutes of physical therapy and 135 minutes of occupational therapy were recorded for August 29 – 30, 2016. Exhibit 26 (Therapy projections for Patient Six with bolded entries showing minutes recorded as provided). Such therapy was medically unnecessary and unreasonable due to the patient's lack of potential for improvement and need for hospice services, as documented in the August 24, 2016 consultation report. *See* Exhibit 25.

## X.   ACTIONABLE CONDUCT BY DEFENDANTS

### A.   False Claims Act

### 1.   Applicable Law

309.   This is an action to recover damages and civil penalties on behalf of the United States and Relator LaFerriere arising from the false and/or fraudulent statements, claims, and acts by Defendants made in violation of the False Claims Act, 31 U.S.C. §§ 3729–3732.

310.   The FCA provides that any person who

   (A)   knowingly presents, or causes to be presented, a false and/or fraudulent claim for payment or approval;

   (B)   knowingly makes, uses, or causes to be made or used, a false record or statement material to a false and/or fraudulent claim; or

   (C)   conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)

is liable to the Government for a civil penalty of not less than $10,781 and not more than $21,563 for each such claim, plus three times the amount of damages sustained by the Government because of the false and/or fraudulent claim. *See* 31 U.S.C. § 3729(a)(1).

311.   The FCA defines "claim" as:

(A)   mean[ing] any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

(i)   is presented to an officer, employee, or agent of the United States; or

(ii)   is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I)   provides or has provided any portion of the money or property requested or demanded; or

(II)   will reimburse such contractor, grantee, or other recipient for any portion of the  money or property which is requested or demanded. . . .

31 U.S.C. §3729(b)(2).

312.   The FCA allows any persons having knowledge of a false and/or fraudulent claim against the Government to bring an action in federal district court for himself and for the United States Government and to share in any recovery as authorized by 31 U.S.C. § 3730.

313.    Based on these provisions, Relator LaFerriere, on his own behalf and on behalf of the United States, seeks through this action to recover damages and civil penalties arising from Defendants' violations of the False Claims Act.

## 2.    Defendants' Violations of the False Claims Act

### a.    Presentation of False Claims (31 U.S.C. § 3729(a)(1)(A))

314.    From at least January 2010 to the present, the Encore Defendants knowingly caused the presentation of false and/or fraudulent claims for payment or approval to Medicare, Medicaid, and TRICARE for reimbursement for services that were not medically necessary, medically reasonable, or were not actually provided.

315.    From at least January 2010 to the present, the SNF Defendants knowingly presented false and/or fraudulent claims for payment or approval to Medicare, Medicaid, and TRICARE for reimbursement for services that were not medically necessary, medically reasonable, or were not actually provided.

316.    Claim form CMS-1450 requires providers, including the SNF Defendants, to certify that the information is "true, accurate, and complete" and "[t]hat the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts." It also states that "MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARY

PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S)." Form CMS-1450 (emphasis in original).

317.   By creating and carrying out this fraudulent scheme, Defendants knowingly and repeatedly violated the False Claims Act, 31 U.S.C. § 3729(a)(1).

318.   Given the structure of the health care systems at issue, Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the government's payment decision and was material to the government's decision to pay the claims. Medicaid, Medicare, and TRICARE only pay for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

319.   Defendants' violations of the applicable statutes, regulations, and program instructions, and subsequent misrepresentations regarding their compliance, were material, because they went to the very essence of the bargain for which health care programs contracted. Had the government known of Defendants' non-compliance, which resulted in the submission of ineligible claims for reimbursement, the government would not have paid the claims.

320.   Defendants' presentment, or causation of presentment, of false and/or fraudulent claims to Medicare, Medicaid, and TRICARE was a foreseeable factor

in the United States' loss and a consequence of the scheme. By virtue of Defendants' actions, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

### b. Making or Using False Records or Statements to Cause Claims to be Paid (31 U.S.C. § 3729(a)(1)(B))

321. From at least January 2010 to the present, the Defendants knowingly made, used, or caused to be made or used, false records or statements in order to cause false and/or fraudulent claims to be paid or approved by the United States. These false statements or records consist of false and/or fraudulent MDS assessments, documentation supporting MDS assessments and claims forms, as well as false and/or fraudulent certifications or representations made or caused to be made by Defendants to Medicare, Medicaid, and TRICARE when seeking to participate in the various government programs, as well as when submitting claims.

322. For example, MDS assessments, which are used as a basis for determining the daily reimbursement rate for Part A patients, contain the following certification: "I certify that the accompanying information accurately reflects resident assessment information for this resident and that I collected or coordinated collection of this information on the dates specified. I further understand that payment of such federal funds and continued participation in the government-funded health care programs is conditioned on the accuracy and truthfulness of this information."

323.   Defendants made, or caused to be made, false and/or fraudulent representations regarding whether services were medically necessary, medically reasonable, or actually provided.

324.   Given the structure of the health care systems at issue, Defendants' false or fraudulent statements or records, or causation of false or fraudulent statements or records, had the potential to influence the government's payment decision and were material to the government's decision to pay the claims. Medicaid, Medicare, and TRICARE only pay for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

325.   Defendants' violations of the applicable statutes, regulations, and program instructions, and subsequent misrepresentations regarding their compliance, were material, because they went to the very essence of the bargain for which health care programs contracted. Had the government known of Defendants' non-compliance, which resulted in the submission of ineligible claims for reimbursement, the government would not have paid the claims.

326.   Defendants' submission, or causation of submission, of false records and statements to Medicare, Medicaid, and TRICARE was a foreseeable factor in the United States' loss and a consequence of the scheme.  By virtue of Defendants'

actions, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

### c.  Conspiracy to Defraud the Government (31 U.S.C. 3729(a)(1)(C))

327.   From at least January 2010 to the present, Defendants conspired with one another to submit false and/or fraudulent claims for reimbursement of skilled nursing care services.  All Defendants understood that the SNF Defendants were submitting false and/or fraudulent claims for reimbursement that arose out of services not rendered by the Encore Defendants or false and/or fraudulent representations that services were medically necessary and reasonable. The practice of providing unnecessary medical services and billing for services that were not provided was common knowledge to Defendants.

328.   Given the structure of the health care systems at issue, Defendants' conspiracy had the potential to influence the government's payment decision. Medicaid, Medicare, and TRICARE only pay for services when they are medically necessary and actually provided. Thus, a representation that services are medically necessary and have actually been provided is material to the government's decision to pay a claim.

329.   Defendants' conspiratorial scheme was a foreseeable factor in the United States' loss.  By virtue of Defendants' actions, the United States has

suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## XI.   CAUSES OF ACTION

### A.   Count I – False Claims (31 U.S.C. § 3729(a)(1)(A))

330.   Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

331.   From at least January 2010 to the present, the Encore Defendants knowingly caused the presentation of false and/or fraudulent claims for payment or approval to Medicare, Medicaid, and TRICARE for reimbursement for services that were not medically necessary, medically reasonable, or were not actually provided.

332.   From at least January 2010 to the present, the SNF Defendants knowingly presented false and/or fraudulent claims for payment or approval to Medicare, Medicaid, and TRICARE for reimbursement for services that were not medically necessary, medically reasonable, or were not actually provided.

333.   Claim form CMS-1450 requires providers, including the SNF Defendants, to certify that the information is "true, accurate, and complete" and "[t]hat the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts." It also states that "MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY

THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S)." Form CMS-1450 (emphasis in original).

334.    By creating and carrying out this fraudulent scheme, Defendants knowingly and repeatedly violated the False Claims Act, 31 U.S.C. § 3729(a)(1).

335.    Given the structure of the health care systems at issue, Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the government's payment decision and was material to the government's decision to pay the claims. Medicaid, Medicare, and TRICARE only pay for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

336.    Defendants' violations of the applicable statutes, regulations, and program instructions, and subsequent misrepresentations regarding their compliance, were material, because they went to the very essence of the bargain for which health care programs contracted. Had the government known of Defendants' non-compliance, which resulted in the submission of ineligible claims for reimbursement, the government would not have paid the claims.

337.    The United States paid the false and/or fraudulent claims.

338.   Defendants' presentment, or causation of presentment, of false and/or fraudulent claims to Medicare, Medicaid, and TRICARE was a foreseeable factor in the United States' loss and a consequence of the scheme.   By virtue of Defendants' actions, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**B.     Count II – False Records or Statements (31 U.S.C. § 3729(a)(1)(B))**

339.   Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

340.   From at least January 2010 to the present, the Defendants knowingly made, used, or caused to be made or used, false records or statements in order to cause false and/or fraudulent claims to be paid or approved by the United States. These false statements or records consist of false and/or fraudulent MDS assessments, documentation supporting MDS assessments and claims forms, as well as false and/or fraudulent certifications or representations made or caused to be made by Defendants to Medicare, Medicaid, and TRICARE when seeking to participate in the various government programs, as well as when submitting claims.

341.   For example, MDS assessments, which are used as a basis for determining the daily reimbursement rate for Part A patients, contain the following certification: "I certify that the accompanying information accurately reflects resident assessment information for this resident and that I collected or coordinated

collection of this information on the dates specified. I further understand that payment of such federal funds and continued participation in the government-funded health care programs is conditioned on the accuracy and truthfulness of this information."

342.   Defendants made, or caused to be made, false and/or fraudulent representations regarding whether services were medically necessary, medically reasonable, or actually provided.

343.   Given the structure of the health care systems at issue, Defendants' false or fraudulent statements or records, or causation of false or fraudulent statements or records, had the potential to influence the government's payment decision and were material to the government's decision to pay the claims. Medicaid, Medicare, and TRICARE only pay for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

344.   Defendants' violations of the applicable statutes, regulations, and program instructions, and subsequent misrepresentations regarding their compliance, were material, because they went to the very essence of the bargain for which health care programs contracted. Had the government known of Defendants' non-compliance, which resulted in the submission of ineligible claims for reimbursement, the government would not have paid the claims.

345. The United States paid the false and/or fraudulent claims.

346. Defendants' submission, or causation of submission, of false records and statements to Medicare, Medicaid, and TRICARE was a foreseeable factor in the United States' loss and a consequence of the scheme.  By virtue of Defendants' actions, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## C.   Count III – Conspiracy (31 U.S.C. § 3729(a)(1)(C)

347. Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

348. From at least January 2010 to the present, Defendants conspired with one another to submit false and/or fraudulent claims for reimbursement of skilled nursing care services.  All Defendants understood that the SNF Defendants were submitting false and/or fraudulent claims for reimbursement that arose out of services not rendered by the Encore Defendants or false and/or fraudulent representations that services were medically necessary and reasonable. The practice of providing unnecessary medical services and billing for services that were not provided was common knowledge to Defendants.

349. Given the structure of the health care systems at issue, Defendants' conspiracy has the potential to influence the government's payment decision. Medicaid, Medicare, and TRICARE only pay for services when they are medically

necessary and actually provided. Thus, a representation that services are medically necessary and have actually been provided is material to the Government's decision to pay a claim.

350.   The United States paid the false and/or fraudulent claims.

351.   Defendants' conspiratorial scheme was a foreseeable factor in the United States' loss.   By virtue of Defendants' actions, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## ORIGINAL SOURCE

352.   There are no bars to recovery under 31 U.S.C. § 3730(e), and, or in the alternative, Relator is an original source as defined therein. Relator has direct and independent knowledge of the information on which the allegations are based. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions and has provided this information to the United States prior to filing this Complaint by serving a voluntary Pre-filing Disclosure Statement detailing Relator LaFerriere's discovery and investigation of Defendants' fraudulent schemes on January 13, 2017.

## RELIEF

353.   On behalf of the United States, Relator seeks to receive monetary damages equal to three times that suffered by the United States.  In addition, on behalf of the United States, Relator seeks to receive civil penalties against Defendants equal to $21,563 for each violation of 31 U.S.C. § 3729.

354.   Relator seeks an award totaling the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act.

355.   Relator seeks an award for all costs and expenses for this action, including attorneys' fees and court costs.

## PRAYER

356.   WHEREFORE, Relator prays for judgment in his favor and against Defendants for the following:

- Damages in the amount of three (3) times the actual damages suffered by the United States Government as a result of Defendants' conduct;

- Civil penalties against Defendants equal to $21,563 for each violation of 31 U.S.C. § 3729;

- The maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

- All costs and expenses of this litigation, including attorneys' fees and costs of court; and,

> ▪ All other relief on Relator's behalf or on behalf of the United States Government to which they may be entitled and that the Court deems just and proper.

**D.     Count IV – California False Claims Act**

357.     Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

358.     This is a *qui tam* action brought by Relator and the State of California to recover treble damages and civil penalties under the California False Claims Act, CAL. GOV'T. CODE § 12650 *et seq*.

359.     CAL. GOV'T. CODE § 12651(a) provides liability for any person who-

> (1)     Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

> (2)     Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim.

> (3)     Conspires to commit a violation of this subdivision.

360.     From at least January 2010 to the present, Defendants knowingly presented or caused to be presented false and/or fraudulent claims to California's Medicaid program, Medi-Cal, for reimbursement for services that were not medically necessary, medically reasonable, or were not actually provided. By creating and carrying out this fraudulent scheme, Defendants knowingly and

repeatedly violated the California False Claims Act, CAL. GOV'T. CODE § 12651(a).

361.    Defendants knowingly made, used, or caused to be made or used, false records or statements in order to cause false and/or fraudulent claims to be paid or approved by the State of California.  These false statements or records consist of false and/or fraudulent MDS forms, documentation supporting MDS assessments, as well as false and/or fraudulent certifications or representations made or caused to be made by Defendants when seeking to participate in Medi-Cal and when submitting claims. Defendants made or caused to be made false and/or fraudulent representations regarding whether services were medically necessary, medically reasonable, or actually provided.

362.    Defendants conspired with one another to submit false and/or fraudulent claims for reimbursement of services.  Defendants understood that the facilities were submitting false and/or fraudulent claims for reimbursement that arose out of services not rendered or false and/or fraudulent representations that patients were qualified for nursing care under Medi-Cal.  The practice of providing unnecessary medical services and billing for services that were not provided was common knowledge to Defendants.

363.    Given the structure of the health care system at issue, Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims

had the potential to influence the State of California's payment decision and was material to the State of California's decision to pay the claims. Medi-Cal only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

364. Given the structure of the health care system at issue, Defendants' false or fraudulent statements or records, or causation of false or fraudulent statements or records, had the potential to influence the State of California's payment decision and were material to the State of California's decision to pay the claims. Medi-Cal only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

365. Defendants' violations of the applicable statutes, regulations, and program instructions, and subsequent misrepresentations regarding their compliance, were material, because they went to the very essence of the bargain for which Medi-Cal contracted. Had the State of California known of Defendants' non-compliance, which resulted in the submission of ineligible claims for reimbursement, the State of California would not have paid the claims.

366. The State of California paid the false and/or fraudulent claims.

367. Defendants' presentment of false and/or fraudulent claims to Medi-Cal, false records and statements, and conspiratorial scheme were foreseeable

factors in the State of California's loss, and a consequence of the scheme.  By virtue of Defendants' actions, the State of California has suffered significant damages.

368.    There are no bars to recovery under CAL. GOV'T CODE §12652(d)(3), or in the alternative, Relator is an original source as defined therein.  Relator has brought this action on his own behalf and on behalf of the State of California pursuant to CAL. GOV'T CODE § 12652(c). Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the State before filing an action based on the information.

369.    This Court is requested to accept pendent jurisdiction over this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damages to the State of California.

370.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF CALIFORNIA:

(1)    Three times the amount of actual damages that the State of California has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)    A civil penalty of not less than $11,000 for each false claim that Defendants presented or caused to be presented to the State of California; and

(3)    All costs incurred in bringing this action.

To RELATOR:

    (1)    The maximum amount allowed pursuant to CAL. GOV'T CODE § 12652 and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses that Relator incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

## E.   Count V – Connecticut False Claims Act

371.   Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

372.   This is a *qui tam* action brought by Relator and the State of Connecticut to recover treble damages and civil penalties under the Connecticut False Claims Act, CONN. GEN. STAT. § 4-274 *et seq*.

373.   CONN. GEN. STAT. § 4-275(a) provides that no person shall:

    (1)    Knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval under a state-administered health or human services program;

    (2)    Knowingly make, use or cause to be made or used, a false record or statement material to a false or fraudulent claim under a state-administered health or human services program;

    (3)    Conspire to commit a violation of this section.

374.   From at least January 2010 to the present, Defendants knowingly presented or caused to be presented false and/or fraudulent claims to Connecticut's

Medicaid program for reimbursement for services that were not medically necessary, medically reasonable, or were not actually provided. By creating and carrying out this fraudulent scheme, Defendants knowingly and repeatedly violated the Connecticut False Claims Act, CONN. GEN. STAT. § 4-275(a).

375.   Defendants knowingly made, used, or caused to be made or used, false records or statements in order to cause false and/or fraudulent claims to be paid or approved by the State of Connecticut.  These false statements or records consist of false and/or fraudulent MDS forms, documentation supporting MDS assessments, as well as false and/or fraudulent certifications or representations made or caused to be made by Defendants when seeking to participate in Connecticut Medicaid and when submitting claims. Defendants made or caused to be made false and/or fraudulent representations regarding whether services were medically necessary, medically reasonable, or actually provided.

376.   Defendants conspired with one another to submit false and/or fraudulent claims for reimbursement of services.  Defendants understood that the facilities were submitting false and/or fraudulent claims for reimbursement that arose out of services not rendered or false and/or fraudulent representations that patients were qualified for nursing care under Connecticut Medicaid.  The practice of providing unnecessary medical services and billing for services that were not provided was common knowledge to Defendants.

377.   Given the structure of the health care system at issue, Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the State of Connecticut's payment decision and were material to the State of Connecticut's decision to pay the claims. Connecticut Medicaid only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

378.   Given the structure of the health care system at issue, Defendants' false or fraudulent statements or records, or causation of false or fraudulent statements or records, had the potential to influence the State of Connecticut's payment decision and was material to the State of Connecticut's decision to pay the claims. Connecticut Medicaid only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

379.   Defendants' violations of the applicable statutes, regulations, and program instructions, and subsequent misrepresentations regarding their compliance, were material, because they went to the very essence of the bargain for which Connecticut Medicaid contracted. Had the State of Connecticut known of Defendants' non-compliance, which resulted in the submission of ineligible claims for reimbursement, the State of Connecticut would not have paid the claims.

380. The State of Connecticut paid the false and/or fraudulent claims.

381. Defendants' presentment of false and/or fraudulent claims to Connecticut Medicaid, false records and statements, and conspiratorial scheme were foreseeable factors in the State of Connecticut's loss, and a consequence of the scheme. By virtue of Defendants' actions, the State of Connecticut has suffered significant damages.

382. There are no bars to recovery under CONN. GEN. STAT. § 4-282, or in the alternative, Relator is an original source as defined therein. Relator has brought this action on his own behalf and on behalf of the State of Connecticut pursuant to CONN. GEN. STAT. § 4-277. Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the State before filing an action based on the information.

383. This Court is requested to accept pendent jurisdiction over this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damages to the State of Connecticut.

384. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF CONNECTICUT:

(1)   Three times the amount of actual damages that the State of Connecticut has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)   A civil penalty of not less than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Connecticut; and

(3)   All costs incurred in bringing this action.

To RELATOR:

(1)   The maximum amount allowed pursuant to CONN. GEN. STAT. § 4-278(e) and/or any other applicable provision of law;

(2)   Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)   An award of reasonable attorneys' fees and costs; and

(4)   Such further relief as this Court deems equitable and just.

## F.   Count VI – Delaware False Claims and Reporting Act

385.   Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

386.   This is a *qui tam* action brought by Relator and the State of Delaware to recover treble damages and civil penalties under the Delaware False Claims and Reporting Act, DEL. CODE ANN. tit. 6, § 1201 *et seq.*

387.   DEL. CODE ANN. tit. 6, § 1201(a) provides that no person shall-

(1)    Knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval under a state-administered health or human services program;

(2)    Knowingly make, use or cause to be made or used, a false record or statement material to a false or fraudulent claim under a state-administered health or human services program;

(3)    Conspire to commit a violation of this section.

388.    From at least January 2010 to the present, Defendants knowingly presented or caused to be presented false and/or fraudulent claims to Delaware's Medicaid program for reimbursement for services that were not medically necessary, medically reasonable, or were not actually provided. By creating and carrying out this fraudulent scheme, Defendants knowingly and repeatedly violated the Delaware False Claims and Reporting Act, DEL. CODE ANN. tit. 6, § 1201(a).

389.    Defendants knowingly made, used, or caused to be made or used, false records or statements in order to cause false and/or fraudulent claims to be paid or approved by the State of Delaware.  These false statements or records consist of false and/or fraudulent MDS forms, documentation supporting MDS assessments, as well as false and/or fraudulent certifications or representations made or caused to be made by Defendants when seeking to participate in Delaware Medicaid and when submitting claims. Defendants made or caused to be made false and/or fraudulent representations regarding whether services were medically necessary, medically reasonable, or actually provided.

141

390.   Defendants conspired with one another to submit false and/or fraudulent claims for reimbursement of services.  Defendants understood that the facilities were submitting false and/or fraudulent claims for reimbursement that arose out of services not rendered or false and/or fraudulent representations that patients were qualified for nursing care under Delaware Medicaid.  The practice of providing unnecessary medical services and billing for services that were not provided was common knowledge to Defendants.

391.   Given the structure of the health care system at issue, Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the State of Delaware's payment decision and was material to the State of Delaware's decision to pay the claims. Delaware Medicaid only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

392.   Given the structure of the health care system at issue, Defendants' false or fraudulent statements or records, or causation of false or fraudulent statements or records, had the potential to influence the State of Delaware's payment decision and were material to the State of Delaware's decision to pay the claims. Delaware Medicaid only pays for services that are medically necessary,

actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

393.   Defendants' violations of the applicable statutes, regulations, and program instructions, and subsequent misrepresentations regarding their compliance, were material, because they went to the very essence of the bargain for which Delaware Medicaid contracted. Had the State of Delaware known of Defendants' non-compliance, which resulted in the submission of ineligible claims for reimbursement, the State of Delaware would not have paid the claims.

394.   The State of Delaware paid the false and/or fraudulent claims.

395.   Defendants' presentment of false and/or fraudulent claims to Delaware Medicaid, false records and statements, and conspiratorial scheme were foreseeable factors in the State of Delaware's loss, and a consequence of the scheme.  By virtue of Defendants' actions, the State of Delaware has suffered significant damages.

396.   There are no bars to recovery under DEL. CODE ANN. tit. 6, § 1206, or in the alternative, Relator is an original source as defined therein.  Relator has brought this action on his own behalf and on behalf of the State of Delaware pursuant to DEL. CODE ANN. tit. 6 § 1203. Relator has direct and independent knowledge of the information on which these allegations are based and has

voluntarily provided the information to the State before filing an action based on the information.

397.   This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the State of Delaware.

398.   WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF DELAWARE:

(1)   Three times the amount of actual damages that the State of Delaware has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)   A civil penalty of not less than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Delaware; and

(3)   All costs incurred in bringing this action.

To RELATOR:

(1)   The maximum amount allowed pursuant to DEL. CODE ANN. tit. 6 § 1205, and/or any other applicable provision of law;

(2)   Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)   An award of reasonable attorneys' fees and costs; and

(4)   Such further relief as this Court deems equitable and just.

## G.    Count VII – Florida False Claims Act

399.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

400.    This is a *qui tam* action brought by Relator and the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, FLA. STAT. § 68.081 *et seq.*

401.    FLA. STAT. § 68.082(2) provides liability for any person who-

    (1)  Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

    (2)  Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

    (3)  Conspires to commit a violation of this subsection.

402.    From at least January 2010 to the present, Defendants knowingly presented or caused to be presented false and/or fraudulent claims to Florida's Medicaid program for reimbursement for services that were not medically necessary, medically reasonable, or were not actually provided. By creating and carrying out this fraudulent scheme, Defendants knowingly and repeatedly violated the Florida False Claims Act, FLA. STAT. § 68.082(2).

403.    Defendants knowingly made, used, or caused to be made or used, false records or statements in order to cause false and/or fraudulent claims to be

paid or approved by the State of Florida.  These false statements or records consist of false and/or fraudulent MDS forms, documentation supporting MDS assessments, as well as false and/or fraudulent certifications or representations made or caused to be made by Defendants when seeking to participate in Florida Medicaid and when submitting claims. Defendants made or caused to be made false and/or fraudulent representations regarding whether services were medically necessary, medically reasonable, or actually provided.

404.   Defendants conspired with one another to submit false and/or fraudulent claims for reimbursement of services.  Defendants understood that the facilities were submitting false and/or fraudulent claims for reimbursement that arose out of services not rendered or false and/or fraudulent representations that patients were qualified for nursing care under Florida Medicaid.  The practice of providing unnecessary medical services and billing for services that were not provided was common knowledge to Defendants.

405.   Given the structure of the health care system at issue, Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the State of Florida's payment decision and was material to the State of Florida's decision to pay the claims. Florida Medicaid only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

406.   Given the structure of the health care system at issue, Defendants' false or fraudulent statements or records, or causation of false or fraudulent statements or records, had the potential to influence the State of Florida's payment decision and were material to the State of Florida's decision to pay the claims. Florida Medicaid only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

407.   Defendants' violations of the applicable statutes, regulations, and program instructions, and subsequent misrepresentations regarding their compliance, were material, because they went to the very essence of the bargain for which Florida Medicaid contracted. Had the State of Florida known of Defendants' non-compliance, which resulted in the submission of ineligible claims for reimbursement, the State of Florida would not have paid the claims.

408.   The State of Florida paid the false and/or fraudulent claims.

409.   Defendants' presentment of false and/or fraudulent claims to Florida Medicaid, false records and statements, and conspiratorial scheme were foreseeable factors in the State of Florida's loss, and a consequence of the scheme. By virtue of Defendants' actions, the State of Florida has suffered significant damages.

410.    There are no bars to recovery under FLA. STAT. § 68.087(3), or in the alternative, Relator is an original source as defined therein.  Relator has brought this action on his own behalf and on behalf of the State of Florida pursuant to FLA. STAT. § 68.083. Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the State of Florida before filing an action based on the information.

411.    This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the State of Florida.

412.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF FLORIDA:

(1)    Three times the amount of actual damages that the State of Florida has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)    A civil penalty of not less than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Florida; and

(3)    All costs incurred in bringing this action.

To RELATOR:

(1)    The maximum amount allowed pursuant to FLA. STAT. § 68.085 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## H.    Count VIII – Georgia State False Medicaid Claims Act

413.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

414.    This is a *qui tam* action brought by Relator and the State of Georgia to recover treble damages and civil penalties under the Georgia State False Medicaid Claims Act, GA. CODE ANN. § 49-4-168 *et seq*.

415.    GA. CODE ANN. § 49-4-168.1(a) provides liability for any person who:

(1)     Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

(2)     Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

(3)    Conspires to commit a violation of paragraph (1), (2), (4), (5), (6), or (7) of this subsection.

416.    From at least January 2010 to the present, Defendants knowingly presented or caused to be presented false and/or fraudulent claims to Georgia's Medicaid program for reimbursement for services that were not medically necessary, medically reasonable, or were not actually provided. By creating and

carrying out this fraudulent scheme, Defendants knowingly and repeatedly violated the Georgia State False Medicaid Claims Act, GA. CODE ANN. § 49-4-168.1(a).

417.    Defendants knowingly made, used, or caused to be made or used, false records or statements in order to cause false and/or fraudulent claims to be paid or approved by the State of Georgia.  These false statements or records consist of false and/or fraudulent MDS forms, documentation supporting MDS assessments, as well as false and/or fraudulent certifications or representations made or caused to be made by Defendants when seeking to participate in Georgia Medicaid and when submitting claims. Defendants made or caused to be made false and/or fraudulent representations regarding whether services were medically necessary, medically reasonable, or actually provided.

418.    Defendants conspired with one another to submit false and/or fraudulent claims for reimbursement of services.  Defendants understood that the facilities were submitting false and/or fraudulent claims for reimbursement that arose out of services not rendered or false and/or fraudulent representations that patients were qualified for nursing care under Georgia Medicaid.  The practice of providing unnecessary medical services and billing for services that were not provided was common knowledge to Defendants.

419.    Given the structure of the health care system at issue, Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims

had the potential to influence the State of Georgia's payment decision and was material to the State of Georgia's decision to pay the claims. Georgia Medicaid only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

420.   Given the structure of the health care system at issue, Defendants' false or fraudulent statements or records, or causation of false or fraudulent statements or records, had the potential to influence the State of Georgia's payment decision and were material to the State of Georgia's decision to pay the claims. Georgia Medicaid only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

421.   Defendants' violations of the applicable statutes, regulations, and program instructions, and subsequent misrepresentations regarding their compliance, were material, because they went to the very essence of the bargain for which Georgia Medicaid contracted. Had the State of Georgia known of Defendants' non-compliance, which resulted in the submission of ineligible claims for reimbursement, the State of Georgia would not have paid the claims.

422.   The State of Georgia paid the false and/or fraudulent claims.

423.    Defendants' presentment of false and/or fraudulent claims to Georgia Medicaid, false records and statements, and conspiratorial scheme were foreseeable factors in the State of Georgia's loss, and a consequence of the scheme. By virtue of Defendants' actions, the State of Georgia has suffered significant damages.

424.    There are no bars to recovery under GA. CODE ANN. § 49-4-168.2, or in the alternative, Relator is an original source as defined therein.  Relator has brought this action on his own behalf and on behalf of the State of Georgia pursuant to GA. CODE ANN. § 49-4-168.2. Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the State of Georgia Attorney General's Office before filing an action based on the information.

425.    This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the State of Georgia.

426.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF GEORGIA:

    (1)    Three times the amount of actual damages that the State of Georgia has sustained as a result of the fraudulent and illegal practices of the Defendants;

    (2)    A civil penalty of not less than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Georgia; and

    (3)    All costs incurred in bringing this action.

To RELATOR:

    (1)    The maximum amount allowed pursuant to GA. CODE ANN. § 49-4-168.2 and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses that Relator incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

## I.    Count IX – Illinois False Claims Act

427.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

428.    This is a *qui tam* action brought by Relator and the State of Illinois to recover treble damages and civil penalties under the Illinois False Claims Act, 740 ILL. COMP. STAT. 175/1 *et seq.*

429.    740 ILL. COMP. STAT. 175/3(a)(1) provides liability for any person who-

    (A)    Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)     Knowingly makes, uses, or causes to be made or used, a
        false record or statement material to a false or fraudulent
        claim;

(C)     Conspires to commit a violation of subparagraph (A), (B), (D),
        (E), (F), or (G).

430.    From at least January 2010 to the present, Defendants knowingly presented or caused to be presented false and/or fraudulent claims to the Illinois Medicaid program for reimbursement for services that were not medically necessary, medically reasonable, or were not actually provided. By creating and carrying out this fraudulent scheme, Defendants knowingly and repeatedly violated the Illinois False Claims Act, 740 ILL. COMP. STAT. 175/3(a)(1).

431.    Defendants knowingly made, used, or caused to be made or used, false records or statements in order to cause false and/or fraudulent claims to be paid or approved by the State of Illinois.  These false statements or records consist of false and/or fraudulent MDS forms, documentation supporting MDS assessments, as well as false and/or fraudulent certifications or representations made or caused to be made by Defendants when seeking to participate in the Illinois Medicaid program and when submitting claims. Defendants made or caused to be made false and/or fraudulent representations regarding whether services were medically necessary, medically reasonable, or actually provided.

432.   Defendants conspired with one another to submit false and/or fraudulent claims for reimbursement of services.  Defendants understood that the facilities were submitting false and/or fraudulent claims for reimbursement that arose out of services not rendered or false and/or fraudulent representations that patients were qualified for nursing care under Illinois Medicaid.  The practice of providing unnecessary medical services and billing for services that were not provided was common knowledge to Defendants.

433.   Given the structure of the health care system at issue, Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the State of Illinois's payment decision and was material to the State of Illinois's decision to pay the claims. Illinois Medicaid only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

434.   Given the structure of the health care system at issue, Defendants' false or fraudulent statements or records, or causation of false or fraudulent statements or records, had the potential to influence the State of Illinois's payment decision and were material to the State of Illinois's decision to pay the claims. Illinois Medicaid only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

435.   Defendants' violations of the applicable statutes, regulations, and program instructions, and subsequent misrepresentations regarding their compliance, were material, because they went to the very essence of the bargain for which Illinois Medicaid contracted. Had the State of Illinois known of Defendants' non-compliance, which resulted in the submission of ineligible claims for reimbursement, the State of Illinois would not have paid the claims.

436.   The State of Illinois paid the false and/or fraudulent claims.

437.   Defendants' presentment of false and/or fraudulent claims to Illinois Medicaid, false records and statements, and conspiratorial scheme were foreseeable factors in the State of Illinois' loss, and a consequence of the scheme. By virtue of Defendants' actions, the State of Illinois has suffered significant damages.

438.   There are no bars to recovery under 740 ILL. COMP. STAT. 175/4, or in the alternative, Relator is an original source as defined therein.   Relator has brought this action on his own behalf and on behalf of the State of Illinois pursuant to 740 ILL. COMP. STAT. 175/4. Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the State of Illinois before filing an action based on the information.

439.     This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the State of Illinois.

To the STATE OF ILLINOIS:

    (1)    Three times the amount of actual damages that the State of Illinois has sustained as a result of the fraudulent and illegal practices of the Defendants;

    (2)    A civil penalty of not less than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Illinois; and

    (3)    All costs incurred in bringing this action.

To RELATOR:

    (1)    The maximum amount allowed pursuant to 740 ILL. COMP. STAT. 175/4(d) and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses that Relator incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

## J.     Count X – Indiana Medicaid False Claims and Whistleblower Protection Act

440.     Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

441.   This is a *qui tam* action brought by Relator and the State of Indiana to recover treble damages and civil penalties under the Indiana Medicaid False Claims and Whistleblower Protection Act, IND. CODE §5-11-5.7 *et seq.*

442.   IND. CODE §5-11-5.7-2(a) provides liability for any person who-

(1)   Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2)   Knowingly makes, uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim;

***

(7)   Conspires with another person to perform an act described in subdivisions (1) through (6); or

(8)   Causes or induces another person to perform an act described in subdivisions (1) through (6).

443.   From at least January 2010 to the present, Defendants knowingly presented or caused to be presented false and/or fraudulent claims to Indiana's Medicaid program for reimbursement for services that were not medically necessary, medically reasonable, or were not actually provided. By creating and carrying out this fraudulent scheme, Defendants knowingly and repeatedly violated the Indiana Medicaid False Claims and Whistleblower Protection Act, IND. CODE §5-11-5.7-2(a).

444.   Defendants knowingly made, used, or caused to be made or used, false records or statements in order to cause false and/or fraudulent claims to be paid or approved by the State of Indiana.  These false statements or records consist of false and/or fraudulent MDS forms, documentation supporting MDS assessments, as well as false and/or fraudulent certifications or representations made or caused to be made by Defendants when seeking to participate in Indiana Medicaid and when submitting claims. Defendants made or caused to be made false and/or fraudulent representations regarding whether services were medically necessary, medically reasonable, or actually provided.

445.   Defendants conspired with one another to submit false and/or fraudulent claims for reimbursement of services.  Defendants understood that the facilities were submitting false and/or fraudulent claims for reimbursement that arose out of services not rendered or false and/or fraudulent representations that patients were qualified for nursing care under Indiana Medicaid.  The practice of providing unnecessary medical services and billing for services that were not provided was common knowledge to Defendants.

446.   Given the structure of the health care system at issue, Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the State of Indiana's payment decision and was material to the State of Indiana's decision to pay the claims. Indiana Medicaid only

pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

447.   Given the structure of the health care system at issue, Defendants' false or fraudulent statements or records, or causation of false or fraudulent statements or records, had the potential to influence the State of Indiana's payment decision and were material to the State of Indiana's decision to pay the claims. Indiana Medicaid only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

448.   Defendants' violations of the applicable statutes, regulations, and program instructions, and subsequent misrepresentations regarding their compliance, were material, because they went to the very essence of the bargain for which Indiana Medicaid contracted. Had the State of Indiana known of Defendants' non-compliance, which resulted in the submission of ineligible claims for reimbursement, the State of Indiana would not have paid the claims.

449.   The State of Indiana paid the false and/or fraudulent claims.

450.   Defendants' presentment of false and/or fraudulent claims to Indiana Medicaid, false records and statements, and conspiratorial scheme were foreseeable factors in the State of Indiana's loss, and a consequence of the scheme.

By virtue of Defendants' actions, the State of Indiana has suffered significant damages.

451.    There are no bars to recovery under IND. CODE § 5-11-5.7-6.  Relator has brought this action on his own behalf and on behalf of the State of Indiana pursuant to IND. CODE § 5-11-5.7-4. Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the State of Indiana before filing an action based on the information.

452.    This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the State of Indiana.

453.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF INDIANA:

(1)    Three times the amount of actual damages that the State of Indiana has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)    A civil penalty of not less than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Indiana; and

(3)    All costs incurred in bringing this action.

To RELATOR:

(1)    The maximum amount allowed pursuant to IND. CODE §5-11-5.7-6 and/or any other applicable provision of law;

    (2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

    (3)     An award of reasonable attorneys' fees and costs; and

    (4)     Such further relief as this Court deems equitable and just.

## K.    Count XI – Iowa False Claims Act

454.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

455.    This is a *qui tam* action brought by Relator and the State of Iowa to recover treble damages and civil penalties under the Iowa False Claims Act, IOWA CODE § 685.1 *et seq.*

456.    IOWA CODE § 685.2(1) provides liability for any person who:

    (a)     Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.

    (b)     Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

    (c)     Conspires to commit a violation of paragraph "a", "b", "d", "e", "f", or "g."

457.    From at least January 2010 to the present, Defendants knowingly presented or caused to be presented false and/or fraudulent claims to Iowa's Medicaid program for reimbursement for services that were not medically necessary, medically reasonable, or were not actually provided. By creating and

carrying out this fraudulent scheme, Defendants knowingly and repeatedly violated the Iowa False Claims Act, IOWA CODE § 685.2(1).

458.    Defendants knowingly made, used, or caused to be made or used, false records or statements in order to cause false and/or fraudulent claims to be paid or approved by the State of Iowa.  These false statements or records consist of false and/or fraudulent MDS forms, documentation supporting MDS assessments, as well as false and/or fraudulent certifications or representations made or caused to be made by Defendants when seeking to participate in Iowa Medicaid and when submitting claims. Defendants made or caused to be made false and/or fraudulent representations regarding whether services were medically necessary, medically reasonable, or actually provided.

459.    Defendants conspired with one another to submit false and/or fraudulent claims for reimbursement of services.  Defendants understood that the facilities were submitting false and/or fraudulent claims for reimbursement that arose out of services not rendered or false and/or fraudulent representations that patients were qualified for nursing care under Iowa Medicaid.  The practice of providing unnecessary medical services and billing for services that were not provided was common knowledge to Defendants.

460.    Given the structure of the health care system at issue, Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims

had the potential to influence the State of Iowa's payment decision and was material to the State of Iowa's decision to pay the claims. Iowa Medicaid only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

461.    Given the structure of the health care system at issue, Defendants' false or fraudulent statements or records, or causation of false or fraudulent statements or records, had the potential to influence the State of Iowa's payment decision and were material to the State of Iowa's decision to pay the claims. Iowa Medicaid only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

462.    Defendants' violations of the applicable statutes, regulations, and program instructions, and subsequent misrepresentations regarding their compliance, were material, because they went to the very essence of the bargain for which Iowa Medicaid contracted. Had the State of Iowa known of Defendants' non-compliance, which resulted in the submission of ineligible claims for reimbursement, the State of Iowa would not have paid the claims.

463.    The State of Iowa paid the false and/or fraudulent claims.

464.    Defendants' presentment of false and/or fraudulent claims to Iowa Medicaid, false records and statements, and conspiratorial scheme were

foreseeable factors in the State of Iowa's loss, and a consequence of the scheme. By virtue of Defendants' actions, the State of Iowa has suffered significant damages.

465.    There are no bars to recovery under IOWA CODE § 685.3 and, or in the alternative, Relator is an original source as defined under IOWA CODE § 685.1. Relator has brought this action on his own behalf and on behalf of the State of Iowa pursuant to IOWA CODE § 685.3. Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the State of Iowa before filing an action based on the information.

466.    This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the State of Iowa.

467.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF IOWA:

(1)    Three times the amount of actual damages that the State of Iowa has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)    A civil penalty of not less than $21,563 for each false claim that the Defendants presented or caused to be presented to the State of Iowa; and

(3)     All costs incurred in bringing this action.

To RELATOR:

(1)     The maximum amount allowed pursuant to IOWA CODE §
        685.3(4) and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses that Relator incurred in
        connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## L.      Count XII – Louisiana Medical Assistance Programs Integrity Law

468.    Relator realleges and hereby incorporates by reference each and every

allegation contained in all paragraphs of this Complaint.

469.    This is a *qui tam* action brought by Relator and the State of Louisiana

to recover treble damages and civil penalties under the Louisiana Medical

Assistance Programs Integrity Law, LA. REV. STAT. ANN. § 46:437.1 *et seq.*

470.    LA. REV. STAT. ANN. § 46:438.3 provides –

        A.     No person shall knowingly present or cause to be
presented a false or
            fraudulent claim.

        B.     No person shall knowingly engage in misrepresentation
or make, use, or
            cause to be made or used, a false record or statement material to
            a false or fraudulent claim.

166

\*\*\*

    D.    No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim.

471.   From at least January 2010 to the present, Defendants knowingly presented or caused to be presented false and/or fraudulent claims to Louisiana's Medicaid program for reimbursement for services that were not medically necessary, medically reasonable, or were not actually provided. By creating and carrying out this fraudulent scheme, Defendants knowingly and repeatedly violated the Louisiana Medical Assistance Programs Integrity Law, LA. REV. STAT. ANN. § 46:438.3.

472.   Defendants knowingly made, used, or caused to be made or used, false records or statements in order to cause false and/or fraudulent claims to be paid or approved by the State of Louisiana.  These false statements or records consist of false and/or fraudulent MDS forms, documentation supporting MDS assessments, as well as false and/or fraudulent certifications or representations made or caused to be made by Defendants when seeking to participate in Louisiana Medicaid and when submitting claims. Defendants made or caused to be made false and/or fraudulent representations regarding whether services were medically necessary, medically reasonable, or actually provided.

167

473.   Defendants conspired with one another to submit false and/or fraudulent claims for reimbursement of services.  Defendants understood that the facilities were submitting false and/or fraudulent claims for reimbursement that arose out of services not rendered or false and/or fraudulent representations that patients were qualified for nursing care under Louisiana Medicaid.  The practice of providing unnecessary medical services and billing for services that were not provided was common knowledge to Defendants.

474.   Given the structure of the health care system at issue, Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the State of Louisiana's payment decision and was material to the State of Louisiana's decision to pay the claims. Louisiana Medicaid only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

475.   Given the structure of the health care system at issue, Defendants' false or fraudulent statements or records, or causation of false or fraudulent statements or records, had the potential to influence the State of Louisiana's payment decision and were material to the State of Louisiana's decision to pay the claims. Louisiana Medicaid only pays for services that are medically necessary,

actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

476. Defendants' violations of the applicable statutes, regulations, and program instructions, and subsequent misrepresentations regarding their compliance, were material, because they went to the very essence of the bargain for which Louisiana Medicaid contracted. Had the State of Louisiana known of Defendants' non-compliance, which resulted in the submission of ineligible claims for reimbursement, the State of Louisiana would not have paid the claims.

477. The State of Louisiana paid the false and/or fraudulent claims.

478. Defendants' presentment of false and/or fraudulent claims to Louisiana Medicaid, false records and statements, and conspiratorial scheme were foreseeable factors in the State of Louisiana's loss, and a consequence of the scheme. By virtue of Defendants' actions, the State of Louisiana has suffered significant damages.

479. There are no bars to recovery under LA. REV. STAT. ANN. § 46:439.1(E), or in the alternative, Relator is an original source as defined therein. Relator has brought this action on his own behalf and on behalf of the State of Louisiana pursuant to LA. REV. STAT. ANN. § 46:439.1. Relator has direct and independent knowledge of the information on which these allegations are based

and has voluntarily provided the information to the State of Louisiana before filing an action based on the information.

480.    This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the State of Louisiana.

481.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF LOUISIANA:

    (1)    Three times the amount of actual damages that the State of Louisiana has sustained as a result of the fraudulent and illegal practices of the Defendants;

    (2)    A civil penalty of not less than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Louisiana; and

    (3)    All costs incurred in bringing this action.

To RELATOR:

    (1)    The maximum amount allowed pursuant to LA. REV. STAT. § 46:439.4 and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses that Relator incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

**M.      Count XIII – Maryland False Health Claims Act**

482.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

483.    This is a *qui tam* action brought by Relator and the State of Maryland to recover treble damages and civil penalties under the Maryland False Claims Act, MD. CODE ANN. HEALTH-GEN. §2-601 *et seq.*

484.    MD. CODE ANN. HEALTH-GEN. §2-602(a) provides that a person may not:

> (1)      Knowingly present or cause to be presented a false or fraudulent claim for payment or approval;
>
> (2)      Knowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim;
>
> (3)      Conspire to commit a violation under this subtitle;
>
> ***
>
> (9)      Knowingly make any other false or fraudulent claim against a State health plan or a State health program.

485.    From at least January 2010 to the present, Defendants knowingly presented or caused to be presented false and/or fraudulent claims to Maryland's Medicaid program for reimbursement for services that were not medically necessary, medically reasonable, or were not actually provided. By creating and carrying out this fraudulent scheme, Defendants knowingly and repeatedly violated the Maryland False Health Claims Act, MD. CODE ANN. HEALTH-GEN. §2-602(a).

486.   Defendants knowingly made, used, or caused to be made or used, false records or statements in order to cause false and/or fraudulent claims to be paid or approved by the State of Maryland.   These false statements or records consist of false and/or fraudulent MDS forms, documentation supporting MDS assessments, as well as false and/or fraudulent certifications or representations made or caused to be made by Defendants when seeking to participate in Maryland Medicaid and when submitting claims. Defendants made or caused to be made false and/or fraudulent representations regarding whether services were medically necessary, medically reasonable, or actually provided.

487.   Defendants conspired with one another to submit false and/or fraudulent claims for reimbursement of services.   Defendants understood that the facilities were submitting false and/or fraudulent claims for reimbursement that arose out of services not rendered or false and/or fraudulent representations that patients were qualified for nursing care under Maryland Medicaid.   The practice of providing unnecessary medical services and billing for services that were not provided was common knowledge to Defendants.

488.   Given the structure of the health care system at issue, Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the State of Maryland's payment decision and was material to the State of Maryland's decision to pay the claims. Maryland Medicaid

only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

489.   Given the structure of the health care system at issue, Defendants' false or fraudulent statements or records, or causation of false or fraudulent statements or records, had the potential to influence the State of Maryland's payment decision and were material to the State of Maryland's decision to pay the claims. Maryland Medicaid only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

490.   Defendants' violations of the applicable statutes, regulations, and program instructions, and subsequent misrepresentations regarding their compliance, were material, because they went to the very essence of the bargain for which Maryland Medicaid contracted. Had the State of Maryland known of Defendants' non-compliance, which resulted in the submission of ineligible claims for reimbursement, the State of Maryland would not have paid the claims.

491.   The State of Maryland paid the false and/or fraudulent claims.

492.   Defendants' presentment of false and/or fraudulent claims to Maryland Medicaid, false records and statements, and conspiratorial scheme were foreseeable factors in the State of Maryland's loss, and a consequence of the

scheme.   By virtue of Defendants' actions, the State of Maryland has suffered significant damages.

493.   There are no bars to recovery under MD. CODE ANN. HEALTH-GEN. §2-606. In the alternative, Relator has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the State of Maryland prior to filing the action.  Relator has brought this action pursuant to MD. CODE ANN. HEALTH-GEN. §2-604(a) on behalf of himself and on behalf of the State of Maryland.

494.   This Court is requested to accept pendent jurisdiction over this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damages to the State of Maryland in the operation of its Medicaid program.

To the STATE OF MARYLAND:

(1)   Three times the amount of actual damages that the State of Maryland has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)   A civil penalty of not less than $10,000 for each false claim that the Defendants presented or caused to be presented to the State of Maryland; and

(3)   All costs incurred in bringing this action.

To RELATOR:

(1)    The maximum amount allowed pursuant to MD. CODE ANN. HEALTH-GEN. §2-605 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## N.    Count XIV – Massachusetts False Claims Act

495.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

496.    This is a *qui tam* action brought by Relator and the Commonwealth of Massachusetts for treble damages and penalties under the Massachusetts False Claims Act, MASS. GEN. LAWS ANN. 12 § 5A *et seq.*

497.    MASS. GEN. LAWS ch. 12 § 5B provides liability for any person who-

(1)    Knowingly presents, or causes to be presented, a false and/or fraudulent claim for payment or approval;

(2)    Knowingly makes, uses, or causes to be made or used a false record or statement material to a false and/or fraudulent claim;

(3)    Conspires to commit a violation of this subsection

498.    From at least January 2010 to the present, Defendants knowingly presented or caused to be presented false and/or fraudulent claims to the Commonwealth's Medicaid program, MassHealth, for reimbursement for services that were not medically necessary, medically reasonable, or were not actually

provided. By creating and carrying out this fraudulent scheme, Defendants knowingly and repeatedly violated the Massachusetts False Claims Act, MASS. GEN. LAWS ANN. 12 § 5B.

499.   Defendants knowingly made, used, or caused to be made or used, false records or statements in order to cause false and/or fraudulent claims to be paid or approved by the Commonwealth of Massachusetts.  These false statements or records consist of false and/or fraudulent MDS forms, documentation supporting MDS assessments, as well as false and/or fraudulent certifications or representations made or caused to be made by Defendants when seeking to participate in MassHealth and when submitting claims. Defendants made or caused to be made false and/or fraudulent representations regarding whether services were medically necessary, medically reasonable, or actually provided.

500.   Defendants conspired with one another to submit false and/or fraudulent claims for reimbursement of services.  Defendants understood that the facilities were submitting false and/or fraudulent claims for reimbursement that arose out of services not rendered or false and/or fraudulent representations that patients were qualified for nursing care under MassHealth.  The practice of providing unnecessary medical services and billing for services that were not provided was common knowledge to Defendants.

501.    Given the structure of the health care system at issue, Defendants'
knowing submission, or causation of submission, of false and/or fraudulent claims
had the potential to influence the Commonwealth's payment decision and was
material to the Commonwealth's decision to pay the claims. MassHealth only pays
for services that are medically necessary, actually provided, and are provided in
conformity with applicable statutes, regulations, and program instructions.

502.    Given the structure of the health care system at issue, Defendants'
false or fraudulent statements or records, or causation of false or fraudulent
statements or records, had the potential to influence the Commonwealth's payment
decision and were material to the Commonwealth's decision to pay the claims.
MassHealth only pays for services that are medically necessary, actually provided,
and are provided in conformity with applicable statutes, regulations, and program
instructions.

503.    Defendants' violations of the applicable statutes, regulations, and
program instructions, and subsequent misrepresentations regarding their
compliance, were material, because they went to the very essence of the bargain
for which MassHealth contracted. Had the Commonwealth known of Defendants'
non-compliance, which resulted in the submission of ineligible claims for
reimbursement, the Commonwealth would not have paid the claims.

504.   The Commonwealth of Massachusetts paid the false and/or fraudulent claims.

505.   Defendants' presentment of false and/or fraudulent claims to MassHealth, false records and statements, and conspiratorial scheme were foreseeable factors in the Commonwealth's loss, and a consequence of the scheme. By virtue of Defendants' actions, the Commonwealth of Massachusetts has suffered significant damages.

506.   There are no bars to recovery under MASS. GEN. LAWS ch. 12 § 5G, and, or in the alternative, Relator is an original source as defined in MASS. GEN. LAWS ch. 12 § 5A. Relator has brought this action on his own behalf and on behalf of the Commonwealth of Massachusetts pursuant to MASS. GEN. LAWS ch. 12 § 5C(2). Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the Commonwealth of Massachusetts before filing an action based on the information.

507.   This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the Commonwealth of Massachusetts.

508.   WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the COMMONWEALTH OF MASSACHUSETTS:

(1)    Three times the amount of actual damages that the Commonwealth of Massachusetts has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)    A civil penalty of not less than $11,000 for each false claim that the Defendants presented or caused to be presented to the Commonwealth of Massachusetts; and

(3)    All costs incurred in bringing this action.

To RELATOR:

(1)    The maximum amount allowed pursuant to MASS. GEN. LAWS ch. 12, §5F and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## O.    Count XV – Michigan Medicaid False Claims Act

509.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

510.    This is a *qui tam* action brought by Relator and the State of Michigan for treble damages and penalties under the Michigan Medicaid False Claim Act, MICH. COMP. LAWS § 400.601 *et seq.*

511.    The Michigan Medicaid False Claim Act contains the following provisions:

- A person shall not knowingly make or cause to be made a false statement or false representation of a material fact for use in

determining rights to a Medicaid benefit. (MICH. COMP. LAWS § 400.603(2)).

- A person shall not enter into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another to obtain the payment or allowance of a false claim under the social welfare act, Act No. 280 of the Public Acts of 1939, as amended, being sections 400.1 to 400.121 of the Michigan Compiled Laws. (MICH. COMP. LAWS § 400.606(1)).

- A person shall not make or present or cause to be made or presented to an employee or officer of this state a claim under the social welfare act, 1939 PA 280, MCL 400.1 to 400.119b, upon or against the state, knowing the claim to be false. (MICH. COMP. LAWS § 400.607(1)).

512. From at least January 2010 to the present, Defendants knowingly presented or caused to be presented false and/or fraudulent claims to Michigan's Medicaid program for reimbursement for services that were not medically necessary, medically reasonable, or were not actually provided. By creating and carrying out this fraudulent scheme, Defendants knowingly and repeatedly violated the Michigan Medicaid False Claims Act, MICH. COMP. LAWS § 400.601 *et seq.*

513. Defendants knowingly made, used, or caused to be made or used, false records or statements in order to cause false and/or fraudulent claims to be paid or approved by the State of Michigan.  These false statements or records consist of false and/or fraudulent MDS forms, documentation supporting MDS assessments, as well as false and/or fraudulent certifications or representations made or caused to be made by Defendants when seeking to participate in Michigan

Medicaid and when submitting claims. Defendants made or caused to be made false and/or fraudulent representations regarding whether services were medically necessary, medically reasonable, or actually provided.

514.   Defendants conspired with one another to submit false and/or fraudulent claims for reimbursement of services.  Defendants understood that the facilities were submitting false and/or fraudulent claims for reimbursement that arose out of services not rendered or false and/or fraudulent representations that patients were qualified for nursing care under Michigan Medicaid.  The practice of providing unnecessary medical services and billing for services that were not provided was common knowledge to Defendants.

515.   Given the structure of the health care system at issue, Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the State of Michigan's payment decision and was material to the State of Michigan's decision to pay the claims. Michigan Medicaid only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

516.   Given the structure of the health care system at issue, Defendants' false or fraudulent statements or records, or causation of false or fraudulent statements or records, had the potential to influence the State of Michigan's

payment decision and were material to the State of Michigan's decision to pay the claims. Michigan Medicaid only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

517.    Defendants' violations of the applicable statutes, regulations, and program instructions, and subsequent misrepresentations regarding their compliance, were material, because they went to the very essence of the bargain for which Michigan Medicaid contracted. Had the State of Michigan known of Defendants' non-compliance, which resulted in the submission of ineligible claims for reimbursement, the State of Michigan would not have paid the claims.

518.    The State of Michigan paid the false and/or fraudulent claims.

519.    Defendants' presentment of false and/or fraudulent claims to Michigan Medicaid, false records and statements, and conspiratorial scheme were foreseeable factors in the State of Michigan's loss, and a consequence of the scheme.  By virtue of Defendants' actions, the State of Michigan has suffered significant damages.

520.    There are no bars to recovery under MICH. COMP. LAWS § 400.610a, and, or in the alternative, Relator is an original source as defined therein.  Relator has brought this action on his own behalf and on behalf of the State of Michigan pursuant to MICH. COMP. LAWS § 400.610a. Relator has direct and independent

knowledge of the information on which these allegations are based and has voluntarily provided the information to the State of Michigan Attorney General's Office before filing an action based on the information.

521. This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the State of Michigan.

522. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF MICHIGAN:

(1) Three times the amount of actual damages that the State of Michigan has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2) A civil penalty of not less than $10,000 for each false claim that the Defendants presented or caused to be presented to the State of Michigan; and

(3) All costs incurred in bringing this action.

To RELATOR:

(1) The maximum amount allowed pursuant to MICH. COMP. LAWS §400.610a(9) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

P.    **Count XVI – Minnesota False Claims Act**

523.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

524.    This is a *qui tam* action brought by Relator and the State of Minnesota to recover treble damages and civil penalties under the Minnesota False Claims Act, MINN. STAT. § 15C.01 *et seq.*

525.    MINN. STAT. § 15C.02(a) imposes liability on any person who

(1)    Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

(2)    Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3)    Knowingly conspires to commit a violation of clause (1), (2), (4), (5), (6), or (7).

526.    From at least January 2010 to the present, Defendants knowingly presented or caused to be presented false and/or fraudulent claims to Minnesota's Medicaid program for reimbursement for services that were not medically necessary, medically reasonable, or were not actually provided. By creating and carrying out this fraudulent scheme, Defendants knowingly and repeatedly violated the Minnesota False Claims Act, MINN. STAT. § 15C.02(a).

527.    Defendants knowingly made, used, or caused to be made or used, false records or statements in order to cause false and/or fraudulent claims to be

184

paid or approved by the State of Minnesota.  These false statements or records consist of false and/or fraudulent MDS forms, documentation supporting MDS assessments, as well as false and/or fraudulent certifications or representations made or caused to be made by Defendants when seeking to participate in Minnesota Medicaid and when submitting claims. Defendants made or caused to be made false and/or fraudulent representations regarding whether services were medically necessary, medically reasonable, or actually provided.

528.   Defendants conspired with one another to submit false and/or fraudulent claims for reimbursement of services.  Defendants understood that the facilities were submitting false and/or fraudulent claims for reimbursement that arose out of services not rendered or false and/or fraudulent representations that patients were qualified for nursing care under Minnesota Medicaid.  The practice of providing unnecessary medical services and billing for services that were not provided was common knowledge to Defendants.

529.   Given the structure of the health care system at issue, Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the State of Minnesota's payment decision and was material to the State of Minnesota's decision to pay the claims. Minnesota Medicaid only pays for services that are medically necessary, actually provided,

and are provided in conformity with applicable statutes, regulations, and program instructions.

530.    Given the structure of the health care system at issue, Defendants' false or fraudulent statements or records, or causation of false or fraudulent statements or records, had the potential to influence the State of Minnesota's payment decision and were material to the State of Minnesota's decision to pay the claims. Minnesota Medicaid only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

531.    Defendants' violations of the applicable statutes, regulations, and program instructions, and subsequent misrepresentations regarding their compliance, were material, because they went to the very essence of the bargain for which Minnesota Medicaid contracted. Had the State of Minnesota known of Defendants' non-compliance, which resulted in the submission of ineligible claims for reimbursement, the State of Minnesota would not have paid the claims.

532.    The State of Minnesota paid the false and/or fraudulent claims.

533.    Defendants' presentment of false and/or fraudulent claims to Minnesota Medicaid, false records and statements, and conspiratorial scheme were foreseeable factors in the State of Minnesota's loss, and a consequence of the

scheme.  By virtue of Defendants' actions, the State of Minnesota has suffered significant damages.

534.    There are no bars to recovery under MINN. STAT. § 15C.05, or in the alternative, Relator is an original source as defined in MINN. STAT. §15C.01. Relator has brought this action on his own behalf and on behalf of the State of Minnesota pursuant to MINN. STAT. § 15C.05. Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the State of Minnesota before filing an action based on the information.

535.    This Court is requested to accept pendent jurisdiction over this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damages to the State of Minnesota.

536.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF MINNESOTA:

(1)    Three times the amount of actual damages that the State of Minnesota has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)    A civil penalty of not less than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Minnesota; and

(3)    All costs incurred in bringing this action.

To RELATOR:

    (1)    The maximum amount allowed pursuant to MINN. STAT. § 15C.13 and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses that Relator incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

## Q.    Count XVII – New Jersey False Claims Act

537.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

538.    This is a *qui tam* action brought by Relator and the State of New Jersey to recover treble damages and civil penalties under the New Jersey False Claims Act, N.J. STAT. ANN. § 2A:32C-1 *et seq.*

539.    N.J. STAT. ANN. § 2A:32C-3 provides liability for any person who

    (a)    Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

    (b)    Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

    (c)    Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State.

540.   From at least January 2010 to the present, Defendants knowingly presented or caused to be presented false and/or fraudulent claims to New Jersey's Medicaid program for reimbursement for services that were not medically necessary, medically reasonable, or were not actually provided. By creating and carrying out this fraudulent scheme, Defendants knowingly and repeatedly violated the New Jersey False Claims Act, N.J. STAT. ANN. § 2A:32C-3.

541.   Defendants knowingly made, used, or caused to be made or used, false records or statements in order to cause false and/or fraudulent claims to be paid or approved by the State of New Jersey.  These false statements or records consist of false and/or fraudulent MDS forms, documentation supporting MDS assessments, as well as false and/or fraudulent certifications or representations made or caused to be made by Defendants when seeking to participate in New Jersey Medicaid and when submitting claims. Defendants made or caused to be made false and/or fraudulent representations regarding whether services were medically necessary, medically reasonable, or actually provided.

542.   Defendants conspired with one another to submit false and/or fraudulent claims for reimbursement of services.  Defendants understood that the facilities were submitting false and/or fraudulent claims for reimbursement that arose out of services not rendered or false and/or fraudulent representations that patients were qualified for nursing care under New Jersey Medicaid.  The practice

of providing unnecessary medical services and billing for services that were not provided was common knowledge to Defendants.

543.  Given the structure of the health care system at issue, Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the State of New Jersey's payment decision and was material to the State of New Jersey's decision to pay the claims. New Jersey Medicaid only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

544.  Given the structure of the health care system at issue, Defendants' false or fraudulent statements or records, or causation of false or fraudulent statements or records, had the potential to influence the State of New Jersey's payment decision and were material to the State of New Jersey's decision to pay the claims. New Jersey Medicaid only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

545.  Defendants' violations of the applicable statutes, regulations, and program instructions, and subsequent misrepresentations regarding their compliance, were material, because they went to the very essence of the bargain for which New Jersey Medicaid contracted. Had the State of New Jersey known of

Defendants' non-compliance, which resulted in the submission of ineligible claims for reimbursement, the State of New Jersey would not have paid the claims.

546.   The State of New Jersey paid the false and/or fraudulent claims.

547.   Defendants' presentment of false and/or fraudulent claims to New Jersey Medicaid, false records and statements, and conspiratorial scheme were foreseeable factors in the State of New Jersey's loss, and a consequence of the scheme.  By virtue of Defendants' actions, the State of New Jersey has suffered significant damages.

548.   There are no bars to recovery under N.J. STAT. ANN. § 2A:32C-9(c), or in the alternative, Relator is an original source as defined therein.  Relator is an individual with direct and independent knowledge of the allegations herein. Furthermore, Relator has voluntarily provided the information underlying these allegations to the State prior to bringing this action on behalf of himself and on behalf of the State of New Jersey pursuant to N.J. STAT. ANN. § 2A:32C-5(b).

549.   This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the State of New Jersey.

550.   WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF NEW JERSEY:

    (1)    Three times the amount of actual damages that the State of New Jersey has sustained as a result of the fraudulent and illegal practices of the Defendants;

    (2)    A civil penalty of not less than $21,563 for each false claim that the Defendants presented or caused to be presented to the State of New Jersey; and

    (3)    All costs incurred in bringing this action.

To RELATOR:

    (1)    The maximum amount allowed pursuant to N.J. STAT. ANN. § 2A:32C-7 and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses that Relator incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

## R.    Count XVIII – New York False Claims Act

551.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

552.    This is a *qui tam* action brought by Relator and State of New York to recover treble damages and civil penalties under the New York False Claims Act, N.Y. STATE FIN. LAW §§ 187–194.

553.    N.Y. STATE FIN. LAW § 189(1) provides liability for any person who-

    (a) Knowingly presents, or causes to be presented a false and/or fraudulent claim for payment or approval;

    (b) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false and/or fraudulent claim;

192

(c) Conspires to commit a violation of paragraph (a), (b), (d), (e), (f), or (g) of this subdivision.

554.    From at least January 2010 to the present, Defendants knowingly presented or caused to be presented false and/or fraudulent claims to New York's Medicaid program for reimbursement for services that were not medically necessary, medically reasonable, or were not actually provided. By creating and carrying out this fraudulent scheme, Defendants knowingly and repeatedly violated the New York False Claims Act, N.Y. STATE FIN. LAW § 189(1).

555.    Defendants knowingly made, used, or caused to be made or used, false records or statements in order to cause false and/or fraudulent claims to be paid or approved by the State of New York.  These false statements or records consist of false and/or fraudulent MDS forms, documentation supporting MDS assessments, as well as false and/or fraudulent certifications or representations made or caused to be made by Defendants when seeking to participate in New York Medicaid and when submitting claims. Defendants made or caused to be made false and/or fraudulent representations regarding whether services were medically necessary, medically reasonable, or actually provided.

556.    Defendants conspired with one another to submit false and/or fraudulent claims for reimbursement of services.  Defendants understood that the facilities were submitting false and/or fraudulent claims for reimbursement that

arose out of services not rendered or false and/or fraudulent representations that patients were qualified for nursing care under New York Medicaid.  The practice of providing unnecessary medical services and billing for services that were not provided was common knowledge to Defendants.

557.   Given the structure of the health care system at issue, Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the State of New York's payment decision and was material to the State of New York's decision to pay the claims. New York Medicaid only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

558.   Given the structure of the health care system at issue, Defendants' false or fraudulent statements or records, or causation of false or fraudulent statements or records, had the potential to influence the State of New York's payment decision and were material to the State of New York's decision to pay the claims. New York Medicaid only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

559.   Defendants' violations of the applicable statutes, regulations, and program instructions, and subsequent misrepresentations regarding their

compliance, were material, because they went to the very essence of the bargain for which New York Medicaid contracted. Had the State of New York known of Defendants' non-compliance, which resulted in the submission of ineligible claims for reimbursement, the State of New York would not have paid the claims.

560.   The State of New York paid the false and/or fraudulent claims.

561.   Defendants' presentment of false and/or fraudulent claims to New York Medicaid, false records and statements, and conspiratorial scheme were foreseeable factors in the State of New York's loss, and a consequence of the scheme.  By virtue of Defendants' actions, the State of New York has suffered significant damages.

562.   There are no bars to recovery under N.Y. STATE FIN. LAW. § 190(9), and, or in the alternative, Relator is an original source as defined in § 188(7). Relator has independent knowledge of the information supporting these allegations and has voluntarily disclosed the information on which his allegations are based prior to bringing this action on behalf of himself and on behalf of the State of New York pursuant to N.Y. STATE FIN. LAW § 190(2).

563.   This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the State of New York.

564.   WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF NEW YORK:

(1)   Three times the amount of actual damages that the State of New York has sustained as a result of the fraudulent and illegal practices of Defendants;

(2)   A civil penalty of not less than $12,000 for each false claim that Defendants presented or caused to be presented to the State of New York; and

(3)   All costs incurred in bringing this action.

To RELATOR:

(1)   The maximum amount allowed pursuant to N.Y. STATE. FIN. LAW § 190(6) and/or any other applicable provision of law;

(2)   Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)   An award of reasonable attorneys' fees and costs; and

(4)   Such further relief as this Court deems equitable and just.

## S.   Count XIX – North Carolina False Claims Act

565.   Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

566.   This is a *qui tam* action brought by Relator and the State of North Carolina to recover treble damages and civil penalties under the North Carolina False Claims Act, N.C. GEN. STAT. § 1-605 *et seq.*

567. N.C. GEN. STAT. § 1-607(a) provides liability for any person who

(1) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

(3) Conspires to commit a violation of subdivision (1), (2), (4), (5), (6), or (7) of this section.

568. From at least January 2010 to the present, Defendants knowingly presented or caused to be presented false and/or fraudulent claims to North Carolina's Medicaid program for reimbursement for services that were not medically necessary, medically reasonable, or were not actually provided. By creating and carrying out this fraudulent scheme, Defendants knowingly and repeatedly violated the North Carolina False Claims Act, N.C. GEN. STAT. § 1-607(a).

569. Defendants knowingly made, used, or caused to be made or used, false records or statements in order to cause false and/or fraudulent claims to be paid or approved by the State of North Carolina. These false statements or records consist of false and/or fraudulent MDS forms, documentation supporting MDS assessments, as well as false and/or fraudulent certifications or representations made or caused to be made by Defendants when seeking to participate in North Carolina Medicaid and when submitting claims. Defendants made or caused to be

made false and/or fraudulent representations regarding whether services were medically necessary, medically reasonable, or actually provided.

570. Defendants conspired with one another to submit false and/or fraudulent claims for reimbursement of services. Defendants understood that the facilities were submitting false and/or fraudulent claims for reimbursement that arose out of services not rendered or false and/or fraudulent representations that patients were qualified for nursing care under North Carolina Medicaid. The practice of providing unnecessary medical services and billing for services that were not provided was common knowledge to Defendants.

571. Given the structure of the health care system at issue, Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the State of North Carolina's payment decision and was material to the State of North Carolina's decision to pay the claims. North Carolina Medicaid only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

572. Given the structure of the health care system at issue, Defendants' false or fraudulent statements or records, or causation of false or fraudulent statements or records, had the potential to influence the State of North Carolina's payment decision and were material to the State of North Carolina's decision to

pay the claims. North Carolina Medicaid only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

573.   Defendants' violations of the applicable statutes, regulations, and program instructions, and subsequent misrepresentations regarding their compliance, were material, because they went to the very essence of the bargain for which North Carolina Medicaid contracted. Had the State of North Carolina known of Defendants' non-compliance, which resulted in the submission of ineligible claims for reimbursement, the State of North Carolina would not have paid the claims.

574.   The State of North Carolina paid the false and/or fraudulent claims.

575.   Defendants' presentment of false and/or fraudulent claims to North Carolina Medicaid, false records and statements, and conspiratorial scheme were foreseeable factors in the State of North Carolina's loss, and a consequence of the scheme.  By virtue of Defendants' actions, the State of North Carolina has suffered significant damages.

576.   There are no bars to recovery under N.C. GEN. STAT. § 1-611, or in the alternative, Relator is an original source as defined therein.   Relator has brought this action on his own behalf and on behalf of the State of North Carolina pursuant to N.C. GEN. STAT. § 1-608(b). Relator has direct and independent

knowledge of the information on which these allegations are based and has voluntarily provided the information to the State before filing an action based on the information.

577.    This Court is requested to accept pendent jurisdiction over this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damages to the State of North Carolina.

578.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF NORTH CAROLINA:

> (1)    Three times the amount of actual damages that the State of North Carolina has sustained as a result of the fraudulent and illegal practices of the Defendants;
>
> (2)    A civil penalty of not less than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of North Carolina; and
>
> (3)    All costs incurred in bringing this action.

To RELATOR:

> (1)    The maximum amount allowed pursuant to N.C. GEN. STAT. § 1-610 and/or any other applicable provision of law;
>
> (2)    Reimbursement for reasonable expenses that Relator incurred in connection with this action;
>
> (3)    An award of reasonable attorneys' fees and costs; and
>
> (4)    Such further relief as this Court deems equitable and just.

**T.      Count XX – Rhode Island State False Claims Act**

579.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

580.    This is a *qui tam* action brought by Relator and the State of Rhode Island to recover treble damages and civil penalties under the Rhode Island State False Claims Act, R.I. GEN. LAWS § 9-1.1-1 *et seq.*

581.    R.I. GEN. LAWS § 9-1.1-3 provides liability for any person who

    (1)    Knowingly presents, or causes to be presented a false or fraudulent
       claim for payment or approval;

    (2)    Knowingly makes, uses, or causes to be made or used, a false record
       or statement material to a false or fraudulent claim;

    (3) Conspires to commit a violation of subdivisions 9-1.1-3(1), (2),
    (3), (4), (5), (6) or (7)

582.    From at least January 2010 to the present, Defendants knowingly presented or caused to be presented false and/or fraudulent claims to Rhode Island's Medicaid program for reimbursement for services that were not medically necessary, medically reasonable, or were not actually provided. By creating and carrying out this fraudulent scheme, Defendants knowingly and repeatedly violated the Rhode Island State False Claims Act, R.I. GEN. LAWS § 9-1.1-3.

583.   Defendants knowingly made, used, or caused to be made or used, false records or statements in order to cause false and/or fraudulent claims to be paid or approved by the State of Rhode Island.  These false statements or records consist of false and/or fraudulent MDS forms, documentation supporting MDS assessments, as well as false and/or fraudulent certifications or representations made or caused to be made by Defendants when seeking to participate in Rhode Island Medicaid and when submitting claims. Defendants made or caused to be made false and/or fraudulent representations regarding whether services were medically necessary, medically reasonable, or actually provided.

584.   Defendants conspired with one another to submit false and/or fraudulent claims for reimbursement of services.  Defendants understood that the facilities were submitting false and/or fraudulent claims for reimbursement that arose out of services not rendered or false and/or fraudulent representations that patients were qualified for nursing care under Rhode Island Medicaid.   The practice of providing unnecessary medical services and billing for services that were not provided was common knowledge to Defendants.

585.   Given the structure of the health care system at issue, Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the State of Rhode Island's payment decision and was material to the State of Rhode Island's decision to pay the claims. Rhode

Island Medicaid only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

586.    Given the structure of the health care system at issue, Defendants' false or fraudulent statements or records, or causation of false or fraudulent statements or records, had the potential to influence the State of Rhode Island's payment decision and were material to the State of Rhode Island's decision to pay the claims. Rhode Island Medicaid only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

587.    Defendants' violations of the applicable statutes, regulations, and program instructions, and subsequent misrepresentations regarding their compliance, were material, because they went to the very essence of the bargain for which Rhode Island Medicaid contracted. Had the State of Rhode Island known of Defendants' non-compliance, which resulted in the submission of ineligible claims for reimbursement, the State of Rhode Island would not have paid the claims.

588.    The State of Rhode Island paid the false and/or fraudulent claims.

589.    Defendants' presentment of false and/or fraudulent claims to Rhode Island Medicaid, false records and statements, and conspiratorial scheme were

foreseeable factors in the State of Rhode Island's loss, and a consequence of the scheme. By virtue of Defendants' actions, the State of Rhode Island has suffered significant damages.

590. There are no bars to recovery under R.I. GEN. LAWS § 9-1.1-4(e), or in the alternative, Relator is an original source as defined therein. Relator has brought this action on his own behalf and on behalf of the State of Rhode Island pursuant to R.I. GEN. LAWS § 9-1.1-4(b). Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the State before filing an action based on the information.

591. This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the State of Rhode Island.

592. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF RHODE ISLAND:

(1) Three times the amount of actual damages that the State of Rhode Island has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2) A civil penalty of not less than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Rhode Island; and

(3)     All costs incurred in bringing this action.

To Relator:

(1)     The maximum amount allowed pursuant to R.I. Gen. Laws § 9-1.1-4(d) and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

**U.     Count XXI – Tennessee Medicaid False Claims Act**

593.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

594.    This is a *qui tam* action brought by Relator and the State of Tennessee to recover treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*

595.    Tenn. Code Ann. § 71-5-182(a)(1) provides liability for any person who-

(A)     Knowingly presents, or causes to be presented, a false and/or fraudulent claim for payment or approval under the Medicaid program;

(B)     Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false and/or fraudulent claim under the Medicaid program;

(C)     Conspires to commit a violation of subsection (A), (B), or (D).

596.   From at least January 2010 to the present, Defendants knowingly presented or caused to be presented false and/or fraudulent claims to Tennessee's Medicaid program, TennCare, for reimbursement for services that were not medically necessary, medically reasonable, or were not actually provided. By creating and carrying out this fraudulent scheme, Defendants knowingly and repeatedly violated the Tennessee Medicaid False Claims Act, TENN. CODE ANN. § 71-5-182(a)(1).

597.   Defendants knowingly made, used, or caused to be made or used, false records or statements in order to cause false and/or fraudulent claims to be paid or approved by the State of Tennessee.  These false statements or records consist of false and/or fraudulent MDS forms, documentation supporting MDS assessments, as well as false and/or fraudulent certifications or representations made or caused to be made by Defendants when seeking to participate in TennCare and when submitting claims. Defendants made or caused to be made false and/or fraudulent representations regarding whether services were medically necessary, medically reasonable, or actually provided.

598.   Defendants conspired with one another to submit false and/or fraudulent claims for reimbursement of services.  Defendants understood that the facilities were submitting false and/or fraudulent claims for reimbursement that arose out of services not rendered or false and/or fraudulent representations that

patients were qualified for nursing care under TennCare.  The practice of providing unnecessary medical services and billing for services that were not provided was common knowledge to Defendants.

599.   Given the structure of the health care system at issue, Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the State of Tennessee's payment decision and was material to the State of Tennessee's decision to pay the claims. TennCare only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

600.   Given the structure of the health care system at issue, Defendants' false or fraudulent statements or records, or causation of false or fraudulent statements or records, had the potential to influence the State of Tennessee's payment decision and were material to the State of Tennessee's decision to pay the claims. TennCare only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

601.   Defendants' violations of the applicable statutes, regulations, and program instructions, and subsequent misrepresentations regarding their compliance, were material, because they went to the very essence of the bargain for which TennCare contracted. Had the State of Tennessee known of Defendants'

non-compliance, which resulted in the submission of ineligible claims for reimbursement, the State of Tennessee would not have paid the claims.

602.   The State of Tennessee paid the false and/or fraudulent claims.

603.   Defendants' presentment of false and/or fraudulent claims to TennCare, false records and statements, and conspiratorial scheme were foreseeable factors in the State of Tennessee's loss, and a consequence of the scheme.  By virtue of Defendants' actions, the State of Tennessee has suffered significant damages.

604.   There are no bars to recovery under TENN. CODE ANN. § 71-5-183(e)(2), or in the alternative, Relator is an original source as defined therein. Relator has brought this action on his own behalf and on behalf of the State of Tennessee pursuant to TENN. CODE ANN. § 71-5-183(b)(1). Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the State before filing an action based on the information.

605.   This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the State of Tennessee.

606.   WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF TENNESSEE:

(1)     Three times the amount of actual damages that the State of Tennessee has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)     A civil penalty of not less than $25,000 for each false claim that Defendants presented or caused to be presented to the State of Tennessee; and

(3)     All costs incurred in bringing this action.

To RELATOR:

(1)     The maximum amount allowed pursuant to TENN. CODE ANN. § 71-5-183(d) and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## V.     Count XXII – Texas Medicaid Fraud Prevention Act

607.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

608.    This is a *qui tam* action brought by Relator and the State of Texas to recover double damages and civil penalties under Texas Human Resources Code § 36.001.

609.    Defendants violated the following provisions of TEX. HUM. RES. CODE ANN. § 36.002, which provides liability for any person who-

(1)   Knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid Program that is not authorized or that is greater than the benefit or payment that is authorized;

**2.**

      \*\*\*

(4)   Knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning . . . (B) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

      \*\*\*

(9)   Conspires to commit a violation of Subdivision (1), (2), (3), (4), (5), (6), (7), (8), (10), (11), (12), or (13);

      \*\*\*

(13)  Knowingly engages in conduct that constitutes a violation under Section 32.039(b).

610.   From at least January 2010 to the present, Defendants knowingly presented or caused to be presented false and/or fraudulent claims to the Texas Medicaid program for reimbursement for services that were not medically necessary, medically reasonable, or were not actually provided. By creating and carrying out this fraudulent scheme, Defendants knowingly and repeatedly violated the Texas Medicaid Fraud Prevention Act, TEX. HUM. RES. CODE ANN. § 36.002.

611.   Defendants knowingly made, used, or caused to be made or used, false records or statements in order to cause false and/or fraudulent claims to be

paid or approved by the State of Texas.  These false statements or records consist of false and/or fraudulent MDS forms, documentation supporting MDS assessments, as well as false and/or fraudulent certifications or representations made or caused to be made by Defendants when seeking to participate in the Texas Medicaid program and when submitting claims. Defendants made or caused to be made false and/or fraudulent representations regarding whether services were medically necessary, medically reasonable, or actually provided.

612.   Defendants conspired with one another to submit false and/or fraudulent claims for reimbursement of services.  Defendants understood that the facilities were submitting false and/or fraudulent claims for reimbursement that arose out of services not rendered or false and/or fraudulent representations that patients were qualified for nursing care under Texas Medicaid.  The practice of providing unnecessary medical services and billing for services that were not provided was common knowledge to Defendants.

613.   Given the structure of the health care system at issue, Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the State of Texas's payment decision and was material to the State of Texas's decision to pay the claims. Texas Medicaid only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

614.   Given the structure of the health care system at issue, Defendants' false or fraudulent statements or records, or causation of false or fraudulent statements or records, had the potential to influence the State of Texas's payment decision and were material to the State of Texas's decision to pay the claims. Texas Medicaid only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

615.   Defendants' violations of the applicable statutes, regulations, and program instructions, and subsequent misrepresentations regarding their compliance, were material, because they went to the very essence of the bargain for which Texas Medicaid contracted. Had the State of Texas known of Defendants' non-compliance, which resulted in the submission of ineligible claims for reimbursement, the State of Texas would not have paid the claims.

616.   The State of Texas paid the false and/or fraudulent claims.

617.   Defendants' presentment of false and/or fraudulent claims to Texas Medicaid, false records and statements, and conspiratorial scheme were foreseeable factors in the State's loss, and a consequence of the scheme.  By virtue of Defendants' actions, the State of Texas has suffered significant damages.

618.   There are no bars to recovery under TEX. HUM. RES. CODE ANN. § 36.113, or in the alternative, Relator is an original source as defined therein.

Relator has brought this action on his own behalf and on behalf of the State of Texas pursuant to TEX. HUM. RES. CODE ANN. § 36.101. Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the State before filing an action based on the information.

619.    This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the State of Texas.

620.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendants:

To the STATE OF TEXAS:

(1)    Two times the amount of actual damages that the State of Texas has sustained as a result of the fraudulent and illegal practices of Defendants;

(2)    A civil penalty of not less than $21,563 for each false claim that Defendants presented or caused to be presented to the State of Texas;

(3)    All costs incurred in bringing this action.

To RELATOR:

(1)     The maximum amount pursuant to TEX. HUM. RES. CODE ANN. §
          36.110, and/or any other applicable provision of law;

(2)      Reimbursement for reasonable expenses that Relator incurred in

      connection with this action;

(3)      An award of reasonable attorneys' fees and costs; and

(4)      Such further relief as this Court deems equitable and just.

## W.   Count XXIII – Virginia Fraud Against Taxpayers Act

621.   Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

622.   This is a *qui tam* action brought by Relator and the Commonwealth of Virginia to recover treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act, VA. CODE ANN. § 8.01-216.1 *et seq.*

623.   VA. CODE ANN. § 8.01-216.3 provides liability for any person who

1.      Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

2.      Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

3.      Conspires to commit a violation of subdivision 1, 2, 4, 5, 6, or 7.

624.   From at least January 2010 to the present, Defendants knowingly presented or caused to be presented false and/or fraudulent claims to the Commonwealth's Medicaid program for reimbursement for services that were not medically necessary, medically reasonable, or were not actually provided. By

creating and carrying out this fraudulent scheme, Defendants knowingly and repeatedly violated the Virginia Fraud Against Taxpayers Act, VA. CODE ANN. § 8.01-216.3.

625.  Defendants knowingly made, used, or caused to be made or used, false records or statements in order to cause false and/or fraudulent claims to be paid or approved by the Commonwealth of Virginia.  These false statements or records consist of false and/or fraudulent MDS forms, documentation supporting MDS assessments, as well as false and/or fraudulent certifications or representations made or caused to be made by Defendants when seeking to participate in Virginia Medicaid and when submitting claims. Defendants made or caused to be made false and/or fraudulent representations regarding whether services were medically necessary, medically reasonable, or actually provided.

626.  Defendants conspired with one another to submit false and/or fraudulent claims for reimbursement of services.  Defendants understood that the facilities were submitting false and/or fraudulent claims for reimbursement that arose out of services not rendered or false and/or fraudulent representations that patients were qualified for nursing care under Virginia Medicaid.  The practice of providing unnecessary medical services and billing for services that were not provided was common knowledge to Defendants.

627.   Given the structure of the health care system at issue, Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the Commonwealth's payment decision and was material to the Commonwealth's decision to pay the claims. Virginia Medicaid only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

628.   Given the structure of the health care system at issue, Defendants' false or fraudulent statements or records, or causation of false or fraudulent statements or records, had the potential to influence the Commonwealth's payment decision and were material to the Commonwealth's decision to pay the claims. Virginia Medicaid only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

629.   Defendants' violations of the applicable statutes, regulations, and program instructions, and subsequent misrepresentations regarding their compliance, were material, because they went to the very essence of the bargain for which Virginia Medicaid contracted. Had the Commonwealth known of Defendants' non-compliance, which resulted in the submission of ineligible claims for reimbursement, the Commonwealth would not have paid the claims.

630.   The Commonwealth of Virginia paid the false and/or fraudulent claims.

631.   Defendants' presentment of false and/or fraudulent claims to Virginia Medicaid, false records and statements, and conspiratorial scheme were foreseeable factors in the Commonwealth's loss, and a consequence of the scheme. By virtue of Defendants' actions, the Commonwealth of Virginia has suffered significant damages.

632.   There are no bars to recovery under VA. CODE ANN. § 8.01-216.8, or in the alternative, Relator is an original source as defined therein.  Relator has brought this action on his own behalf and on behalf of the Commonwealth of Virginia pursuant to VA. CODE ANN. § 8.01-216.5. Relator has direct and independent knowledge of the information on which these allegations are based and has voluntarily provided the information to the State before filing an action based on the information.

633.   This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the Commonwealth of Virginia.

634.   WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the COMMONWEALTH OF VIRGINIA:

(1)     Three times the amount of actual damages that the Commonwealth of Virginia has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)     A civil penalty of not less than $11,000 for each false claim that the Defendants presented or caused to be presented to the Commonwealth of Virginia; and

(3)     All costs incurred in bringing this action.

To RELATOR:

(1)     The maximum amount allowed pursuant to VA. CODE ANN. § 8.01-216.7 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## X.     Count XXIV – Washington State Medicaid Fraud False Claims Act

635.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

636.    This is a *qui tam* action brought by Relator and the State of Washington to recover treble damages and civil penalties under the Washington State Medicaid Fraud False Claims Act, WASH. REV. CODE § 74.66.005 *et seq.*

637.    WASH. REV. CODE § 74.66.020(1) provides liability for any person who-

a.     Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

218

b.    Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

c.    Conspires to commit one or more of the violations in this subsection (1).

638.  From at least January 2010 to the present, Defendants knowingly presented or caused to be presented false and/or fraudulent claims to Washington's Medicaid program for reimbursement for services that were not medically necessary, medically reasonable, or were not actually provided. By creating and carrying out this fraudulent scheme, Defendants knowingly and repeatedly violated the Washington State Medicaid Fraud False Claims Act, WASH. REV. CODE § 74.66.020(1).

639.  Defendants knowingly made, used, or caused to be made or used, false records or statements in order to cause false and/or fraudulent claims to be paid or approved by the State of Washington.  These false statements or records consist of false and/or fraudulent MDS forms, documentation supporting MDS assessments, as well as false and/or fraudulent certifications or representations made or caused to be made by Defendants when seeking to participate in Washington Medicaid and when submitting claims. Defendants made or caused to be made false and/or fraudulent representations regarding whether services were medically necessary, medically reasonable, or actually provided.

640.   Defendants conspired with one another to submit false and/or fraudulent claims for reimbursement of services.  Defendants understood that the facilities were submitting false and/or fraudulent claims for reimbursement that arose out of services not rendered or false and/or fraudulent representations that patients were qualified for nursing care under Washington Medicaid.  The practice of providing unnecessary medical services and billing for services that were not provided was common knowledge to Defendants.

641.   Given the structure of the health care system at issue, Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the State of Washington's payment decision and was material to the State of Washington's decision to pay the claims. Washington Medicaid only pays for services that are medically necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

642.   Given the structure of the health care system at issue, Defendants' false or fraudulent statements or records, or causation of false or fraudulent statements or records, had the potential to influence the State of Washington's payment decision and were material to the State of Washington's decision to pay the claims. Washington Medicaid only pays for services that are medically

necessary, actually provided, and are provided in conformity with applicable statutes, regulations, and program instructions.

643.   Defendants' violations of the applicable statutes, regulations, and program instructions, and subsequent misrepresentations regarding their compliance, were material, because they went to the very essence of the bargain for which Washington Medicaid contracted. Had the State of Washington known of Defendants' non-compliance, which resulted in the submission of ineligible claims for reimbursement, the State of Washington would not have paid the claims.

644.   The State of Washington paid the false and/or fraudulent claims.

645.   Defendants' presentment of false and/or fraudulent claims to Washington Medicaid, false records and statements, and conspiratorial scheme were foreseeable factors in the State of Washington's loss, and a consequence of the scheme.   By virtue of Defendants' actions, the State of Washington has suffered significant damages.

646.   There are no bars to recovery under WASH. REV. CODE § 74.66.080, or in the alternative, Relator is an original source as defined therein.  Relator has brought this action on his own behalf and on behalf of the State of Washington pursuant to WASH. REV. CODE § 74.66.050. Relator has direct and independent knowledge of the information on which these allegations are based and has

voluntarily provided the information to the State before filing an action based on the information.

647.    This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the same facts as the federal claim; Relator merely asserts separate damage to the State of Washington.

648.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF WASHINGTON:

(1)    Three times the amount of actual damages that the State of Washington has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2)    A civil penalty of not less than $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Washington; and

(3)    All costs incurred in bringing this action.


To RELATOR:

(1)    The maximum amount allowed pursuant to WASH. REV. CODE § 74.66.070 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## Y.  Count XXV – Common Fund Relief

649.  Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

650.  While the states possessing *qui tam* statutes have a regulatory scheme for rewarding Relator for coming forward, those that have none will potentially receive a windfall with little or no investigation or commitment of time or resources to the recovery.  The common-fund doctrine preserves the right of the litigant or counsel to an award from the common fund generated.  The United States Supreme Court and many other courts have addressed this remedy.  *Boeing Company v. Van Gemert*, 444 U.S. 472, 478 (1980):

> Since the decisions in *Trustees v. Greenough*, 105 U.S. 527, 26 L.Ed. 1157 (1882), and *Central Railroad & Banking Co. v. Pettuss*, 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885), this Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole. [citations omitted].  The common-fund doctrine reflects the traditional practice in courts of equity, *Trustees v. Greenough*, supra 105 U.S., at 532-537, and it stands as a well-recognized exception to the general principle that requires every litigant to bear his own attorney's fees [citations omitted].  The doctrine rests upon the perception that persons who obtain the benefit of the lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense [citation omitted].  Jurisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionally among those benefitted by this suit. [citations omitted].

651.   Other courts have also recognized the common fund doctrine for situations such as those that may arise in this case.  *See e.g., In re Smithkline Beckman Corp. Securities Litig.*, 751 F. Supp. 525, 531 (E.D. Pa. 1990) (citing *Boeing* in support of decision to award common fund relief); *see also* "The Common Fund Doctrine: Coming of Age in the Law of Insurance Subrogation," 31 Ind. L. Rev. 313, 337–38 (1998).  Relator respectfully requests this Court to award him a percentage share from the common fund generated by his actions.

## XII.  DEMAND FOR JURY TRIAL

652.   Pursuant to Federal Rule of Civil Procedure 38, Relator demands a trial by jury.

## XIII.  DOCUMENTARY EVIDENCE

653.   The documentary evidence referenced herein consists of the following:

| EXHIBIT NO. | DESCRIPTION | BATES NUMBERS |
|---|---|---|
| 1 | Centers for Medicare & Medicaid Services, Medicare Coverage of Skilled Nursing Facilities | LAF000001-LAF000056 |
| 2 | January 13, 2015 e-mail from Jody Seal | LAF000057-LAF000057 |
| 3 | February 25, 2015 e-mail from Jody Seal | LAF000058-LAF000058 |
| 4 | November 4, 2015 e-mail from Alan Beck | LAF000059-LAF000059 |
| 5 | June 18, 2015 e-mail from Jody Seal | LAF000060-LAF000060 |
| 6 | October 20, 2015 e-mail from Raj Tiwari | LAF000061- |

| | | LAF000061 |
|---|---|---|
| 7 | E-mail from Kevin Kuznia regarding Part B CPT codes | LAF000062-LAF00062 |
| 8 | E-mail from Raj Tiwari regarding Part B patient | LAF000063-LAF000063 |
| 9 | Spreadsheet with 2013 CMS data regarding RUG billing | LAF000087-LAF000137 |
| 10 | Therapy projections for Patient One with bolded entries showing minutes recorded as provided and discharge summary | LAF000064-LAF000065 |
| 11 | Progress notes for Patient One | LAF000066-LAF000066 |
| 12 | August 13, 2016 treatment encounter note from PTA Angela Daoud regarding Patient Two | LAF000067-LAF000067 |
| 13 | Therapy projections for Patient Two with bolded entries showing minutes recorded as provided | LAF000068-LAF000068 |
| 14 | August 16 - 17, 2016 treatment encounter notes from PTA Angela Daoud regarding Patient Two | LAF000069-LAF000069 |
| 15 | August 16, 2016 treatment encounter note from COTAL Jennifer Canchola regarding Patient Two | LAF000070-LAF000070 |
| 16 | Progress notes for Patient Two | LAF000071-LAF000072 |
| 17 | Progress notes for Patient Three | LAF000073-LAF000076 |
| 18 | Therapy projections for Patient Three with bolded entries showing minutes recorded as provided | LAF000077-LAF000077 |
| 19 | June 13, 2016 treatment encounter note from PT Liza Ann M. Dela Paz regarding Patient Three | LAF000078-LAF000078 |
| 20 | June 13, 2016 treatment encounter note from COTAL Samantha Vermillion regarding Patient Three | LAF000079-LAF000079 |
| 21 | Progress notes for Patient Four | LAF000080-LAF000080 |

| 22 | Therapy projections for Patient Four with bolded entries showing minutes recorded as provided | LAF000081-LAF000081 |
|---|---|---|
| 23 | Progress notes for Patient Five | LAF000082-LAF000082 |
| 24 | Therapy projections for Patient Five with bolded entries showing minutes recorded as provided | LAF000083-LAF000083 |
| 25 | August 24, 2016 consultation report from physical therapist Jan Pietrasik regarding Patient Six | LAF000084-LAF000084 |
| 26 | Therapy projections for Patient Six with bolded entries showing minutes recorded as provided | LAF000085-LAF000086 |

Respectfully submitted,

David M. Blanchard (P67190)
**BLANCHARD & WALKER, PLLC**
Local Counsel for Relator Adam LaFerriere
221 N. Main Street, Ste. 300
Ann Arbor, MI 48104

Joel M. Androphy
TX State Bar No. 01254700
Janis G. Gorton
TX State Bar No. 24071063
**BERG & ANDROPHY**
3704 Travis Street
Houston, Texas 77002
Telephone (713) 529-5622
Facsimile (713) 529-3785

Dated: January 27, 2017

## CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2016, a true and correct copy of this Original Complaint and exhibits referenced herein were delivered to the United States Attorney's Office for the Western District of Michigan, the Department of Justice in Washington, D.C., and the Attorneys General of the Qui Tam States via electronic mail and via the United States Mail, certified, return receipt requested.

David M. Blanchard